Wesley D. Hutchins, #6576
**THE HUTCHINS LAW FIRM, P.C.**
6751 South Adventure Way
West Jordan, Utah 84081
Telephone: (801) 969-0104
Fax: (801) 618-4251
E-Mail: wes@thehutchinslawfirm.com
***Attorney for Plaintiffs "Biological Fathers" and "Minor Children"***

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENITO MANZANARES; CHRISTOPHER DAVID THOMAS CARLTON; JAKE M. STRICKLAND; JACOB D. BROOKS; FRANK L. MARTIN; SAMUEL G. DYE; BOBBY L. NEVARES; WILLIAM E. BOLDEN; JOHN M. WYATT, III; CODY M. O'DEA; SCOTTIE WALLACE; NIKOLAUS L. THURNWALD; TERRY J. ACHANE; JOHNATHON C. CRAWFORD-HARRIS; CODY FOWLER; AUSTIN B. KNUDSON; DALLIN CURRY; C. CLINT WORSLEY; TRAVIS J. ANDERSON; RANDY COLE; MASON MEENDERINK; GERALD LAWSON, JR.; and GARRETT CONDOS; ET AL (identified below); personally and individually, and for and on behalf of their Minor Children;[1] | **FIRST AMENDED COMPLAINT** **(Jury Demanded)** Civil No.: 2:14-CV-00040-EJF Judge: |
| Plaintiffs, vs. | |
| ATTORNEY GENERAL SEAN D. REYES, ATTORNEY GENERAL OF THE STATE OF UTAH; MARK L. SHURTLEFF; and JOHN E. SWALLOW, in both their personal/individual and official capacities;  and JOHN DOES I TO XX; | |
| Defendants. | |

---

[1]The named Plaintiffs are representatives of a much larger class of individuals and children (estimated to be at least three hundred if not many more) whose constitutional rights to due process and other fundamental civil rights have been violated by the Defendants herein. Plaintiffs anticipate bringing a motion to certify this matter as a class action suit pursuant to Rule 23, of the Federal Rules of Federal Civil procedure.

The above-captioned Plaintiffs, for and on behalf of themselves personally and individually, as well as for and on behalf of their Minor Children, hereby COMPLAIN, ALLEGE, AND AVER against the Defendants, as follows:

## TABLE OF CONTENTS

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VENUE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF THE CASE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**FACTS RELATING TO EACH OF THE BIOLOGICAL FATHERS**. . . . . . . . . . . . . 13

**Background Facts Relating to Manzanares and K.M.**   . . . . . . . . . . . . . . . . . 13
**Background Facts Relating to Carlton and A.M.**  . . . . . . . . . . . . . . . . . . . 17
**Background Facts Relating to Strickland and J.S.** . . . . . . . . . . . . . . . . . . . 21
**Background Facts Relating to Brooks and J.M.S.**. . . . . . . . . . . . . . . . . . . . 26
**Background Facts Relating to Martin and L.M.** . . . . . . . . . . . . . . . . . . . 31
**Background Facts Relating to Dye and S.D.** . . . . . . . . . . . . . . . . . . . . . 32
**Background Facts Relating to Nevares and B.N.** . . . . . . . . . . . . . . . . . . . 34
**Background Facts Relating to Bolden and J.S.** . . . . . . . . . . . . . . . . . . . . 35
**Background Facts Relating to Wyatt and E.W.** . . . . . . . . . . . . . . . . . . . . 36
**Background Facts Relating to O'Dea and E.G.** . . . . . . . . . . . . . . . . . . . . 38
**Background Facts Relating to Wallace and T.B.** . . . . . . . . . . . . . . . . . . . 41
**Background Facts Relating to Thurwald and T.T.**   . . . . . . . . . . . . . . . . . 43
**Background Facts Relating to Achane and A.T.** . . . . . . . . . . . . . . . . . . . . 46
**Background Facts Relating to Crawford and J.C.** . . . . . . . . . . . . . . . . . . . 51
**Background Facts Relating to Fowler and E.F.** . . . . . . . . . . . . . . . . . . . . 53
**Background Facts Relating to Knudson and O.K.**   . . . . . . . . . . . . . . . . . 54
**Background Facts Relating to Curry and A.C.** . . . . . . . . . . . . . . . . . . . . 56
**Background Facts Relating to Worsley and G.W.** . . . . . . . . . . . . . . . . . . . 59
**Background Facts Relating to Anderson and A.A.**   . . . . . . . . . . . . . . . . . 61

**Background Facts Relating to Cole and C.C.** . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**Background Facts Relating to Meenderink and M.M.** . . . . . . . . . . . . . . . . . . . . 63

**Background Facts Relating to Lawson and K.L.** . . . . . . . . . . . . . . . . . . . . . . . . 64

**Background Facts Relating to Condos and C.C.** . . . . . . . . . . . . . . . . . . . . . . . 65

**FACTS RELATING TO THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF UTAH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**FACTS RELATING TO THE CONDUCT (OR FAILURE TO ACT)
OF THE UAG** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**FACTS RELATING TO DEFENDANTS' OFFICIAL AND
PERSONAL CAPACITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**EVIDENCE RELATING TO THE FRAUDULENT AND UNCONSTITUTIONAL
CONDUCT OF UTAH ADOPTION AGENCIES** . . . . . . . . . . . . . . . . . . . . . . . . . 75

**March 25, 2011 Interview of ACC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**March 10, 2012 Interview of ACC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**Interviews With Other Utah Adoption Agencies** . . . . . . . . . . . . . . . . . . . . . 83

**Questionable, Unethical, and/or Other Illegal Conduct by Agencies** . . . . . . . . . 88

**I. FIRST CAUSE OF ACTION: CIVIL RIGHTS VIOLATIONS** . . . . . . . . . . . . . . . 90

**II. SECOND CAUSE OF ACTION** (Declaratory Relief) . . . . . . . . . . . . . . . . . . . . . . 91

**III. THIRD CAUSE OF ACTION** (Reservation to Amend) . . . . . . . . . . . . . . . . . . . . 93

**JURY DEMAND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

## PARTIES

1.      Robert Benito Manzanares ("Manzanares"), is/was at all relevant times hereto

either a resident of Colorado or New Mexico, and is the biological father of his minor daughter.

2.      K.M. is the Minor Child of Manzanares, a daughter born February 17, 2008 in

Utah, residing in both Utah and New Mexico.

3.      Christopher David Thomas Carlton ("Carlton"), is/was at all relevant times hereto a resident of Pennsylvania, and is the biological father of his minor daughter.

4.      A.M. is the Minor Child of Carlton, a daughter born June 24, 2010 in Utah, residing on information and belief in Utah.

5.      Jake M. Strickland ("Strickland"), is/was at all relevant times hereto either a resident of Utah and more recently Arizona, and is the biological father of his minor son.

6.      J.S. is the Minor Child of Strickland, a son born December 29, 2010 in Utah, residing on information and belief in Utah.

7.      Jacob D. Brooks ("Brooks"), is/was at all relevant times hereto a resident of Pennsylvania, and is the biological father of his minor son.

8.      J.M.S. is the Minor Child of Brooks, a son born on or about January 10, 2012, in Utah, residing on information and belief in Tennessee

9.      Frank L. Martin ("Martin") is a resident of the state of Ohio, and is the biological father of his minor daughter.

10.      L.M. is the Minor Child of Martin, born November 14, 2012 in the State of Ohio.

11.      Samuel G. Dye ("Dye") is a resident of the state of Texas, and is the biological father of his minor son.

12.      S.D. is the Minor Child of Dye, born November 25, 2011 in the State of Texas.

13.      Bobby L. Nevares ("Nevares") is a resident of the State of Colorado, and is the biological father of his minor son.

14.    B.N. is the Minor Child of Nevares, born in the State of Utah on September 29, 2010.

15.    William E. Bolden ("Bolden") is a resident of the State of Utah, and is the biological father of his minor son.

16.    J.S. is the Minor Child of Bolden, born in State of Utah, on March 26, 2011.

17.    John M. Wyatt, III ("Wyatt") is a resident of the State of Virginia, and is the biological father of his minor daughter.

18.    E.W. is the Minor Child of Wyatt, born in Virginia on February 10, 2009, and transported to Utah within days of her birth.

19.    Cody M. O'Dea ("O'Dea") is a resident of the State of Idaho, but at prior relevant times was a resident of the State of Wyoming, and is the biological father of his minor daughter.

20.    E.G. is the Minor Child of O'Dea, born in Utah on June 15, 2006, only 2-3 days after E.G.'s birth mother came to Utah.

21.    Scottie Wallace ("Wallace") is a resident of the State of Utah, and is biological father of his minor son.

22.    T.B. is the Minor Child of Wallace, born in Utah on May 28, 2011.

23.    Nikolaus L. Thurnwald ("Thurnwald") is a resident of the State of Utah, and is biological father of his minor son.

24.    T.T. is the Minor Child of Thurnwald, born in Utah on September 4, 2004.

25.    Terry J. Achane ("Achane") is a resident of the State of South Carolina, and is the biological father of his minor son.

5

26.     A.B. is the Minor Child of Achane, born March 1, 2011.

27.     Johnathon C. Crawford-Harris ("Crawford") is a resident of the State of Tennessee, and is the biological father of his minor daughter.

28.     C.D. is the Minor Child of Crawford, born in Utah on April 12, 2013.

29.     Cody Fowler ("Fowler") is a resident of the State of Utah, and is the biological father of his minor child.

30.     E.F. is the Minor Child of Fowler, born in Utah, but the birth date is not known at this time.

31.     Austin B. Knudson ("Knudson") is a resident of the State of North Dakota, and is the biological father of his minor daughter.

32.     O.K. is the Minor Child of Knudson born in Utah on September 19, 2010.

33.     Dallin Curry ("Curry") is a resident of the State of Utah, and is the biological father of his minor daughter.

34.     A.C. is the Minor Child of Curry, born in Utah on an unknown date.

35.     C. Clint Worsley ("Worsley") is a resident of the State of Utah, and is the biological father of his minor daughter.

36.     C.W. is the Minor Child of Worsley, born in Utah on April 30, 2008.

37.     Travis J. Anderson ("Anderson") is a resident of the State of Utah, and is the biological father of his minor son.

38.     A.A. is the Minor Child of Anderson, born in Utah on or about June 7, 2002.

39.     Randy Cole ("Cole") is not a resident of the State of Utah, and is the biological

6

father of his minor son.

40. C.C. is the Minor Child of Cole, born in Utah on April 20, 2011.

41. Mason Meenderink ("Meenderink") is a resident of the State of Utah, and is the biological father of his minor son.

42. M.M. is the Minor Child of Meenderink, born in Utah in late June 2013.

43. Gerald Lawson, Jr. ("Lawson") is a resident of the State of Oregon, and is the biological father of his minor son.

44. K.L. is the Minor Child of Lawson, born in Utah on August 19, 2011.

45. Garrett Condos ("Condos") is a resident of the State of Wyoming, and is the biological father of his minor son.

46. C.C. is the Minor Child of Condos, born in Utah on October 30, 2013.

47. The "ET AL." Plaintiffs listed above are the following individuals:

    a. Alec Fain ("Fain");

    b. Kevin Washington ("Washington");

    c. Thomas T. Shaw III ("Shaw");

    d. Antaeus D. Amey ("Amey);

    e. Josh Lamano ("Lamano");

    f. George Alliss ("Alliss");

    g. Farrell Jenkins ("Jenkins");

    h. Travis Jayan ("Jayan");

    i. Taulagia Seuvaai ("Seuvaai"); and

j.      Others as may be identified through discovery and/or through the potential

certification of this matter as a class.  (All birth father plaintiffs identified above shall be referred

to hereinafter jointly and severally as "Biological Fathers."  All of the minor children of the

Biological Fathers identified above shall be referred to hereinafter jointly and severally as "Minor

Children").

48.     Sean D. Reyes ("AG Reyes")(as set forth in the Second Cause of Action) has been

the Attorney General of the State of Utah from approximately December 2013 to present, and

therefore the appropriate party brought as a party-defendant in this matter for the purposes of

obtaining prospective relief.

49.     Mark L. Shurtleff ("Shurtleff") was the Attorney General for the State of Utah

from January 2001 to January 2013.

50.     John E. Swallow ("Swallow") was the Attorney General for the State of Utah from

January 2013 to December 2013, prior to which Swallow was Shurtleff's Chief Deputy of civil

matters.

51.     John Doe Defendants are individuals and/or entities whose identities are presently

not known, but may become known through the course of discovery.  Plaintiffs reserve the right

to amend this pleading to add all such additional individuals and/or entities.

## JURISDICTION

52.     This Court has jurisdiction under federal question jurisdiction,  18 U.S.C. § 1981

et. seq. (civil action for deprivation of rights); and/or 18 U.S.C. § 1988 (proceedings in

vindication of civil rights; attorney's fees and costs); the Court also has jurisdiction over this

matter pursuant to 28 U.S.C. § 1367 arising out of Utah state law.

## VENUE

53.     Venue is proper in this Court based upon the statutory provisions cited in the

preceding paragraph, and further based upon 28 U.S.C. § 1391(b) and upon 18 U.S.C. § 1965(b).

## SUMMARY OF THE CASE

54.     In spite of promises by Shurtleff, later endorsed by Swallow, even though they

had received numerous written notifications of gross adoption infirmities in Utah, they have done

nothing for more than a decade to correct the fraud and deception that has consequently led to the

unlawful and unconstitutional removal of children from their biological families, essentially

resulting in their kidnapping[2] and highly unethical and disruptive placement into adoptive homes

without the knowledge or consent of their biological fathers.  The putative father requirements

set forth in Utah's Adoption Act (including in Utah Code Ann. § 78B-6-121 and -122) though

perhaps intended to assist with more final and stable adoptive placements in Utah, have now

been employed in practice, to create a confusing labrynth of virtually incomprehensible legal

mandates and nearly impossible deadlines with which Biological Fathers and others are unable to

comply, in direct contravention of their due process, equal protection, self-incrimination, Utah

open courts provision, and other constitutional rights.[3]  Biological mothers, Utah adoption

---

[2]"Kidnapping" is admittedly an emotionally charged word, describing perhaps one of the most atrocious abuses that can be wrought upon a child.  Kidnapping, is nevertheless, by its most basic definition, the stealing of a child by another person to whom that child does not belong.

[3]The putative father requirements under the Utah Adoption Act include:
(3) Except as provided in Subsections (6) and 78B-6-122(1), and subject to Subsection (5), with regard to a child who is six months of age or less at the time the child is placed with prospective

agencies, and Utah adoption attorneys have consistently exploited Utah laws in a manner they were never intended.

     55.     The majority if not all of the illegal adoptions accomplished in Utah are ostensibly

---

adoptive parents, consent of an unmarried biological father is not required unless, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, the unmarried biological father:

     (a) initiates proceedings in a district court of Utah to establish paternity under Title 78B, Chapter 15, Utah Uniform Parentage Act;
     (b) files with the court that is presiding over the paternity proceeding a sworn affidavit:
          (I) stating that he is fully able and willing to have full custody of the child;
          (ii) setting forth his plans for care of the child; and
          (iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;
     (c) consistent with Subsection (4), files notice of the commencement of paternity proceedings, described in Subsection (3)(a), with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and
     (d) offered to pay and paid, during the pregnancy and after the child's birth, a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability, unless:
          (i) he did not have actual knowledge of the pregnancy;
          (ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or
          (iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses described in this Subsection (3)(d).

Utah Code Ann. § 78B-6-121 (hereinafter referred to at times as "putative father requirements").

The unmarried biological father must "fully and strictly" comply with the putative father requirements "before he later of: (I) 20 days after the day that the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that a qualifying circumstance existed; or (II) the time that the mother executed a consent to adoption or relinquishment of the child for adoption."

Utah Code Ann. § 78B-6-122 (1)(c)(ii)(B).

given a stamp of judicial approval through an adoption process that has effectively legalized

fraud and kidnapping.  Under Utah Code Ann. § 78B-6-106, an adoption may be accomplished

through fraud, misdirection, misrepresentations, and lies, however, fraud expressly may not be a

basis to undo an otherwise fraudulent adoption.  This statute, and the incentive that it creates for

some to engage in fraud in adoption scenarios is referred to hereinafter as "Fraud Immunity."

The "Fraud Immunity" statute, does provide for civil liability for money damages, but a father

may never obtain custody of his biological offspring – the practical equivalent of a death

sentence to the father-child relationship.

   56. The Utah Legislature, however, expressly entered findings in the Utah Adoption

Act, specifically recognizing "that the rights and interests of ___*all parties*___ affected by an adoption

proceeding must be considered and balanced in determining what constitutional protections and

processes are necessary and appropriate."  Utah Code. Ann. §78B-6-102(3) (emphasis).  This

statutory provision has been ignored and overlooked in applying a mutated interpretation of the

Utah Adoption Act to a variety of adoption scenarios, including but not limited to those

involving Biological Fathers in this case.

   57. Since its amending in approximately 2008 (and even earlier), the Fraud Immunity

Statute and other portions of the Utah Adoption Act (Utah Code Ann. § 78B-6-101, et. seq.) have

been used to unlawfully and unconstitutionally strip unmarried Biological Fathers of their right to

parent their Minor Children.

   58. As a result, the Minor Children have also been unlawfully and unconstitutionally

denied of their right to know and maintain a child-parent relationship with their Biological

Fathers.[4]

59.     As set forth above, Utah's Fraud Immunity Statute essentially legalizes and incentivizes biological mothers (and in many cases, lawyers and adoption agency representatives working with them) to commit fraud against Biological Fathers.

60.     The unmarried biological mothers, and others working with them, committed a variety of fraudulent acts against Biological Fathers in this case.  Surprisingly to virtually everyone, the Utah Adoption Act callously and ostensibly proclaims fraudulent adoptions to be immune from judicial challenge.  See Utah Code Ann. Section 78B-6-106.

61.     Other portions of the Utah Adoption Act and Utah laws encourage non-Utah-resident biological mothers to forum shop the state of Utah, where laws are comparatively unfriendly to (if not utterly dismissive of) Biological Fathers.  Biological mothers are therefore encouraged to secretly flee their home state and come to Utah for a very short period of time to give birth to their Minor Children, place them for adoption without any meaningful notice to or knowledge of the Biological Fathers, and then return to their home state, seemingly unaccountable for their immoral, unethical, and fraudulent conduct.

62.     Utah adoption laws, in far too many cases, countenance and support such reprehensible actions by biological mothers and all those who profit financially from deceptive

---

[4]Much is spoken of the "best interest" of a child, but a true analysis of their fundamental constitutional rights and true best interests requires one to consider what the Minor Children have lost out on by ***not*** being raised by their own flesh and blood, Biological Fathers and extended families who not only share genetics, but who share culture, traditions, and genealogy that bind them together beyond the mirage of a manufactured placement with a adoptive "family" members who are by definition legal strangers to the Minor Children.

practices.

63.     Utah laws which permit such unlawful conduct, and which have wrongfully been permitted to remain unchanged through the Utah Attorney General's affirmative actions and through gross inaction, have violated the fundamental civil rights of the Biological Fathers and their Minor Children.

64.     This lawsuit is principally intended to accomplish two things: (1) provide compensatory relief for the Biological Fathers and the Minor Children for the violation of their due process and other civil rights which were essentially snuffed out by Utah's unethical, illegal, and constitutionally bankrupt adoption laws, as well as compensatory relief for the Minor Children whose constitutional rights to be raised by their Biological Fathers have also been violated; and (2) provide prospective equitable relief to other Biological Fathers, and others, through declaratory relief that the Utah Adoption Act is in fact unconstitutional as it was applied to Biological Fathers in this case, and as it will most likely be prospectively applied to biological fathers in the future if the Utah Adoption Act is allowed to remain unchecked.

## FACTS RELATING TO EACH OF THE BIOLOGICAL FATHERS

### Background Facts Relating to Manzanares and K.M.

65.     Manzanares and his girlfriend Carie Morelock ("Morelock") carried on an intimate relationship with one another in Denver County, State of Colorado, resulting in the conception of the Minor Child, K.M., at issue in this case, who is also one of the Plaintiffs in this matter.

66.     Manzanares engaged in regular communication with Morelock regarding her

welfare, and the welfare of the K.M., who was yet to be born.

68. 67. Manzanares provided financial support to Morelock during the pregnancy and after the birth of their daughter, the K.M.  Furthermore, even though Manzanares offered additional assistance, Morelock did not request or accept any additional assistance.

68. Morelock attempted to pressure Manzanares into consenting to the placement of the K.M. for adoption, including Morelock having a Colorado LDS Family Services adoption agency contact Manzanares in November 2007 requesting that he sign papers permitting the adoption of K.M. to go forward.

69. Manzanares' attorney in Colorado responded to the adoption agency, and communicated that Manzanares would not consent to the adoption of his daughter K.M.

70. Manzanares filed a paternity action in Colorado, and in response to that action Morelock admitted that Manzanares is the biological father of K.M.

71. On January 11, 2008, Morelock e-mailed Manzanares, and stated in pertinent part as follows:

> I will be flying to Utah to visit my father in Feb for a week (maybe a little longer, it depends on how he/things are).  Then it will be back to work to finish up the club's construction before I take time off at the end of March. . . in April I will be willing to sit down and talk with you about your reconsideration to consent for adoption otherwise this will be a long process and it will benefit no one, especially this baby.

(Hereinafter "January Email").[5]

---

[5]The debate in the Utah state courts in the Manzanares case revolved around the existence of a "qualifying circumstance" that would have triggered Manzanares having the statutory mandate to come to Utah and comply with Utah's putative father requirements as set forth above. This section of the Utah Adoption Act states as follows:

_____

78B-6-122.   Qualifying circumstance.

(1) (a) For purposes of this section, "qualifying circumstance" means that, at any point during the time period beginning at the conception of the child and ending at the time the mother executed a consent to adoption or relinquishment of the child for adoption:

(I) the child or the child's mother resided on a permanent basis, or a temporary basis of no less than 30 consecutive days, in the state;

(ii) the mother intended to give birth to the child in the state;

(iii) the child was born in the state; or

(iv) the mother intended to execute a consent to adoption or relinquishment of the child for adoption:

(A) in the state; or

(B) under the laws of the state.

(b) For purposes of Subsection (1)(c)(i)© only, when determining whether an unmarried biological father has demonstrated a full commitment to his parental responsibilities, a court shall consider the totality of the circumstances, including, if applicable:

(i) efforts he has taken to discover the location of the child or the child's mother;

(ii) whether he has expressed or demonstrated an interest in taking responsibility for the child;

(iii) whether, and to what extent, he has developed, or attempted to develop, a relationship with the child;

(iv) whether he offered to provide and, if the offer was accepted, did provide, financial support for the child or the child's mother;

(v) whether, and to what extent, he has communicated, or attempted to communicate, with the child or the child's mother;

(vi) whether he has filed legal proceedings to establish his paternity of, and take responsibility for, the child;

(vii) whether he has filed a notice with a public official or agency relating to:

(A) his paternity of the child; or

(B) legal proceedings to establish his paternity of the child; or

(viii) other evidence that demonstrates that he has demonstrated a full commitment to his parental responsibilities.

(c) Notwithstanding the provisions of Section 78B-6-121, the consent of an unmarried biological father is required with respect to an adoptee who is under the age of 18 if:

(i) (A) the unmarried biological father did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed;

(B) before the mother executed a consent to adoption or relinquishment of the child for adoption, the unmarried biological father fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with

72.     Morelock never told Manzanares that she was coming to Utah with the actual intent to give birth to K.M., and to place her for adoption, without Manzanares' knowledge and/or consent.  In fact, Morelock viewed Manzanares as nothing more than a "chromosome donor."

73.     In or about November 2007, Morelock retained and/or consulted with Utah legal counsel, and maintained an attorney-client and/or other consulting relationship him/them through issuance of the Supreme Court decision on January 27, 2012, remand proceedings conducted thereafter, and on information and belief up to the present time pertaining to custody proceedings

---

the adoption of the child, imposed by:
    (I) the last state where the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that the mother resided in before the mother executed the consent to adoption or relinquishment of the child for adoption; or
    (II) the state where the child was conceived; and
    (C) the unmarried biological father has demonstrated, based on the totality of the circumstances, a full commitment to his parental responsibilities, as described in Subsection (1)(b); or
    (ii) (A) the unmarried biological father knew, or through the exercise of reasonable diligence should have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed; and
    (B) the unmarried biological father complied with the requirements of Section 78B-6-121 before the later of:
    (I) 20 days after the day that the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that a qualifying circumstance existed; or
    (II) the time that the mother executed a consent to adoption or relinquishment of the child for adoption.
    (2) An unmarried biological father who does not fully and strictly comply with the requirements of Section 78B-6-121 and this section is considered to have waived and surrendered any right in relation to the child, including the right to:
    (a) notice of any judicial proceeding in connection with the adoption of the child; and
    (b) consent, or refuse to consent, to the adoption of the child.

in Colorado.  In the same time frame, November 2007, Morelock formed an intention to fraudulently place K.M. for adoption with her brother and sister-in-law.

74.     There was a wide variety of filings and actions taken in the Utah adoption action, culminating with a Utah Supreme Court decision reversing the Utah District Court decision that went against Manzanares.  *See In re Baby B,* 270 P.3d 486 (Utah 2012).[6]

75.     Manzanares has most recently been required to go through a several-day custody hearing in Colorado that has been taken under advisement.

**Background Facts Relating to Carlton and A.M.**

76.     Carlton engaged in a romantic relationship with Shalanda Brown ("Brown") including in late 2009.

77.     The relationship resulted in the conception of the minor child A.M. who was born on June 24, 2010 in Utah.

78.     Curiously, however, Brown always misrepresented to Carlton that his baby was a boy.  It was not until the adoption agency, Adoption Center of Choice's ("ACC") counsel (Larry Jenkins, hereinafter "Jenkins") sent an email to Carlton's counsel on May 23, 2011 (11 months after birth), that Carlton learned (while deployed with the Department of Defense in Afghanistan) that his son was actually a daughter.[7]

---

[6]Interestingly, though it is a split 3-2 decision, even the dissenting Justices in the case acknowledged that the wrongful conduct of the birth mother in the case was fraudulent and outrageous.  *See Manzanares v. Byington*, 2012 UT ¶¶ 94 (Utah 2012).

[7]Jenkins inquired whether or not it mattered to Carlton that his child is a girl rather than a boy.  Of course, Carlton, through counsel, informed Jenkins that he still wanted to father his child, regardless of gender.

79.     On June 26, 2010, Brown relinquished her parental rights to the child to ACC, a Utah licensed child-placing agency, though Carlton, did not know Brown intended to place the child for adoption, did not know that Brown had come to Utah for the purpose of doing so, and ***at all relevant times was told by Brown that his child was dead.***

80.     On June 26, 2010, Brown also executed a Birth Father Affidavit.  She ostensibly chose to exercise her right under Utah law not to identify the child's birth father.  Brown stated that she was single and had never been married.  She also alleged that the birth father had been very abusive to her and, therefore, chose not to inform him of the adoption or that she was working with a Utah agency.  She stated that the birth father knew that she was pregnant, but he allegedly tried to use the pregnancy and baby as a tool of manipulation to keep her in a relationship with him.  She further alleged that he did not support her emotionally or financially during the pregnancy and that she never refused financial support from him.

81.     Carlton submitted evidence that Brown's affidavit was full of lies and misrepresentations.  Carlton asserted that while a birth mother may exercise her right not to identify a child's father, by electing to do so, she is also electing to place the stability of the placement/adoption of her child at risk, because the birth father has rights of paternity that he can exercise.

82.     Carlton further argued that if he was not able to more timely exercise his rights because of the wrongdoing of Brown (birth mother), then the adoption is subject to challenge.[8]

---

[8]It is ironic that the AC relies on a Birth Mother Affidavit, supposedly its accuracy and its foundation upon actual facts, but then in virtually the same breath pleads that it doesn't matter if such an affidavit is a lie, or full of fraudulent statements, because the birth mother is allegedly

83.   Carlton has never abused Brown.

84.   The evidence strongly suggested that ACC knew that such statements were false, or were likely false, and were nothing more than a regurgitation of what the ACC coached Brown to say in order to cut Carlton out of the parenting picture.

85.   Stacy Ellstawary ("Ellstawary"), who works for a Pennsylvania state representative, took personal interest in Carlton's case, as he tried to get anyone to listen to him and assist in getting his child back.

86.   Ellstawary called the ACC in late 2010, and inquired about placement of children for adoption when the birth mother is from out of state, and does not want the birth father involved.   AC stated that if a birth mother claimed there was physical abuse from the birth father, then he would be cut off from his rights automatically.[9]

87.   ACC also expressly told Ellstawary that there are "ways to get around the birth father."   AC went on to indicate that there were ways to sequester the birth mother from the birth father so that "he would never have a shot in hell in ever getting his child back."   A copy of a

---

permitted to lie all she wants to get an adoption to go through, and then there can be no challenge to the adoption that ostensibly relies on such representations that later turn out to be false.  *See* Utah Code Ann. § 78B-6-106.  This statute is sometimes referred to herein for sake of convenience and brevity as the "Fraud Immunity Statute".

[9]There is no provision in the Utah Adoption Act that permits the exclusion of notice to a birth father if the birth mother simply alleges that she was physically abused by the birth father. Presumably, this is a "policy" that AC has developed as a way of feeling justified in performing adoptions in which no notice is given to the birth father.

summary of Ellstawary's phone conversation with AC is attached hereto as Exhibit A.[10]

88.     It is undisputed that Brown never informed Carlton that she was placing the child for adoption, or that she was working with a Utah Adoption agency.

89.     Carlton never used the pregnancy as a tool of manipulation to keep Brown in a relationship with him.

90.     Contrary to ACC's assertions, Carlton did support Brown emotionally, and desired to support her financially, until she disappeared, thus rejecting his assistance.

91.     Carlton wanted at all times to father his daughter, A.M., to fully support Brown, however, Brown rejected his efforts and desires, fleeing to Utah to have the child without his knowledge and consent, and then returning to Pennsylvania and trying to rekindle a relationship with Carlton, claiming that his child had died, when in reality she had unilaterally placed her for adoption with ACC in Utah.

92.     When Carlton insisted on obtaining information about the death of his child, and where his deceased child was buried, Brown filed harassment charges against him.

93.     Negative paternity searches done in Utah and Pennsylvania support the fact that Carlton had no knowledge of Brown's conduct.  The child was born on June 24, 2010.  The searches were done on June 29, 2010, and again on July 20, 2010, five days after the child was born, and then twenty-six days after that birth.

94.     ACC ignored, however, that Carlton had no idea that Brown had come to Utah to

---

[10]Transcripts of other interviews with ACC and other Utah adoption agencies are discussed more fully below and attached as Exhibits.  They dramatically underscore the fraudulent, unethical, and illegal practices of various adoption agencies in Utah.

give birth to A.M..  How would Carlton even have the slightest notion he needed to file a notice

of commencement in Utah?  He didn't.  He wouldn't.  AC improperly relied on meaningless

negative paternity searches.

95.     It was not until November 23, 2010, that Carlton learned of Brown's unlawful

actions, when she broke down during a mediation in Carlton's Pennsylvania child custody action,

and she admitted that Carlton's child was alive, had been born in Utah, and that she placed him

for adoption without his knowledge and consent.

96.     Furthermore, upon retaining the undersigned counsel and learning of Utah's

putative father registry, Carlton filed with Utah's office of vital records on March 9, 2011.

97.     Carlton filed a paternity proceeding in Pennsylvania in November 2010, but that

matter was dismissed for lack of jurisdiction on November 23, 2010.

98.     Carlton's attempts to stop the unlawful adoption of his daughter and gain custody

of her through Utah courts were thwarted, in large measure based on his opposition relying on

Utah's Fraud Immunity Statute.

99.     Carlton's custody-related lawsuit is now on appeal to the Utah Supreme Court;

briefs have been completed, oral argument conducted, and the matter is under advisement.  (See

Case No. 20120268-SC).

**Background Facts Relating to Strickland and J.S.**

100.    Strickland met the birth mother Whitney Pettersson, n/k/a Whitney Demke

("Demke") in the middle of February 2009 at Applebee's Restaurant.

101.    They began a romantic relationship after Demke told Strickland she had divorced

21

her husband Kyle Rathjen, which Strickland later learned was one of many lies – she had not divorced him.

102.    In approximately January 2010, Strickland began to have an intimate romantic relationship with Demke, and later conceived a child together.

103.    Strickland expressed a desire to raise their minor child, J.S., together.

104.    At one point Demke told Strickland she was considering adoption, but he vehemently objected stating that he wanted to raise his son, even if it meant doing so on his own.

105.    Demke promised that she would not place J.S. for adoption, if Strickland would never "bail" on her, which he promised he would never do.

106.    Demke became part of the Strickland family, including attending a baby shower hosted by Strickland's brother, and attending Strickland family parties.

107.    Strickland attended prenatal appointments with Demke, and together they picked out a name for their son.

108.    Demke accepted financial support and emotional support from Strickland. (Strickland even helped Demke financially with her child from her prior marriage).

109.    At one point Strickland considered filing to protect his paternity rights, and consulted with an attorney (but did not retain the attorney) who described that it would cost nearly $3,500 just to start the paternity action process.

110.    Strickland told Demke what he was considering, and she became enraged that he would accuse her of working behind his back, and that if he felt he had to go forward with a paternity filing that she would view it as an act of distrust, and would make it so Strickland

22

would never see their son.

111.    Based on Demke's repeated promises they would co-parent together, based on the expense of having to file for paternity (money better spent on all the needs for a new baby), Strickland decided not to file for paternity.

112.    Strickland and Demke continued a friendly relationship, attending social functions, movies, meals, and other Strickland events.

113.    They spoke on the phone and exchanged texts virtually every day, often multiple times.

114.    Strickland was excited for the arrival of his son.  He knew that he would be a great father, and could raise him in a loving and happy environment.  He wanted to be there and be a dad to his child, to teach him right from wrong, to help him with his schoolwork, to watch him play sports, and to be there for every part of his life.  Strickland yearned to be the father that his father had taught him to be, loving and always willing to take the time to do whatever it took to ensure that all of the children were happy and taken care of.

115.    Demke had indicated that J.S. was due to be born by C-section on January 12, 2011 – which also turned out to be a lie.

116.    Strickland continued his preparations to become a father: wanting no Christmas gifts for himself, he wanted items to prepare for the arrival of J.S., and received clothes, a car seat, a stroller and other items; a nursery was decorated and fully stocked for the arrival of J.S.; a cradle was purchased and placed in Strickland's room for use during J.S.'s earliest days of infancy.

117.     Strickland and Demke remained close, continuing their activities together, including up to the night of December 28, 2010, when they toured together (arm in arm) the lights at the LDS Temple Square in downtown Salt Lake City.

118.     The very next day, Demke went into labor with J.S. and he was born, on December 29, 2010 – without any notice to Strickland.  The alleged C-section on January 12, 2011 had been a lie.

119.     On December 30, 2010 (the day after J.S. had been born), Strickland sent Demke a text that said, "Hey how are you today are we having a baby yet lol :)".

120.     Demke's response was,  "I'm good lol".  Pettersson never mentioned anything about giving birth or giving Baby Jack to adoptive parents.

121.     On January 3, 2011 (now 5 days after J.S was born), Strickland sent Pettersson a text and asked how her doctor's appointment went.  Her response was "Good no change".  They exchanged a few more texts and ended the conversation when she would only respond with two or three words at a time; Strickland just assumed that she wasn't in a very talkative mood.

122.     On January 5, 2011 (7 days after J.S. was born), Strickland sent Demke another text and apologized for not being able to talk to her the day before because of work.

123.     When she did not respond to the text for a few hours, Strickland got concerned and called her.   When he called, she didn't seem very excited to talk to him and gave short to-the- point answers to any question he asked.  Strickland asked her again how her doctor's appointment went and she gave him the same answer that she had before, "Good no change."

124.     A few hours after the phone conversation, on January 5, 2011, Strickland got a

text from Demke that she needed to talk to him and that she would call him after she was done eating.

125.    When she called, Demke said, "I need to tell you something, I don't think you're going to like it but let me finish and then I will listen to what you have to say.  I had [J.S.] on the 29th of December and I put him up for adoption."

126.    Strickland was so shocked at what she had said that he sat down on the floor. He asked her why she had gone behind his back and done this and she told him that she had been planning on putting him up for adoption from the beginning.

127.    Strickland was so hurt that she had done all this when she knew that he wanted more than anything to be a dad and be there for the birth of his son.  He asked her how she could watch Strickland and his family prepare for J.S., and then just stab them in the back.

128.    Demke said that she did it for J.S., and that he should grow up in a loving home. Strickland said, "The home I have is so loving and excited to have him and you just stole all of it away, you knew I wanted to be a father and you stole my child and gave him away.  I'm fighting this with everything I have."  Admittedly, Strickland recalls saying a few rude but understandable remarks to Demke, and then he hung up.

129.    After the phone call, Strickland only made one more attempt to talk to Demke. He sent her a text that said, "Is there any way I can go see him?"  Demke never responded.

130.    The next day after finding out what Demke had done, Strickland filed for paternity in the Third District Court in West Jordan, Utah.

131.    Strickland's efforts to intervene in and set aside the fraudulent adoption were

25

denied in the Second District Court, and least in part based on Utah's Fraud Immunity Statute.

132.    Strickland's case is now in the briefing process with the Utah Court of Appeals. (See Case No. 20130088).

**Background Facts Relating to Brooks and J.M.S.**

133.    Brooks is the biological father of the minor child J.M.S.

134.    Brooks did not know that the birth mother was fourteen (14) at the time they had consensual intimate relations, and conceived a child in Pennsylvania, on either April 8-9, or 15-16, 2011.

135.    The birth mother lied to Brooks about her age, claiming that she was sixteen (16) years old, just as her mother admitted to Brooks' parents she had lied.

136.    The birth mother's physical appearance, the way she acted, the people she was friends with, the clothes she wore, and numerous other factors all suggested to Brooks that the birth mother was her stated age of sixteen (16) years old.

137.  Brooks had just turned eighteen (18) when he and the birth mother had a physical relationship -- his birthday being on February 24, 1993.

138.    As soon as Brooks learned that the birth mother lied about her age, he terminated his relationship with her.

139.    In late August, 2011, Brooks learned that the birth mother was 4 ½ months pregnant with his son.

140.    Brooks' parents, at the request of the maternal grandmother, met together and discussed the pregnancy on September 5, 2011.

26

141.    Brooks' parents conveyed his desire to assist and support the birth mother financially, emotionally, and every other way he could.

142.    Brooks exchanged numerous texts and other communications with the birth mother regarding his desire to be a part of his son's life.

143.    The birth mother told Brooks when the next doctor's appointment was, which he attended.

144.    At the doctor's appointment, Brooks was able to hear his son's heartbeat, which deepened his resolve to do everything he could to support the birth mother, and be involved in his son's life.

145.    Brooks told the maternal grandmother at the doctor's appointment that he was sorry for what had happened, asked for her forgiveness, and told her that he intended to be there for the birth mother and support her throughout the pregnancy and birth.

146.    At that time the grandmother gave Brooks an envelope that had been pre-addressed to "ACC" in Orem Utah, which contained a Birth Father – Application for Service form, and a Birth Father Medical & Social History Form.

147.    The maternal grandmother told Brooks, "If you decide not to fill this out and send it in, please let me know."[11]    The birth mother texted Brooks later that day and thanked him for coming to the doctor's appointment.

148.    Later that day detectives showed up at Brooks' home, and later in the day Brooks

---

[11]Brooks and his family later came to understand that "ACC" stands for a Utah licensed child-placing agency known as The Adoption Center of Choice (hereinafter "ACC") with its principal place of business in Orem, Utah.  R. 274.

27

called and made an appointment to meet with them regarding a criminal complaint that the birth

mother's mom had filed against him.

149.     Brooks was later charged with indecent assault, a second degree misdemeanor,

and was never charged with any type of rape.

150.     Brooks was instructed by a magistrate judge at a hearing on the criminal charge

that he should have absolutely no contact with birth mother, because it could be considered

intimidation of a witness.

151.     Brooks wanted to communicate with birth mother and directly voice his

commitment to be there and support her in every way through the pregnancy and birth.  Brooks

was able to receive and direct some communications through his Pennsylvania attorney Chad

Vilushis.

152.     Brooks and his parents were surprised that Brooks had been criminally prosecuted

so long after he had a relationship with the birth mother, and only after he expressed desire to

care for and support birth mother through the pregnancy and birth.

153.     They were further surprised and shocked to learn that the birth mother went to

Utah to give birth to Brooks' son.  The birth mother was never a resident of Utah, and was

always a resident of Pennsylvania.

154.     Based on Facebook messages, and information provided to Brooks by others,

Brooks and his parents came to know that the birth mother went to Utah approximately one (1)

week before she gave birth, and returned to Pennsylvania approximately five (5) days after she

gave birth.

28

155.     Brooks has personally, and through his lawyer, offered numerous times to provide financial support, insurance, transportation, and other support to the birth mother, but all of those offers were rejected by the birth mother and/or her mother.

156.     Brooks has at all relevant times remained fully committed to parenting his son. He was/is going to college, and working, and is fully committed to building a stable and bright future that has his son in it.

157.     Brooks' parents are also fully committed to provide additional love, support, and a healthy and safe environment for Brooks' son, and to further assist in providing anything that he needs.

158.     Considering all events that transpired, the maternal grandmother deceived Brooks and his parents in numerous respects, as reflected in their written statements, including but not limited to the birth mother placing the child for adoption in Utah, as well as circumstances leading up to the criminal charge being filed against Brooks.

159.     Based on numerous statements made by the maternal grandmother, Brooks' parents do not believe the birth mother was given a choice by her mother and her mother's boyfriend, but to place Brooks' son for adoption, and was therefore coerced into relinquishing her rights and did so under duress.[12]

160.     Based on the approximate birth date of J.M.S., Brooks believed that an adoption

---

[12]The Utah Supreme Court has very recently recognized the problems created by birth mother deceit and misrepresentation.  Even though it is a split 3-2 decision, even the dissenting Justices recognized the wrongful conduct of the birth mother in that case was fraudulent and outrageous.  *See Manzanares v. Byington*, 2012 UT ¶¶ 94 (Utah 2012).

in this matter was not finalized, until June 11, 2012 at the earliest.

161.    On or about Saturday, February 28, 2012, Brooks received a Notice of Adoption Proceeding.

162.    In response to the Notice, Brooks filed paternity-related documents in Utah through prior counsel, including: (1) a Verified Petition for Paternity on January 11, 2012; (2) a Declaration of Paternity on January 11, 2012; and (3) a Notice of Commencement of Paternity Proceeding, also on January 11, 2012.

163.    Evidence was presented to the Utah state district court that even though the intimate relationship between Brooks and the birth mother may constitute a sexual offense, he was nonetheless entitled to paternity rights in Pennsylvania so long as he could demonstrate his fitness and competence to raise a child.

164.    Brooks was not charged with rape, and under Pennsylvania law, given the definition of rape, and grounds for termination of his rights, it is clear that his paternity rights remain intact.

165.    One of the principal issues in the state district court was whether or not Pennsylvania law should govern in this matter.

166.    The birth mother admitted in a Pennsylvania court that "we gave the baby up for adoption to a loving couple in Tennessee."  She further admitted that she came to Utah to give birth "so that she could give the child to the adoption agency in Utah."

167.    The Utah state district court stated, it is "pretty clear that she specifically went to Utah to give birth so that she would be under the jurisdiction of Utah law and she could give the

30

child to the adoption agency in Utah," and so the father would not have any say whatsoever.[13]  As argued before the Utah state district court:

> Under Pennsylvania code and Pennsylvania case law [Brooks] was entitled to go forward and show his fitness and competence to parent his child.  Not the case in Utah.  It's undisputed in this case. . . that the birth mother forum shopped Utah.  And -- with the help of her mother.  In the Pennsylvania paternity proceeding they admitted that's precisely why they came to Utah, was to cut [Brooks] out of the parenting picture.  In Pennsylvania [Brooks] would have had rights.  In Utah, under a technical reading of the statute, assuming that it applies to this case, he would not have rights.

168.     Brooks argued several violations of his constitutional rights, including due process, and violations of the full faith and credit clause.

169.     The Utah state district court rejected Brooks' arguments, stating that in spite of how the district court felt about the constitutionality of events that had transpired, it was for a higher court to decide such issues.

170.     Brooks' case has been fully briefed to the Utah Court of Appeals, but was recently certified for consideration by the Utah Supreme Court.  No oral argument has yet been scheduled on the case.  (See Case No. 20120683).

**Background Facts Relating to Martin and L.M.**

171.     Martin became romantically involved with the mother of his daughter, L.M. born November 14, 2012 in the State of Ohio.

172.     The mother was enticed by a Utah adoption agency to travel to Utah to place L.M. for adoption, in Utah, without the knowledge or consent of Martin.

---

[13]The Pennsylvania paternity action was dismissed without prejudice at least in part based "upon consideration of the pending proceedings in Utah."

173.    Martin's daughter was initially placed for adoption with a family in Utah as a result of deception, fraud, improper and illegal financial and other incentives offered to the mother, all of which was facilitated through Utah's unconstitutional adoption laws.

174.    Martin hired Utah counsel to challenge the adoptive placement of his daughter, and though ultimately he prevailed in regaining custody of his daughter L.M., he incurred considerable special and general damages in the process.

**Background Facts Relating to Dye and S.D.**

175.    Dye is a resident of Texas, who prior to the birth of his child S.D., had never been to Utah.

176.    Dye conceived a son with a woman in Texas, S.D., who was born in Texas on November 25, 2011.

177.    Dye signed the Acknowledgment of Paternity at the hospital.

178.    Dye developed a substantial relationship with his son, including during his lengthy convalescence after being shot five (5)  times and left for dead during a home invasion robbery.

179.    The mother of S.D. was starting to look pregnant again in December 2012.  She told Dye the doctor stated she had a cyst. Later Dye found out she was pregnant and that he was not the father.  Dye and the mother of S.D. remained together, even though she was pregnant with another man's child.

180.    The mother had the baby on 05/04/2013 and advised Dye that the baby died at the hospital.  She also informed Dye that the hospital would cremate the baby because they didn't

have any life insurance or money for a funeral.

181.    Dye never got to see the little girl born, and later found out the mother gave the baby up for a planned adoption in Utah.

182.    On July 27, 2013, S.D.'s mother took Dye's son (allegedly) to visit his maternal grandmother in Louisiana who was very ill and who wanted to see S.D. in the event of her death.

183.    S.D.'s mother returned to Texas without him, and refused to tell Dye where his son S.D. was.

184.    Dye was later advised that S.D. (nearly 1 ½ years old) had been placed for adoption with the same family in Utah who had adopted his half-sister, who she had previously claimed died at the hospital.

185.    Dye received a letter from an adoption agency and contacted that agency to find out how he could get his son back.  The agency representative started asking Dye questions like when was the last time he saw his son. She even advised Dye that his name wasn't on the birth certificate, which he knew was incorrect.

186.    The Utah adoption agency told Dye on multiple occasions that they would send him information on how to get his son back but never did.   Dye's phone calls to the agency then went unanswered.  Dye's family then decided to hire a lawyer in Texas, who in turn advised that he hire a lawyer in Utah.

187.    On November 26, 2012, eight (8) months before S.D. was placed for adoption in Utah, an Original Petition in Suit Affecting the Parent-Child Relationship had been filed in Texas.

188.    On October 9, 2013, even the handling the 11/26/2012 petition in Texas wrote to the judge over the adoption in Utah and informed the judge that Texas was maintaining jurisdiction over S.D., and such original jurisdiction would not be waived.

189.    After considerable opposition from the prospective adoptive parents who had Dye's son in Utah, the Utah court ruled in Dye's favor, and returned his son to him.

190.    In short, Dye also prevailed in regaining custody of his son S.D., however, he incurred considerable special and general damages in the process, which could have been avoided but for Utah's unchecked unconstitutional adoption laws.

**Background Facts Relating to Nevares and B.N.**

191.    Nevares had an intimate romantic relationship with B.N.'s mother in December of 2009 in Colorado which resulted in the conception of a son.

192.    Nevares refused to consent to an adoption in Colorado.

193.    On September 27, 2010, B.N.'s mother left Colorado and traveled to Utah and gave birth to B.N. on September 29, 2010.

194.    On September 30, 2010, B.N.'s mother signed documents to place B.N. for adoption in Utah, knowing full well that Nevares intended to keep and raise his son.

195.    She unilaterally placed B.N. for adoption without Nevares' knowledge or consent.

196.    Nevares has been suing in Utah to regain custody of his son, challenging the constitutionality of Utah's Adoption Act that ostensibly permits such adoptions to occur without his knowledge or consent.

197.    Nevares' case was briefed to the Utah Court of Appeals, which recently certified

34

the appeal for consideration by the Utah Supreme Court, although oral argument has not yet been scheduled.

**Background Facts Relating to Bolden and J.S.**

198.    Bolden became romantically involved with the mother of J.S., and they conceived a child together, a son.

199.    On March 10, 2011, and March 17, 2011, Bolden filed respectively a paternity lawsuit, and Notice of Commencement of Paternity Proceeding with Utah Vital Records.

200.    Through the inadvertence of Bolden's first attorney, an affidavit in support of the paternity action was not filed.

201.    J.S. was born in Ogden, Utah on March 26, 2011.

202.    Bolden spent time at the hospital with his son J.S. the day he was born, and the following day on March 27, 2011 as well – which tragically would become the last time he saw his son.

203.    After that, beginning March 28, 2011, the biological mother refused to permit Bolden to see his son.

204.    On March 29, 2011, the biological mother consented to place J.S. for adoption, without the knowledge or consent of Bolden.

205.    The following day, on March 30, 2011, the prospective adoptive parents filed a petition to place J.S. for adoption, without any notice to Bolden

206.    Bolden's efforts to intervene in the adoption proceeding were denied based on his failure to timely file an affidavit in support of his paternity action.

207.    Bolden retained new legal counsel who prepared and filed briefs challenging the constitutionality of the affidavit requirement under Utah's Adoption Act.

208.    Bolden's appeal, though initially briefed to the Utah Court of Appeals, was certified for consideration by the Utah Supreme Court where the case was argued and has been under advisement since June 3, 2013.

**Background Facts Relating to Wyatt and E.W.**

209.    As the result of a relationship with Wyatt, E.W.'s mother became pregnant with E.W. in 2008.

210.    Wyatt and the mother of E.W. were both residents of Virginia, and were never married.

211.    Wyatt's daughter, E.W., was born on February 10, 2009 in Woodbridge, Virginia.

212.    Prior to the birth of E.W., the biological mother decided (under duress and through coercion) to place E.W. for adoption.

213.    A Utah adoption agency was retained to assist her with the adoption process.

214.    On February 12, 2009, E.W.'s mother relinquished her parental rights relative to E.W. and consented to an adoption.  Surprisingly, she did so after being rushed out a back door and stairwell of the hospital when Wyatt had arrived and was trying to visit E.W. and the mother at the hospital.

215.    Consequently, the Utah adoption agency placed E.W. with prospective adoptive parents, also in Utah.

216.     On February 17, 2009, the prospective adoptive parents received approval from

the administrator of the Interstate Compact on Child Placement to travel to Utah with E.W.

217.     The next day, on February 18, 2009, Wyatt filed custody and visitation proceedings in a Virginia Juvenile and Domestic Relations Court.

218.     On February 23, 2009, while the Virginia custody and visitation action was proceeding, the prospective adoptive parents filed a Petition for Adoption in a Utah state district court.

219.     On April 8, 2009, Wyatt registered as the putative father of E.W. with the Virginia Putative Father Registry.

220.     On April 28, 2009, Wyatt filed a motion in the Utah court contesting the adoption and requesting permission to intervene.

221.     Wyatt's motion to intervene was denied, and the Utah court determined that his consent to the adoption was not required, because he had failed to comply with Utah law, the Utah Adoption Act, and failed to file his paternity action in Utah and failed to comply with Utah's other putative father requirements.

222.     Subsequently, on December 11, 2009, the Virginia court issued an order granting Wyatt custody of E.W.

223.     Relying on the Parental Kidnapping Prevention Act, the Virginia court determined that it had exclusive jurisdiction to determine custody of E.W.

224.     Utah refused to recognize the Virginia proceeding and orders from the Virginia court.

225.     The Utah adoption was facilitated through subterfuge, deceit, misdirection, and

37

fraud, including but not limited to failing to inform Wyatt that an adoption was planned.

226.    The illegal adoption was permitted to occur only through the constitutionally infirm provisions of the Utah Adoption Act which ostensibly allowed a vague text from E.W.'s mother to Wyatt which referenced a Utah adoption agency to trigger a "qualifying circumstance" mandating Wyatt to comply with Utah's putative father requirements.

227.    In Wyatt's civil lawsuit for fraud and other causes of action against a Utah attorney, the Utah adoption agency (A Act of Love), and others, the Virginia Supreme Court observed in its published opinion:

> [i]t is both astonishing and profoundly disturbing that in this case, a biological mother and her parents, with the aid of two licensed attorneys and an adoption agency, could intentionally act to prevent a biological father -- who is in no way alleged to be an unfit parent -- from legally establishing his parental rights in gaining custody of a child whom the mother did not want to keep. . . .

*John M. Wyatt III, et al. v. McDermott, et al.*, *283 Va. 685*; *725 S.E.2d 555*; *2012 Va. LEXIS 92*.

**Background Facts Relating to O'Dea and E.G.**

228.    O'Dea and the biological mother of were involved in an intimate relationship that resulted in a pregnancy in the fall of 2005.

229.    The mother lied to O'Dea, and first claimed she miscarried.

230.    She did not miscarry, but then claimed she was going to place E.G. for adoption.

231.    O'Dea objected to any adoption.

232.    In an effort to protect his rights, O'Dea registered with putative father registries in Wyoming and Montana, places where the mother was last known to be.

233.    Thereafter, E.G.'s biological mother traveled to Utah for a short stay, with the

intention of giving birth and then placing E.G. for adoption, without the knowledge or consent of O'Dea.

234.    On June 15, 2006, O'Dea received a call from the mother that originated from a blocked number. During the conversation, E.G.'s mother told O'Dea: "You will listen and you will not speak. First of all I want you to stop harassing me and that includes your mother. I am in Utah. You will not father this child. You will pay child support until the child is in college. You will never see this baby. Do you understand?"

235.    In response, O'Dea stated that he did not understand, E.G.'s mother asked again if he understood. O'Dea again stated that he did not and asked if E.G.'s mother meant that she was not placing the child for adoption.

236.    E.G.'s mother responded, "If you understand what I have told you, that is all I have to say." She then terminated the call. Since the number was blocked, O'Dea could not call back.

237.    O'Dea took this conversation to mean that E.G. was not being placed for adoption because she referred to O'Dea having to pay child support.

238.    E.G. was born later on the same day as the brief telephone conversation, June 15, 2006.

239.    The next day, E.G.'s mother signed a document of Birth Mother Relinquishment.

240.    Prior to the birth, a Utah adoption agency had begun preparing the legal framework for the adoption and sought to determine if notice of paternity for the child had been filed in the state of Wyoming.

241.     On June 15, 2006, the adoption agency received a letter from Wyoming's Department of Family Services notifying the agency that O'Dea had filed a notice with Wyoming's putative father registry.

242.     The adoption agency also regularly contacted the Utah Department of Health until July 6, 2006 to determine if proceedings to establish paternity had been initiated in Utah. The department's response was always negative–clear evidence of forum shopping to unconstitutionally sever his paternity rights.

243.     O'Dea searched for E.G. and E.G.'s mother, and after establishing a website relating to his daughter E.G., he learned that she had been placed for adoption in Utah.

244.     O'Dea then took action to protect his rights in Utah, including filing a paternity action, affidavit, and Notice of Commencement with Utah Vital Records, but was deemed to have been fifteen (15) days too late under the Utah Adoption Act which required him to follow Utah law, solely based on a 30 second phone conversation that mentioned the mother was in Utah but suggested she was not placing E.G. for adoption.

245.     O'Dea appealed his case all the way to the Utah Supreme Court, which in a 3 to 2 decision refused to overturn the dismissal of O'Dea's paternity action, asserting that he was not legally entitled to consent to or to object to the adoption because he had failed to timely, fully and strictly comply with Utah's putative father requirements.

246.     The Utah Supreme Court ruled that E.G.'s mother's mention of Utah triggered an obligation for O'Dea to comply with Utah law before E.G.'s mother relinquished her rights, the day after she was born.

40

247.    As Chief Justice Durham observed in her dissenting opinion in the O'Dea case, in

which Justice Parrish joined:

> The majority opinion concedes that "[b]y placing a telephone call to Mr. O'Dea, Ms. Olea did not *create* a qualifying circumstance." *Supra* P38 (emphasis added). The opinion also points out that the trial court and the parties "assumed" that Ms. Olea was "residing on a temporary basis in Utah" when she made the call to Mr. O'Dea. The record does not reflect any facts, other than the telephone call, made on the very day Ms. Olea gave birth, [***36] to support the conclusion that a qualifying circumstance actually existed. I assume that a one- to three-day hospital stay in Utah, for the sole purpose of giving birth and relinquishing an infant for adoption, was not what the legislature intended by "resided, on a permanent or temporary basis, in the state of Utah." *See* Utah Code Ann. §§78-30-4.14(10)(a) (Supp. 2006). I further believe there is a legal distinction between the concept of "residence" and that [**716] of a "visit" or brief "stay." Absent such a distinction, Utah risks becoming a magnet for those seeking to unfairly cut off opportunities for biological fathers to assert their rights to connection with their children. Not every unmarried biological father is indifferent to or unworthy of such connections. Many would marry the mothers of their children if they could, and many would make suitable and loving parents.

*O'Dea*, 217 P.3d at 715-16.

249.    Interestingly, in the more recent well-publicized appellate decision in the Robert

Manzanares case, the Utah Supreme Court debated whether or not its decision in favor of

Manzanares (the biological father in that case) was or was not inconsistent with its decision in

O'Dea.  Ultimately, in *Manzanares,* the court observed that to the extent *Manzanares* could be

confused with the Court's previous ruling in *O'Dea*, the *O'Dea* decision was to be disavowed.

*In re Baby B*, 270 P.3d 486, 502 (Utah 2012).

**Background Facts Relating to Wallace and T.B.**

250.    Wallace became romantically involved with the biological mother of T.B. and

they conceived a son together, who was born on May 28, 2011.

41

251.    Wallace was involved with providing for T.B. and developing a relationship with his son.

252.    T.B.'s mother led Wallace to believe that they would raise their child together, and did so for approximately the first year of T.B.'s life, permitting contact and visits.

253.    Without informing Wallace of her intentions, T.B.'s mother signed on February 7, 2012 (nearly 9 months after his birth), a consent to adopt T.B. to her father (the maternal grandfather of T.B.) with whom she was and has at all relevant times resided.

254.    Wallace was never informed of any adoption, nor did he give his consent to or have any knowledge of such adoption.

255.    Even though Wallace had been defrauded by T.B.'s mother and others, the Utah state district court refused to set aside the adoption based on fraud and based on various other arguments challenging the constitutionality of the Utah Adoption Act.

256.    The petitioning adoptive parents of T.B. were initially both maternal grandparents, though the petition was later amended to include only the maternal grandfather, though he was still married to the maternal grandmother.  On information and belief, the amendment was made dropping the maternal grandmother as a petitioner because she did not believe the adoption was morally or ethically appropriate, was against it being done without Wallace's knowledge and consent, and therefore wanted to have no part in the fraudulent adoption.

257.    After the adoption was completed, a motion was brought to have the birth mother listed as the biological mother on the birth certificate, and that the birth mother's father be listed as the biological father of T.B.  The court, unaware of any precedent for any such seemingly

incestuous relationship to be reflected on a birth certificate, refused to permit any such amending of the birth certificate.

258.   The placement of T.B. with the maternal grandfather for adoption (where the mother lived and continued to live) was actually a "sham," intended as nothing more than to permit the biological mother to keep custody of her child, to the exclusion of Wallace – thus viciously cutting off his paternity rights.[14]

**Background Facts Relating to Thurnwald and T.T.**

259.   Thurnwald and the biological mother of ("A.E.") were involved in romantic relationship for more than three (3) years, during which time they resided together in Davis County, Utah from approximately August 2003 to April 2004.

260.   During their relationship, A.E. became pregnant with T.T..

261.   During the time they resided together, they discussed marriage, however, A.E. decided to move out in April 2004 and live with her grandparents.

262.   After moving out, Thurnwald and A.E. continued to date.

263.   Thurnwald moved during the pregnancy, to take another job to better afford a

---

[14]The continuing "theme" in many fraudulent adoptions, as set forth above, is a mechanism that triggers a "qualifying circumstance" ostensibly mandating compliance with Utah's Adoption Act putative father requirements.  Use of a short text, email, phone call, or other communication merely mentions "Utah" and then gives the birth father some reassurance that the child is not going to be placed for adoption, but then the child is in fact placed for adoption, and the Fraud Immunity Statute seems to prevent a successful challenge to the fraudulent adoptive placement.  In this manner, as demonstrated by the same tragic circumstances repeating themselves over and over, the Fraud Immunity Statute has now become a tool of deception – an incentive for biological mothers (and agencies and attorneys working with them) to intentionally mislead and defraud biological fathers out of their paternity rights.

home and other expenses relating the delivery and rearing of T.T..

267.   A.E. decided not to move with Thurnwald, so Thurnwald eventually moved back to Davis County.

268.   Thurnwald and A.E. discussed raising T.T. together, including moving in with Thurnwald's parents, and discussed other matter pertaining to co-parenting T.T.

269.   Thurnwald attended doctor appointments, and made numerous purchases of items to provide for T.T. and A.E.

270.   On or about August 17, 2004, A.E. told Thurwald she was considering placing T.T. for adoption through LDS Family Services ("LDSFS").

271.   Thurnwald met with LDSFS as well, and was instructed that he and his mother should stop pressuring A.E. and let her make her own decision about adoption.

272.   After the meeting with LDSFS, A.E. told Thurnwald that she had changed her mind, and that she no longer wanted to place T.T. for adoption, and that he did not have anything to worry about.

273.   Thurnwald's mother consulted with legal counsel regarding protection of paternity rights, and the lawyer told them he would look into it and get back to them.

274.   On approximately August 21, 2004, about two weeks before T.T.'s birth, Thurnwald and A.E. attended a baby shower together.

275.   Two days before T.T. was born, Thurnwald and A.E. discussed making arrangements for the arrival of their baby, including Thurnwald selling his car in other to get a vehicle more suitable for a child.

44

276.     A.E. went into premature labor on Saturday, September 4, 2004, and the child was born that day at 9:24 a.m. in Layton, Utah.

277.     Thurnwald learned from one of A.E.'s co-workers that she had given birth that day.

278.     When Thurnwald called A.E. at the hospital, she told him that she had decided to give up T.T. for adoption.

279.     Thurnwald left work immediately and attempted to visit A.E. and his child at the hospital, however, he was refused visitation and told that police would be contacted and he would be arrested if he did not leave immediately.

280.     Thurnwald contacted his lawyer on that Saturday, but was not able to complete all putative father filing requirements until Tuesday, September 7, 2004 because Monday was Labor Day.

281.     In the meantime, A.E. waited the minimum 24 hours as required by Utah statutory law, and then signed on Sunday, September 5, 2004, a relinquishment of her rights and consent to placement of T.T. with LDSFS for adoption.

282.     The trial court ruled against Thurnwald, dismissing his paternity action because he had not completed all necessary Utah filings before A.E. relinquished her rights, finding that because it was not "impossible for Thurnwald to comply with the filing requirements of the statute," his due process rights had not been violated.

283.     The Utah Supreme Court reversed the trial court's ruling in a published opinion, *Thurnwald v. A.E.*, 163 P.3d 623, 628 (Utah 2007), observing: "[the] application of the statutes

45

in accordance with the district court's interpretation is unconstitutional because it would prematurely terminate an unwed father's opportunity to assert paternity when the child's birth occurs on a weekend or holiday."

284.    Even though Thurnwald won before the Utah Supreme Court, he later lost his battle for custody of his child because his notice of commencement of paternity action filed with Utah Vital Records had not been filled out correctly.

**Background Facts Relating to Achane and T.A.**

285.    Achane married T.B. on February 3, 2009, in the state of Texas where they established their marital residence together, and anticipated that they would eventually raise children together as a married couple.[15]

286.    Achane has faithfully served his country and supported his family for twelve (12) years as an enlisted soldier in the United States Army, holding the rank of Staff Sergeant.

287.    In the Summer of 2010, Achane and T.B. learned that they would be having their first child together.

288.    The child's due date was between March 17 and 24, 2011, as far as Achane understood it.

289.    Achane took time off work to accompany his wife to pre-natal doctor appointments, including an ultrasound when they learned for the first time that they would be

---

[15]Utah putative father laws are often cited as pertaining only to unmarried biological fathers.  The Achane matter, however, is one example of how Utah's adoption laws have been twisted in their interpretation and application in an effort to deprive even a married biological father of his paternity rights.

having a baby girl.

290.    T.B. suggested to Achane adoption and abortion as ways to deal with the pregnancy, but he disagreed.

291.    Achane accepted an assignment to move to South Carolina and become a drill instructor.  It was anticipated that Achane would move there first, secure living arrangements, and T.B. would later follow.

292.    Achane and T.B. then began having problems in their marriage, but were trying to work out their differences and even participated in marital counseling in an effort to do so.

293.    T.B. changed her mind, and decided to remain in Texas until after their daughter was born.

294.    Achane provided financially for the family, including T.B. child from an earlier relationship.

295.    Achane left the marital home in Texas to report for his military duty in South Carolina on January 17, 2011.

296.    Approximately one and a half weeks later, T.B. and her mother unilaterally decided to place Achane's daughter for adoption without telling him about their plan.

297.    In approximately this same time frame, the prospective adoptive parents J.F. and K.F. ("PAPs") contacted a private Utah-licensed child-placing agency, Adoption Center of Choice ("ACC") for assistance with acquiring a newborn child.  PAPs had adopted through ACC previously.

298.    ACC made arrangements to transport T.B. from Texas to Utah for the sole

purpose of placing T.A. for adoption with the PAPs.

299.    Achane had never been to Utah before, and had no idea his wife was coming to Utah to unilaterally to give their baby up for adoption.

300.    T.B. gave birth to their daughter on March 1, 2011, and shortly thereafter, on March 3, 2011 she relinquished her parental rights to ACC, who thereafter placed T.A. with PAPs where she resided through protracted court proceedings, including through November 20, 2012, when Fourth District Court Judge Darold J. McDade finally ordered the dismissal of the PAPs petition for adoption.

301.    Even though ACC and PAPs knew Achane had vested parental rights over his daughter, they failed and refused to contact Achane and tell him any of the following: (1) of his daughter's birth; (2) that they were in Utah; (3) that there was a planned adoption; and (4) that PAPs were planning to take possession of his daughter.

302.    T.B. failed and refused to contact Achane and tell him anything, claiming that her phone was not working.

303.    PAPs decided to go forward with an adoption plan, knowing that T.B. was married to Achane, and knowing that if he contested the adoption, Achane's daughter could be returned to him.

304.    During the period between March 18 and 26, 2011, when Achane was expecting his daughter to be born in Texas, he contacted his wife's sister and brother-in-law in an effort to where his wife and daughter were.  Achane was informed that his wife had been seen, appeared to no longer be pregnant and their baby was nowhere in sight.

48

305.     Achane tried to find out where their baby was by contacting health care providers in Texas, but they refused to give him information, citing confidentiality.

306.     In June 2011, T.B. finally contacted Achane, and told him that she had gone to Utah and placed their daughter for adoption with ACC, and gave him their contact information.

307.     That same day, Achane contacted ACC in an effort to get information about his daughter, including where she was and her well-being, however, ACC refused to give him any information, which was their stated policy even in the case of married biological fathers who had vested legal rights to their child.

308.     An ACC attorney thereafter contacted Achance and asked him if he wold sign away his rights, which he replied in no uncertain terms he would not.

309.     Achane determined that he would be required to bring court action to secure the return of his daughter, which in truth he never should have been required to do.

310.     PAPs filed on July 11, 2011, a petition for adoption in court, admitting they were aware Achane was the father, and married to T.B. but claimed that his rights should be terminated because he allegedly abandoned his daughter.  The petition did not allege Achane engaged in only token efforts to be a father, did not allege that he had abused or neglected his daughter, did not allege that he was unfit or incompetent – all additional grounds upon which a father's paternity rights may be terminated.

311.     Achane was served with the adoption petition on July 27, 2011, and later filed a motion to intervene in the adoption proceeding on August 26, 2011, in which he demanded immediate return of his daughter so that he could exercise sole custody over her.

312.     Despite knowing of Achane's desire to have his daughter returned to him, PAPs, their attorneys and ACC refused to do so, believing they had no obligation to do so.

313.     PAPs ignored numerous requests sent through Achane's counsel to have visitation of his daughter, and to receive photographs of her.

314.     PAPs continued to fight in the courts even after the District Court dismissed their petition for adoption, though finally gave up their appeals after the Utah Supreme Court refused to stay enforcement of the trial court's dismissal pending the appeal.

315.     Judge McDade summarized the dismay and disbelief that many experience when they gain some understanding of how slanted Utah adoption laws are against birth fathers:

> The Court is astonished and deeply troubled by the Adoption Center of Choice's policy of refusing to disclose information to the legal, married father of a child who has been place for adoption through their agency even when they are aware that the father has legal rights to his child.  While such a policy may be appropriate in the context of an unmarried, putative father who has never established legal paternity (and, as far as anyone knows, night not even be the child's biological father), such a policy is utterly indefensible in the context of a father like Mr. Achane who already has vested parental rights equivalent to those of the mother before she relinquished.  Thus, when Mr. Achane call the adoption agency inquiring about his daughter the agency should have fully cooperated with him.
>
> Likewise, when the attorney for Adoption Center of Choice contacted Mr. Achane and confirmed that Mr. Achane would not consent to the adoptive placement, the very next conversation they should have had was what arrangements the adoption agnecy would be making to return [T.A.] to him with all due haste.  That did not happen.  While the [PAPs] and their adoption agency may have been justified in initially taking [T.A.] into their home based on [T.B.]'s representation, once Mr. Achane reached out to the Adoption Center of Choice and the [PAPs] to let them know that was not the case and that he wanted his daughter back, they should have cooperated.  The [PAPs] had no justification for withholding [T.A.] from him until he first "proved himself" to them.

**Background Facts Relating to Crawford and J.C.**

316.     Crawford and the biological mother of his daughter conceived a child together in Tennessee, where at all relevant times both lived as residents.

317.     The biological mother, K.J., lied to Crawford, and told him that she was going a cruise with her sister.

318.     Instead, K.J. traveled to Utah and placed Crawford's daughter for adoption through the adoption agency Heart to Heart ("H2H").

319.     J.C. was born at 6:11 p.m on April 12, 2013 in Utah.

320.     K.J. signed a Relinquishment of Parental Rights and Consent of Natural Birth Mother to Adoption the next day at 6:24 p.m. on April 13, 2013.

321.     K.J. was not married to the birth father, and exercised her right to not identify the birth father.  *Id.* at Exhibit 1, page 2, 7.

322.     On or about April 18, 2013, H2H filed a Verified Petition to Determine Parental Rights with a Utah court.

323.     It stated that a paternity search had been completed, and a Certificate of Negative Search was submitted to the Court dated April 16, 2013.

324.     The Verified Petition glaringly failed, however, to disclose anything to the Court about when Crawford or any putative father learned of a qualifying circumstance that would have triggered his obligation to comply with Utah putative father requirements so that the Court could determine if the Certificate of Negative Search was even timely significant and legally sufficient.

325.     Regardless, a Utah court entered an Order ostensibly terminating Crawford's paternity rights on April 23, 2013.  Interestingly, the order was executed by a signing judge that

day, and not by Judge Maughan, who had been assigned to the case.

326.    Crawford filed a Verified Petition to Establish Paternity on April 25, 2013 ("Paternity Action") assigned Case No. 134902118 and was assigned to Judge Robert Faust.

327.    Crawford also filed his Affidavit in support on April 25, 2013, which included his attached Parent Plan.

328.    Finally, Crawford also filed his Notice of Commencement of Paternity Proceeding ("Commencement") on April 25, 2013 at 1:22 p.m.

329.    A motion to dismiss the paternity action was denied by Judge Faust, stating that Judge Maughan (handling the adoption matter) should be considering the paternity issues in the context of the action before him.

330.    Among the exhibits submitted to the court in the Paternity Action were sworn declarations of both Crawford and K.J., confirming what H2H has admitted – that Crawford did not learn of a qualifying circumstance until April 16, 2013.

331.    Sworn statements also confirmed that K.J. had forged Crawford's signature on adoption agency documentation, and further confirmed that the adoption was being done without Crawford's knowledge or consent.

332.    At all times, Crawford wanted to parent his child, and would not consent to an adoption.

332.    Based on the undisputed date which Crawford first learned of Utah involvement (i.e. a qualifying circumstance) – April 16, 2013 – Crawford had 20 days from that date, or in other words until May 6, 2013, to fully and strictly comply with Utah's putative father

requirements.  *See* Utah Code Ann. § 78B-6-122(1)( c)(ii).

333.    Crawford fully and strictly complied with Utah putative father requirements on

April 25, 2013 – eleven (11) days before he was required to do so.  *See* Exhibits 3-5; Utah Code

Ann. § 78B-6-121(3).

334.    Crawford's Motion to Intervene in the adoption, and to Set Aside any adoptive

placement was heard by Judge Maughan on February 5, 2014, and were both motions were

denied by him, ruling from the bench.

335.    Judge Maughan ruled that even though Crawford had filed in Utah within twenty

(20) days of learning K.J had come to Utah to place his daughter for adoption, because Crawford

had not timely filed an action in Tennessee before K.J. signed her rights away in Utah, he had no

right to challenge the Utah adoption, even though under Tennessee law he could file a paternity

action up until three (3) years after the child became the age of majority.

336.    A final order has not yet been entered by Judge Maughan, nevertheless, Crawford

intends to appeal the judge's ruling based upon the fraud and forgery committed by K.J. and

perhaps others, and based upon the violation of his fundamental constitutional rights.

**Background Facts Relating to Fowler and E.F.**

337.    Fowler began a romantic relationship with his girlfriend H.B. on January 11,

2007.

338.    Their relationship went very well to begin with, including becoming engaged in

May of 2007.

339.    As their relationship progressed, Fowler began to see how unstable H.B. was; she

even assaulted Fowler numerous times.

340.    In spite of difficulties, Fowler still loved H.B. very deeply and continued seeing her.

341.    In June of 2011, Fowler learned that H.B. had become pregnant with his child, and Fowler was excited that he had created a life with a woman he loved.

342.    Fowler and H.B. moved in together, and made plans for the child until the end of August 2011 when H.B. assaulted Fowler again, and he moved out.

343.    H.B. stopped communicating with Fowler, though he attempted to find out a due date, his child's name, and the hospital where she would deliver their child.

344.    Fowler hired an attorney to communicate with H.B., after which she promised Fowler she would not place their child for adoption, that she realized he was the father, that she would never deprive him of his paternity rights, and that if Fowler respected her space she would invite him to the hospital after the child was born.

345.    Through January 2012 and early February 2012, Fowler attempted to communicate with H.B. in an effort to obtain more information about her pregnancy and whether or not H.B. needed anything, but in response Fowler received only silence.

346.    Finally, on February 16, 2012, H.B. confessed to Fowler that she had already given birth to their son, and that she had placed him for adoption without his knowledge or consent, and that it was already final.

**Background Facts Relating to Knudson and O.K.**

347.    Knudson and his girlfriend N.H. met in Tioga North Dakota the end of July or

54

beginning of August, 2009.

348.    The started dating, and had a romantic relationship that resulted in the conception of O.K.

349.    N.H. later moved to Brandon South Dakota with her parents.

350.    Knudson visited N.H. and her family over Christmas vacation December 2009 in Brandon, South Dakota, at which time A.K. and N.H. conceived their child, O.K.

351.    Knudson learned of the pregnancy on January 3, 2010.

352.    Knudson and his mother later traveled to Brandon South Dakota where we attended the five (5) month ultrasound and found out the baby the were to have was going to be a girl.

353.    From January 2010 through August 2010, Knudson communicated with N.H. and provided financial and moral support.

354.    On April 17, 2010, N.H.'s sister sent a face book message to Knudson stating that N.H. had lost the baby.  This later turned out to be false.

355.    This was very distressing, insofar as Knudson and N.H. discussed throughout the pregnancy that Austin would raise their daughter until N.H. turned 18 in July of 2010, and at that time she would move in with Knudson and their daughter in North Dakota.

356.    Throughout the pregnancy N.H. had identified a hospital in Sioux Falls, South Dakota, which was shown to Knudson and his mother as the place where the child would be born.

357.    During one of Knudson's visits to Brandon, South Dakota (in approximately July 2010), N.H.'s parents had a LDS church member come to their house and counseled Knudson and N.H. giving their daughter up for adoption.

358.    They both expressed that they were against adoption.

359.    On August 24, 2010, Knudson received a text message stating N.H. was going to give birth, and then give their daughter up for adoption to a family in Utah.

360.    At no time did N.H. ever tell Knudson she was giving birth in Utah.

361.    Knudson never has any desire to relinquish his rights to his daughter.

362.    At this point and time, Knudson retained a lawyer in Sioux Falls, South Dakota.

363.    H.D. gave birth to O.K. on September 19, 2010, in St. George, Utah.

**Background Facts Relating to Curry and A.C.**

364.    Curry became involved in a sexual relationship with the mother of his child in 2006.

365.    The mother, T.J. had been a friend of Curry for their entire lives.

366.    In the period of July through September they decided to move into a house together in Provo, Utah and were planning to get married.

367.    Their relationship became strained and in late November 2006 T.J. moved out.

368.    In December 2006, T.J. contacted Curry and informed him that she had become pregnant, and that she wanted to reconcile their relationship and raise their child together.

369.    Curry and T.J. reunited, and started their relationship over again, planning for their future together with the child they had conceived and now carried.

370.    They spoke daily, and in person, and even discussed names for their child.

371.    On Christmas day, December 25, 2006, T.J. stopped answering Curry's calls.

372.    Curry finally heard from T.J. on New Year's Day, January 1, 2007, and she told him that she no longer wanted to be with him.

373.    At that time, T.J. disappeared, changed her phone number and moved.

374.    Thereafter, Curry met and courted another woman, whom he married in March 2007.  His wife was sympathetic because her mother had never told her father about her existence, and therefore she had never met her father.

375.    In April 2007, T.J. reappeared and contacted Curry and told him that she was sorry for leaving, and further that her mother had convinced her to put their baby up for adoption, but she didn't want to, that she wanted Curry to be in the child's life.

376.    T.J. told Curry, however, that the only way she would allow him to be in her life and that of his baby's was that if he would T.J. back and be with her.

377.    T.J. thereafter disappeared again.

378.    Curry contacted several attorneys and was told there was nothing he could do, that it would cost thousands of dollars, and Curry would be lucky if he could get his name on the birth certificate, and that he would have no chance of having any form of custody.

379.    Curry contacted T.J.'s mother and asked her to help him, but she insisted that he needed to let it go.

380.    In late June 2007, Curry received a phone call from T.J.'s mother, telling him that the baby was born, she was healthy, and that she had been adopted.

57

381.    When Curry asked her about his daughter's birthdate and her name, T.J.'s mother told him it was none of his business and hung up the phone.

382.    Curry later learned that T.J. told the hospital she did not know who the father was.

383.    Curry tried contacting several hospitals, desperately trying to find out where his daughter was, and who she was.  He was unable to find out any information – the hospitals citing privacy laws.

384.    Curry's brother had dated T.J.'s sister and was still in touch with them, and he called Curry soon after and told him that he had met Curry's daughter, had learned her name, and further that T.J's older sister and her husband had adopted Curry's daughter.

385.    Obviously, the adoption was accomplished without Curry knowledge, consent, or even any notice to him.

386.    All these events were completely shocking to Curry, who could not understand how such an adoption could be legally, ethically, and constitutionally accomplished without his involvement.

386.    To add insult to injury, Curry used to babysit for the adoptive parents.

387.    Further insulting is that T.J. is able to see their daughter whenever she wants, but Curry has been cut out of his daughter's life.

388.    Curry and his father and extended family grieve for the loss of Curry's daughter, and suffer each time a new story about fraudulent and unethical adoptions is in the media.

389.    Curry has had another daughter K.C. with his wife, and yearns to have the half-sisters know each other, and raise them together.

**Background Facts Relating to Worsley and G.W.**

390.    Worsley and his daughter's biological mother C.W. started a relationship together on June 1, 2007, which only lasted two months.

391.    On August 8, 2007, Worsley found out C.W. was pregnant which his child.

392.    On August 15, 2007, C.W. decided she did not want to have anything more to do with Worsley and quit talking to him in person.

393.    Worsley tried to offer financial and moral support, including attending doctor visits, and all C.W. would say in response was that "it doesn't matter."

394.    In online discussions, C.W. told Worsley that she was thinking of giving their child up for adoption, which Worsley objected to on several occasions.

395.    Worsley repeatedly told C.W. that he would not consent to an adoption and that he wanted to be involved in raising his child.

396.    C.W. then moved from Salt Lake City to Orem, Utah, but would not give Worsley any of her contact information or information about the child they were expecting.

397.    Eventually, C.W. began ignoring me altogether.

398.    Later Worsley learned that LDSFS was involved in placing his child for adoption, and that it was commonplace for an adoption agency to instruct biological mothers to cut off all contact with the biological father.

399.    On April 28, 2008, Worsley attempted to file paternity documents in the West Jordan court, however, the clerk would not accept them, stating that C.W. had to be served first, but that the clerk had given me a case number and that was all that mattered.

59

400.    Worsley then went straight to a constable in Provo to have C.W. served.

401.    On April 29, 2008, Worsley returned to the courthouse, and again the clerk refused to take his paperwork because C.W. had not been served.

402.    Worsley's daughter G.W. was born twenty (20) days early on April 30, 2008, which he found out a week later from C.W.'s attorney responding to Worsley's court filing.

403.    On May 1, 2008, the day after his daughter was born, Worsley started calling hospitals, and he first found out that she was at a hospital in Provo, was placed on hold several times, and then was told that she was not there.

404.    Worsley immediately went to the Provo hospital to try and place his name on the birth certificate, but he was not allowed inside.

405.    Worsley went to the West Jordan courthouse again and was allowed to file paperwork confirming C.W. was never in the military, but was not permitted to file his affidavit of an unmarried father.

406.    On May 12, 2008, Worsley received a letter stating that C.W. had been served, so he drove straight over to the West Jordan courthouse to finish filing documents relating to the case.

407.    On May 26, 2008, Worsley received a response from C.W.'s attorney, requesting that Worsley's case be dismissed.

408.    Worsley's paternity action was later dismissed on the grounds that he had not timely filed his affidavit of paternity, even though he had tried several times and the clerk would not accept it.

60

409.    The trial court judge dismissing Worsley's case stated that it was Worsley's responsibility to take all necessary action, not the lawyers, and not any third parties, even though C.W. and lied, committed fraud, and not obtained my consent to an adoption of a child she knew he wanted to keep.

410.    Worsley later learned that C.W. had given his daughter up for adoption to a sister who lived in Texas, so that she could still be involved in the child's life, but Worsley could not.

**Background Facts Relating to Anderson and A.A.**

411.    Anderson was engaged to and living with his girlfriend ("G.F.") in 2001.

412.    They conceived a child together who was due to be born on June 7, 2002.

413.    Anderson committed to care for G.F. and the child.

414.    Anderson provided financial and other support for G.F. during the pregnancy.

415.    Anderson's mother and sisters planned a baby shower, and then G.F.'s behavior became erratic, she refused to attend the shower, and asked that Anderson's mother send her a baby blanket that she had made.

416.    Anderson met with an attorney to determine what he should do to protect his rights.

417.    Anderson talked with G.F., and explained he had met with an attorney, and he and G.F. needed to get together to finalize some paperwork.

418.    G.F. pleaded with Anderson to wait until after the baby was born, that she was too emotional to decide what to do, at which point Anderson lost contact with her for a few days.

419.    Then Anderson's mother received a call from G.F., who said she'd had the baby at

LDS Hospital and __he__ was being put up for adoption.

420.    Anderson had no prior knowledge of, and had never given consent to, his son being placed for adoption.

421.    Anderson scrambled to try and figure out what he should do, and discovered a maze of Utah law "fine print" ostensibly required of him to maintain his rights as a biological father, even as a citizen of Utah.

422.    In the end, Anderson was unsuccessful in gaining any custody or other rights to his son, with the adoption action having gone through, and his paternity action being dismissed, even though he had been victimized by laws that permitted G.F. and others to defraud him out of most basic and fundamental parental rights to raise his son.

**Background Facts Relating to Cole and C.C.**

423.    In 2011 Cole was informed by his former girlfriend, L.S., that she was pregnant.

424.    At first, L.S. told Cole she was going to have an abortion, but Cole objected, stating that he would take and raise the child himself.

425.    L.S. then told Cole that she was too far along in her pregnancy to have an abortion, so she planned to deliver the baby and then decide whether or not to keep the child.

426.    L.S. next indicated that her family thought she should give the baby up for adoption, but Cole again stated to her that he wanted to raise his child, as he was financially and physical able to do so.

427.    L.S. lied to Cole, and told him that her due date was May 22, 2011.

428.    Weeks before his son C.C. was born, Cole was contacted by a representative of

LDSFS requesting that he voluntarily relinquish his rights, which Cole refused to do because he deeply wanted to be a father to his child.

429.    In addition, Cole retained an attorney in February 2011 to file documents necessary to protect his paternity rights.

430.    L.S. stopped communicating with Cole.  She would not disclose her intentions, nor any other information regarding how the pregnancy was progressing or where she planned to deliver C.C.

431.    L.S. gave birth to C.C. on April 20, 2011, on information and belief somewhere in Utah, more than a month earlier than she stated she was due.

432.    L.S. concealed the birth of Cole's son at the time.

433.    Without the knowledge or consent of Cole, L.S. placed C.C. for adoption the very next day, on April 21, 2011.

434.    The following day, on April 22, 2011 Cole went to court on his paternity action, and only A.S.'s attorney showed up and he was then informed of the birth of his son, his placement for adoption the day before, and further learned that the filing of necessary paternity documents had taken place only a few hours after A.S. had signed away his son for adoption.

435.    Cole's paternity action was dismissed because he had not timely filed, even though he his son was placed for adoption without his knowledge or consent, and without any meaningful notice to him or any reasonable opportunity to oppose the adoption.

**Background Facts Relating to Meenderink and M.M.**

436.    Meenderink was involved in a romantic relationship with L.A. from October 2012

63

through November 2012, and a child was conceived.

437.    L.A. lied to Meenderink, telling him that a paternity test had been done, and that he was not the father, when in fact no paternity test was ever done.

438.    On information and belief, Meenderink's son M.M. was born premature in late June 2013 at Ogden Regional Medical Center in Ogden Utah.

439.    Meenderink was able to contact the man who L.A. lied and said was the father, and he confessed to Meenderink that a paternity test had never been done.

440.    Meenderink contacted L.A. and asked her for written confirmation of the paternity test, and she said it was too late, she had placed M.M. for adoption the day after he was born.

441.    Meenderink's son was placed for adoption through the fraud of L.A., and possibly involvement of an adoption agency (unknown at this time if an agency was involved), and without any knowledge of, consent, or notice to Meenderink.

**Background Facts Relating to Lawson and K.L.**

442.    Lawson and C.B.were involved in a romantic relationship in Oregon, where they resided, which resulted in the conception and birth of a baby girl there on August 19, 2011.

443.    A Voluntary Acknowledgment of Paternity was signed in Oregon by both Lawson and C.B.

444.    When K.L. was approximately 10 months old, in approximately June 2012, C.B. went to Utah (and took K.L. with her) to allegedly stay with her aunt while she attended college, which Lawson later learned was a lie.

445.    C.B. had been enticed to go to Utah and place Lawson's daughter for adoption.

64

446.     In March 2013, Lawson was served with notice to relinquish his paternity rights.

447.     Lawson opposed the notice, and on April 10, 2013 he filed a motion to intervene in the adoption of his daughter.

448.     Lawson learned from a blood relative of C.B., who was very upset, that his daughter K.L. had been sold to an adoptive family for $15,000 cash.

449.     Lawson submitted an evidence binder to Judge Toomey in an October 2013 hearing, from which the adoption attorneys had withdrawn.

450.     Lawson also filed to have the temporary custody order to the adoptive parents/adoption agency reversed, and for sole custody of his daughter.

451.     Lawson was informed in October 2013 that additional information would be needed from him, and that he would be contacted, but he has not heard a thing.

**Background Facts Relating to Condos and C.C.**

452.     Condos became romantically involved with A.S. in Wyoming.

453.     Condos and A.S. at all relevant times were residents, and are residents, of the State of Wyoming.

454.     A.S. conceived the child C.C. as a result of their relationship.

455.     Condos learned of the pregnancy the week of March 11, 2013.

456.     The week of August 5, 2013, A.S. informed Condos that she intended to place their child for adoption, and "there is nothing you can do about it."

457.     On September 16, 2013, Condos met with Shannon Lyon of LDSFS and A.S. in an effort to get him to relinquish his rights and consent to an adoption, however, Condos refused

to relinquish and stated his opposition to any adoption.

458.     On approximately September 23, 2013 Condos received a letter from LDSFS that he had 30 days to file for paternity in Utah.

459.     On September 27, 2013, Condos's attorney wrote a letter to Ms. Lyon and David Hardy (with Kirton & McConkie) stating that Wyoming had jurisdiction over the case, and that Condos would not be voluntarily relinquishing his rights to his child, and that Condos would continue with court proceedings in Wyoming.

460.     On October 29, 2013, C.C. was born, and Condos learned about the birth from a third party on October 30, 2013.

461.     On November 1, 2013, Condos received a letter from A.S. stating "I have given birth to my child and he has been placed for adoption."

462.     On November 6, 2013, Condos's Wyoming attorney filed a petition for paternity, custody, and child support in the District Court of Uinta County, Wyoming, a copy of which court filing was sent to David Hardy and Lance Rich.

463.     On December 11, 2013, the Wyoming court set a hearing on Condos's petition for January 17, 2014.

464.     Court was cancelled due to the judge becoming ill, and as far as Condos is aware, a new hearing date has not been scheduled.[16]

---

[16]The "ET AL." Plaintiffs identified above each have some unique circumstances giving rise to the loss of their child to an adoption related to Utah in some fashion. Most if not all, however, are remarkably similar to the facts pertaining to the other Plaintiffs, including fraud, deception, and misrepresentation.  Plaintiffs will provide through disclosures and/or discovery more information pertaining to the "ET AL." Plaintiffs as well as other named Plaintiffs above.

## FACTS RELATING TO THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF UTAH

465.    The duties of the UAG, as established by law are as follows:  "The Attorney General shall be the legal adviser of the State officers, except as otherwise provided by this Constitution, and shall perform such other duties as provided by law."  Utah Const. Art. VII Sec. 16.

466.    Among the statutory duties performed by the UAG are:

a.  Give opinions on questions of law to state agencies, officers, boards, commissions, and to county or district attorneys;

b.  Prosecute corporations which act illegally; and

c.  Assist the Constitutional Defense Council.

See Utah Code Ann. § 67-5-1.

467.    The established mission of the UAG, consistent with the UAG's oath of office, "is to uphold the constitutions of the United States and of Utah, enforce the law, provide counsel to state agencies and public officials, to work with law enforcement and protect the interests of Utah, its people, environment and resources."[17]

---

So as to not overburden the Court with lengthy descriptions of each of these Plaintiffs at this time, their names are provided, and they should be included among the other named Plaintiffs in this case.

[17]The full text of the UAG's Oath of Office is as follows: "I, [name of UAG], having been elected to the office of Attorney General, do solemnly swear that I will support, obey and defend the Constitution of the United States and the Constitution of [Utah] and that I will discharge the duties of my office with fidelity."  A true and correct copy of the Oath of Office signed by Shurtleff is attached hereto as Exhibit B.

468.    In short, it is the job of the UAG to protect, preserve, and promote the constitutional rights of all individuals affected by the laws of the State of Utah, and to seek reasonably appropriate and timely redress of the violation of those constitutional rights when they occur.

469.    One of the express roles of the UAG is to protect against "deception, fraud, misrepresentation, or concealment of facts in the sale or advertisement of goods and services." See copy of the "Fraud" page from the UAG website, attached hereto as Exhibit C.

470.    In addition, another one of the explicit high priorities of the UAG is to protect children from abuse and neglect in a variety of capacities, including: serving as an investigative and prosecutorial advisor to county attorneys; serving as the administrator for the Children's Justice Center program; and serving as legal counsel for the Division of Child and Family Services.   See copy of the "Child Abuse" page from the UAG website, attached hereto as Exhibit D.

**FACTS RELATING TO THE CONDUCT (OR FAILURE TO ACT) OF THE UAG**

471.    By failing to take affirmative action on their own, and further by failing to take action upon receiving clear and convincing evidence of children who have been kidnapped from their first biological families, and have been defrauded from ever knowing their first biological families, Defendants have utterly failed to protect the Minor Children from these ultimate forms of abuse and neglect in Utah.  Defendants should have recognized the rights and best interests of the Minor Children, and others, and given them a voice so that they, and future children victimized by such adoption practices in Utah, could have avoided further injury, damages, and

violation of their most fundamental civil rights.

472.  The UAG, Shurtleff, and Swallow (and possibly Reyes), have all failed to carry out the duties, oath, and mission of their office as Utah Attorney General in numerous respects, as set forth more fully herein, but in short, by failing to take appropriate action to bring about corrections to Utah's adoption laws when they either knew, or should have known that such laws were constitutionally infirm and that such action was clearly necessary to prevent further violations of such rights.

473.  In addition to the general duties and responsibilities pertaining to their office which are self-executing and require them to be proactive in carrying them out, Defendants had personal knowledge of Utah's illegal, unconstitutional, and unethical adoption practices.

474.  As early as January 13, 2010,  the UAG was made aware of problems with the Utah Adoption Act when copied on pleadings relating to the constitutional challenges brought by one biological father.

475.  A summary of the formal written notices of constitutional challenges provided to the UAG, in chronological order, extending over two and a half (2 ½) years include, but are necessarily limited to, the following:

a.  In a "John Doe" case in or about July of 2010 (Exhibit E);

b.  In Bolden's case Notice was provided on July 12, 2011; and then UAG refused to enter an appearance in the case by letter dated August 3, 2011 (and then the UAG received a copy of the Docketing Statement in Bolden's appeal on or about August 30, 2012)(Exhibit F);

        c.      A meeting on or about September 22, 2011, with the Utah Adoption Council's President in which then Chief Deputy Swallow received numerous transcripts and other documentation proving adoption agency complicity in fraudulent acts upon biological fathers (see transcripts below);

        d.      In Strickland's case in or about February of 2012 (Exhibit G)[18];

        e.      In Strickland's case on May 26, 2012 (Exhibit H);

        f.      In Carlton's case on January 23, 2013 (Exhibit I); and

        g.      In Wallace's case on January 23, 2013 (Exhibit J).

476.    In or about early 2012, then Chief Deputy Swallow inquired of counsel why UAG was being copied on such documents referenced in the preceding paragraph, and he was referred to Rule 24(d) of the Utah Rules of Civil Procedure, which states as follows:

(d) Constitutionality of statutes and ordinances.
    (d)(1) If a party challenges the constitutionality of a statute in an action in which the Attorney General has not appeared, the party raising the question of constitutionality shall notify the Attorney General of such fact. The court shall permit the state to be heard upon timely application.

477.    As referenced above, on or about September 22, 2011, then Chief Deputy

---

[18] In an effort to bring attention to the wrongful conduct in Strickland's case his mother Jenny Graham, wrote a letter to the First Presidency of the LDS Church, given the involvement of the adoption agency LDS Family Services.  The letter Graham received in response expressed sympathy and condolences, and among other things, but cited to The Family: A Proclamation to the World, including that children "are entitled to birth within the bonds of matrimony, and to be reared by a father and a mother who honor martial vows with complete fidelity."  A true and correct copy of the letter sent to Strickland's mother is attached hereto as Exhibit R.  On information and belief Defendants are members of the LDS Church and may have adopted the same type of ill-conceived ends-justify-the-means approach, misinterpreting the Family Proclamation, to getting children out of single-father homes and into two-parent homes.

Swallow was made aware of constitutional problems with the Utah Adoption Act in the context of other cases, including John Wyatt (known as the "Baby Emma" case) and others.

478.    In spite of the UAG being informed of all the constitutional violations in these cases, not once did the UAG ever enter an appearance in any case, or render any opinion, or take any other significant action whatsoever relating to the unconstitutionality of the Utah Adoption Act which was clearly stripping Biological Fathers of their due process rights.

479.  More than a year previously, on a NBC-produced Dateline broadcast that aired on August 19, 2011, Shurtleff was interviewed in reference to numerous fraudulent biological father cases, including John Wyatt and Cody O'Dea.

480.    Shurtleff expressly publicly promised, as aired on the Dateline program (August 19, 2011) that he would "Yes, absolutely look at the issue closer and see if there's something that's happening, inadvertently, to hurt birthfather," and further that he would "look at [the issue] and talk to [the Utah] legislature about that."   (Exhibit K, partial transcript of the Dateline program).

481.    The night the Dateline program aired, Strickland's mother Jenny Graham drafted to Shurtleff an email on behalf of her son Strickland to follow up regarding fraudulent adoptions in Utah.  Graham received a response that amounted to little more than a "political dodge" of the issue, which directly contradicted Shurtleff's official duties as well as the personal promise issued on Dateline.  (Exhibit L).[19]

---

[19]On information and belief, the taping of the Dateline program took place two to three months before it aired on August 19, 2011, so Shurtleff had that time to begin acting on his personal promise and duties of office even before the program aired, but he did nothing.

482.    Neither Shurtleff nor his successors have done anything as promised, and in the meantime, Biological Fathers, and others, have been again and again unlawfully and continuously deprived of their constitutionally protected paternity rights.

483.    Swallow personally received on or about September 22, 2011, a bound copy of many of the transcripts discussed below, in addition to other printed materials relating to some of Utah's unethical, illegal, and unconstitutional adoption practices.

484.    Swallow personally acknowledged on September 22, 2011, the problems that Fraud Immunity allows to persist in Utah, and the violations of due process that were being carried out under its banner.

485.    Swallow personally stated on or about September 22, 2011, that he was committed to keeping the Dateline promise of Shurtleff, and would assist with the eradication in Utah of adoptions sanctioned through fraudulent and other unconstitutional means.

486.    In spite of Swallow's personal promises and duties of his office, he also essentially did nothing, and further took affirmative action against positive change by withdrawing support for a change in the law that would have required mandatory notice to biological fathers.

487.   State Representative Christine Watkins (D) sponsored a bill in the 2012 legislative session that would have required mandatory notice to unmarried biological fathers and taken steps to dramatically reducing if not eliminating out-of-state birth mothers from forum shopping Utah to take advantage of its relatively anti-birth father unconstitutional adoption laws.

488.   Swallow first professed, privately but in no public manner, support of the bill as a

72

first-step measure to correct the problem.

489.  Succumbing to political pressure, however, he thereafter withdrew his support of the bill on the professed reason that those in favor of the bill, who were pressing for mandatory notice to biological fathers, had "backed the wrong horse by having a Democrat sponsor the bill."

490.  Swallow ignored warnings that the bill was one that crossed party lines, meaning that it would correct many of the constitutional infirmities of the Utah Adoption Act, regardless of a person's political party affiliation.

491.  The bill was eventually defeated in committee.

### FACTS RELATING TO DEFENDANTS' OFFICIAL AND PERSONAL CAPACITIES

492.     Defendants, at various times were acting in their official and also in their individual or personal capacities.

493.     Defendants, acting under color of state law, caused the deprivation of the federal civil rights of the Biological Fathers and the Minor Children, and therefore were acting in their personal or individual capacities.[20]

494.     Defendants personally knew of the fraud and kidnapping that was taking place in Utah, under the guise of Utah's adoption laws, and turned a blind eye to such practices, in direct contradiction to their personal promises, their oath of office, their statutory mandates, and their

---

[20]"[To establish personal liability in a § 1983 action, it is enough to show that the official acting under color of state law, caused the deprivation of a federal right." *Haler v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)).

stated priorities, and also their oaths as licensed attorneys in Utah.[21]

495.   Defendants' failures to act, include but are not limited to their failure to prosecute the illegal conduct of Utah adoption agencies; failure to prosecute other parties engaging in or complicit with fraudulent adoption practices; and a failure to protect children from abusive adoption practices and prosecute those responsible for such practices.

496.   At worst, through both their conduct and inaction, Defendants demonstrated an intentional and knowing violation of the clear and well-established rights of the Biological Fathers and the Minor Children, and others similarly situated, or alternatively at best they showed a callous and reprehensible disregard for those same rights, by failing and refusing to take action.[22]

---

[21]As set forth above, the actionable conduct of Defendants includes individual and personal malfeasance while in office, and is not simply limited to a refusal and/or failure to comply with the established duties and responsibilities of their office. It was also their personal knowledge, personal promises to investigate, to coordinate with the legislature, and to take appropriate action to correct the problems with adoption practices in Utah– all of which they did not do.

[22]The rights of Biological Fathers are clearly established under federal law, including the Fifth and Fourteenth amendments, and United States Supreme Court decisions. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982)(whether state actor violated clearly established federal law is an objective reasonableness test). As the U.S. Supreme Court noted in *Lear v. Robertson*, 463 U.S. 248 (1983), "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self -evident that they are sufficiently vital to merit constitutional protection in appropriate cases." *Lear*, 463 at 256. The *Lear* Court went on to consider and discuss the three cases in which the Court had previously examined the extent to which a natural father's biological relationship with his child receives protection under the Due Process Clause, to wit: *Stanley v. Illinois*, 405 U.S. 645 (1972); *Quilling v. Walcott*, 434 U.S. 246 (1978), and *Caban v. Mohammed*, 441 U.S. 380 (1979). *Id.* at 258-62. As *Lehr* observed, quoting from *Caban*: "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr*, 463 U.S. at 260 (quoting *Caban*, 441

**EVIDENCE RELATING TO THE FRAUDULENT AND**
**UNCONSTITUTIONAL CONDUCT OF UTAH ADOPTION AGENCIES**

497.    Utah adoption agencies regularly coach birth mothers on issues that entice them to

come to Utah to have their babies.   Transcripts of interviews of the adoption agencies and other

materials were provided to Swallow on September 22, 2011.

498.    Such agencies encourage mothers to forum shop Utah, in direct contradiction to

the rights a birth father would otherwise have in his home state.

499.    Stacy Ellstawary ("Ellstawary"), who works for a Pennsylvania state

representative, took personal interest in an unrelated unmarried biological father case, as he tried

to get anyone to listen to him and assist in getting his child back.  Ellstawary called the Utah

adoption agency Adoption Center of Choice ("ACC") in late 2010, and inquired about placement

of children for adoption when the birth mother is from out of state, and does not want the birth

father involved.

500.    ACC stated that if a birth mother claimed there was physical abuse from the birth

father, then he would be cut off from his rights automatically.

501.    ACC also expressly told Ellstawary that there are "ways to get around the birth

father."

502.    ACC went on to indicate that there were ways to sequester the birth mother from

the birth father so that "he would never have a shot in hell in ever getting his child back."  *See*

---

U.S. at 397).  The linchpin in this case is that the Biological Fathers would have established the
type of enduring relationship that would otherwise be required, had they been permitted to do so.
They clearly wanted to, and made every reasonable effort to do so.  All of Biological Father's
conduct is consistent with their efforts to be an involved, caring, and responsible fathers.

Exhibit A.

## **March 25, 2011 Interview of ACC:**

503.    On March 25, 2011, a telephone interview of an individual named Allison with ACC was conducted regarding agency policies and procedures pertaining to out-of-state birth mothers who wish to come to Utah to give birth.  Issues discussed focused on monies paid to such birth mothers and other accommodations gifted to the mother, as well as procedures for cutting the birth father out of the parenting picture. *(See* Exhibit M).

504.    The transcript of the 3/25/2011 interview provides substantial evidence of ACC's unlawful policies and procedures regarding out-of-state birth mother adoption cases similar to this one, to wit, unmarried biological mothers not from this state, are brought into Utah for the purpose of giving birth, placing the child for adoption, without any notice to the birth father, and then returning the birth mother to her home state (Exhibit M):[23]

a.  Birth mother from Maryland "just wants to disappear;" R. 176[24];

b.  The agency has a housing program in Utah, cable tv, utilities, but we would need to grab one of the apartments if the birth mother is serious; R. 175;

---

[23]This adoption "scheme" is precisely, as set forth above, the concern voiced by Chief Justice Durham when she stated it is doubtful that the legislature intended residency requirements to be interpreted so broadly in Utah that the state would become a magnet for birth mothers to come here, for a very  limited period of time and for the sole purpose of giving birth to a child, relinquishing their rights, and then returning to their home state. *O'Dea v. Olea*, 217 P.3d 704, 715 (Utah 2009)(Durham, C.J., dissenting).   The transcript of the ACC interview, as well as the other interviews with adoption agencies, discussed more fully below, demonstrate that Chief Justice Durham's concern has become a reality.

[24]Represents the page number of Exhibit M.

c.  If birth mother comes to Utah then [agency] can go by Utah law and [agency] can give her way more assistance, including post placement money; R. 174;

d.  It's kinda recovery money; not for the baby but for the birth mother to recover from having the baby; that amount could be anywhere from $2,000 to $4,000; it's probably closer to $3,000 to $4,000; R. 174;

e.  In Maryland an agency can't give post placement money; they don't allow us to give cash like that; R. 174;

f.  Once we give them that cash here in Utah they can spend that money any way they see fit; once we give her that money nobody is going to check up and say how did you spend that money; we're regulated by how much we can give her like by rent, transportation, utilities, counseling, and things like that which is how we come up with the amount; R. 173;

g.  Travel is all paid for; R. 173;

h.  We give her a weekly assistance, and birth moms come in and say, "I've never had to have this much money to even eat...they have so much money to get by on"; R. 173;

i.  Utah is one of the better states to work with birth moms regarding the unmarried biological fathers ("UBFs"); there are steps they have to take care of in Utah to be considered a parent and 99% of the guys don't even do it; they throw a little fit and act like they will, but then they don't; R. 172;

j.  There is a notification process if she doesn't want to name him on any paperwork she just doesn't put his name on any of it; lawyers take care of the notification; R. 172;

k.  So she doesn't have to do anything; "Unfortunately, for the guys, that really maybe is not completely fair, but it is Utah law." R. 171;

l.  The birth mom doesn't have to tell the UBF she is coming here; she's not married to him so she has no binding obligation to tell him where she is going; R. 171;

m.  We do have to publish [later says doesn't have to publish], if he's aware to look at publications of babies being born and can come in and throw a fit but it's rare that a dad actually does that; R. 171;

n.  Birth mom wants to just cut UBF out altogether, and wants to know what to expect if he finds out she is in Utah; [interviewer is put on hold so Allison can ask someone that "knows the laws pretty good"]; R. 170;

o.  He doesn't know she is coming to Utah, or that she is even thinking about it; "She needs to keep that a secret from friends, everybody!"  "If that leaks out he's going to find her." R. 170;

p.  "So what she needs to do is just be nonchalant, finish out her quarter [in school] there, and umm just kinda like well I'm going to go visit someone, I mean not really tell anybody, but you know like I'll be back for the next quarter or whatever, and then it just won't look that suspicious to friends and then if he's looking for her, he won't know where she went." R. 170;

q.  [Allison then checks to see where they publish notice]; they will publish in Maryland, and the person asked said they never hear from the UBFs, so the birth mother "is probably pretty safe." R. 169;

r.  The UBF might be operating under Maryland law, and he wouldn't even know to go by Utah laws; R. 169;

s.  "She said we never ever hear from them off of a publication, but she says we legally have to do that." R. 169;

t.  If the birth mother comes to Utah then we use our attorney; R. 168;

u.  "We've had some birth fathers blowing some huge smoke and we thought, oh my gosh this is never going to fly and then they go away."  It's very expensive for them. R. 168;

v.  The UBF won't know she's in Utah; R. 168;

w.  Even if he got to Utah he wouldn't know how to find her; R. 167;

x.  Even if the birth mother comes to Utah until she has the baby, and even though she's not a resident here, just staying here, he still has to comply with Utah law and not Maryland law; R. 168;

y.  If she's here in Utah placing the baby then we go by Utah law; R. 166;

z.  There are several steps he has to take and it is kind of expensive; they start realizing how much it is going to cost; only ones that follow through with it do so because of their parents' money, and that's actually quite rare; Utah law is what is applicable; R. 166;

aa.  Better for her to come to Utah, and he would have to do the research and have to make the effort to find out he has to comply with Utah law; R. 166;

bb.  Had a dad come back and call the office all the time; he called and called and finally he just went away; R. 164;

cc.  "So it sounds really unfair for these dads but he did not take the steps that he

79

needed to take beforehand and we don't give out that information, it's private in the laws."  R. 164;

       dd.  This one guy called pretty frequently and we thought it was going to be a disaster, but he did just disappear and the adoption took place and everything was fine; [The individual that was calling the agency is believed the UBF in the other case]; R. 164;

       ee.  Yeah, hopefully he never figures out where she goes, if she just disappears he won't look for her; R. 164;

       ff.  He has to follow certain guidelines to even have a fighting chance; R. 164;

       gg.  He has to prove some things, and usually once it reaches the point that the baby has been born, there's going to be enough time between her moving and her having the baby, if he's going to throw a fit we're going to see it; R. 163.

### March 10, 2012 Interview of ACC:[25]

    505.  On or about March 10, 2012, another interview of another representative of ACC (or "Agency") was completed by a woman posing as a birth mother from Illinois. The additional interview confirms all of the following forum shopping and other wrongful conduct by ACC (Exhibits N and O):

       a.  The birth father wanted to get married and raise the baby together with the birth mother.  (Ex. N at 3:19-21);

       b.  "In Utah the birth father laws are very unforgiving."  (Ex. N at 5:22-23);

       c.  "If he [the birth father] knows that you are in Utah, that's really ideal.  If

---

[25]ACC's license as a Utah child-placing agency has subsequently been revoked.

he is noticed and served, that helps.  But you don't have to even identify him."  (Ex. N at 5:22-23);

       d.     If the birth mother comes to Utah and has baby and then returns home (to Chicago) and she's not pregnant anymore, the birth father will be mad.  (Ex. N at 7:8-12);

       e.     "You don't have to tell [the birth father] anything," you can say "Hey, you know, we had a really bad accident."  (Ex. N at 7:13-17);

       f.     "You can tell the birthfather whatever you want," including that you "got into a car accident" and the baby died, "that might be easier. . .".  (Ex. N at 7:18-21; Ex. O);

       g.     Adoption Center will support you if you need it, including you getting out of Illinois and moving back to Utah.  (Ex. N at 7:21-24);

       h.     "You have to come here to have the baby."  (Ex. N at 9:14-15);

       i.     "There is no other way out.  If you're going to go somewhere, this is the best place."  (Ex. N at 9:17-19);

       j.     "Utah law allows for the [adoptive] family to provide you with what's called post placement support, which is an attempt to replace your income or what would have been your income for about four to six weeks."  (Ex. N at 10:20-24);

       k.     "It usually ends up being, you know, 3- to $4,000."  (Ex. N at 11:1-2);

       l.     "Not all states allow birth moms money or hardly any at all or they have a cap on it.  Utah doesn't.  It just has to be reasonable."  (Ex. N at 11:11-13);

       m.     "We [Adoption Center] work with families all over the country.  Because Utah's so adoption friendly a lot of families want to adopt out of Utah.  Because if the child is

born here and placed here, Utah law applies."  (Ex. N at 12:9-13);

        n.     "I've [Adoption Center] never seen it work" if you deliver in Utah and he

is in Illinois.  (Ex. N at 13:11-15);

        o.     "[T]here's a lot going on right now, a lot of pressure in Utah to change the

adoption laws for this very reason because they seem very unfair.  In my opinion, it is unfair.

Legal doesn't make it right, but that's the law.  So as long as that's the law, you're protected."

(Ex. N at 13:17-23);

        p.     "[I]f he were my son, I'd be saying `That is not right.  That is unfair.'

Because it is unfair.  But Utah says you have sex, you better figure out there could be a baby, and

that means in nine months you better do something.  And if you don't, too bad."  (Ex. N at 13: 25

to 14:5);

        q.     You can fly to Utah whenever you want, but you'd want to make sure

you're safe; we have women fly out right at their due date, but it's really not advisable.   (Ex. N

at 14:12-13, 24-25 to 15:1);

        r.     The sooner you can get to Utah the better; "If you wanted to come out here

and find a place and get into a place, we'd pay your rent and utilities."  (Ex. N at 16:2-7);

        s.     "We'd give you grocery money every week.  You could get on Utah

Medicaid...." (Ex. N at 16:11-13);

        t.     "I've been a social worker for 30 years."  (Ex. N at 22:20-21);

        u.     "I've been at [Adoption Center] for 11 [years]..."  (Ex. N at 22:23);

        v.     "[T]he question that I need to answer for you is how much of a

complicating factor could the birth father be if you come to Utah." (Ex. N at 23:19-22);

        w.      He doesn't know he has 20 days [from a qualifying circumstance], "[h]e's supposed to figure all of that out. Utah says you [the birth father] should figure it out. You're a big boy, you've been dating, figure it out." (Ex. N at 23:23 to 24:3);

        x.      If you [the birth mother] disappeared he [the birth father] would probably think you came to Utah. (Ex. N at 24:10-12);

        y.      If the birth father found out you lied to him and you actually gave the baby up for adoption, "[h]e would fight and he would lose." (Ex. N at 25:23 to 26:4);

        z.      "It's important not to take support from [the birth father]. . . . "Don't accept any support from him." (Ex. N at 26:10-11, 15-16);

        aa.      You will be required to sign a birth father affidavit that includes a statement that he's not supporting you in any way during the pregnancy; you need to tell the truth. (Ex. N at 26:18 to 27:6); and

        bb.      "I've done 1,239 adoptions." (Ex. N at 32:3).

### Interviews With Other Utah Adoption Agencies:

    506.    Other Utah licensed child-placing agencies engage in a regular practice of enticing out-of-state birth mothers to come to Utah for the sole purpose of giving birth to their children in this state, 24 hours thereafter convincing them to relinquish their rights and placing their children for adoption, then returning birth mothers to their home state, at all times encouraging birth mothers to keep out-of-state birth fathers "in the dark" about what the agencies and birth mothers are doing, and all as part of an ill-conceived scheme designed to prevent birth fathers from

exercising their parental rights and otherwise timely objecting to the adoption of their children. As a brief summary of the transcripts from the other two agencies, further evidence of the adoption "scheme" outlined above includes the following (Exhibits P and Q):

      a.  Financial and living arrangement incentives include help with her living expenses; apartment complex, "we put our gals up in, they get their own furnished apartment." We pay for all their expenses while they are out here; R. 155[26]; we have housing here in Utah; "we help our girls all the time that need to get away from where they're at... so that's not a problem...." R. 154;

      b.  The birth mother wants to know if the UBF can prevent her from giving the baby up for adoption, that's her biggest [concern]; NO HE CAN'T; R. 154;

      c.  She does not have to tell him that she is coming to Utah; R. 153; the UBF doesn't have to know that the birth mom leaves and she comes somewhere else and does something else; R. 141;

      d.  "If he's going to just be a total pain in the butt then we can definitely, just not have him involved at all."  R. 153;

      e.  She can just get on a plane and come out and he can't do anything about it; we'll usually do "like a general notice, ad or whatever, like in the, ya know, how like in the back of the paper or whatever .... so there's technically, we tried to notify him type of thing." [Laughing...] But who reads those, right?  EXACTLY; R. 153;

      f.  Regarding if he can just hop on a plane and come out to Utah, she doesn't want

---

[26]Pages numbers in this section refer to the pages numbers in Exhibits P and Q.

any nasty surprises..."There's a ton of, there's quite a few agencies in Utah. . . ."; R. 152;

g.  Regarding what does the notice say [on hold, while checks]; "Okay.  Alright. It is.  So. Good news.  So.  Apparently umm...if she comes to Utah, like before she actually delivers, which obviously she is probably planning on doing...(Right)  then we don't even need to post in Maryland.  So, ummm...we won't even have to notify him at all.  Only if they're coming out to Utah after they deliver and placing the baby do we have to post."  R. 151-52;

h.  "So if she's already [in Utah] and has the baby here then she doesn't have to tell him she's coming, she doesn't have to tell him anything, she can just disappear." R. 151; "So her best bet, if that, if she wants to get away and get apart from that would be to obviously come here." R. 143;

i.  Like said if she chooses not to identify him on the birth certificate "then we don't even have to deal with him." R. 151;

j.  We deal with birth fathers all the time that try and it just doesn't pan out for them because Utah laws are so protective of the birth mom; R. 151;

k.  By the time he got anything going, it takes so many months, getting anything going, that the placement would already be finalized and he wouldn't stand a chance anyway; R. 151; the birth mother could go back to Maryland and get into trouble, "but the thing is, it's already done and it's already signed and it's legal and so..." R. 141;

l.  There's a deadline...he can't come back a year later...it's like 24 hours, really soon after the birth; R. 151;

m.  So even if she were to come to Utah today, and then by the time if he started

filing papers today, the chances of him getting papers filed to the court on time are like so remote, "unfortunately the court systems take forever, or fortunately in this case . . . ."; R. 150-51;

n.  Any attorney knows that Utah laws are so strict, "it would probably be just like, `Dude, you're hosed,' ya know what I mean..." R. 150;

o.  Regarding whether he wants to parent the child...he wants to have the baby, wants to be a dad, wants to pay for the baby's expenses, and pay to get married, and the birth mother is like "I love you dude, but I don't want to marry you, and I don't want to have a baby with you." R. 150;

p.  Literally over 99% of the time the guys just mouth off and then find out they're going to have to pay $30,000 in legal fees, and they're like never mind; it's like they're almost doing it more to be a jerk to the birth mom, depending on the situation, but then they find out how much it's going to be and they're like okay never mind; R. 150;

q.  It was temporary for her, but he thought it was more permanent..."Well, she won't have to worry about him.  Let's just put it that way."  R. 150;

r.  We hardly have one UBF that is cooperative, so we deal with it all day every day, so that's not even an issue; R. 149;

s.  We pay for her way to come to Utah and to send her back to Maryland; R. 149;

t.  We pay her final placement money too; "it's money to kind of help her get back on her feet after placement . . . It's usually about $3,000." R. 149; She would go home with money in her pocket, so she would have 6 weeks covered; R. 143;

86

u.  We need to give him 20 days notice, and then once she signs papers after the baby's born if that 20 days has passed then his rights are terminated; what we try to do about 30 days out, give us that leeway if she is early, he still has the 20 days even if it's post delivery; so it's 20 days from when she tells him; R. 142;

v.  We don't tell him that he has to come to Utah and file, we just tell him that it will all go down in Utah, and then if he's really responsible as he says he's going to be in raising a child, then he needs to go to work and figure out what to do; R. 129;

w.  "And so many of these guys are such dead beats they just you know think that they can scream and holler and don't place the baby and then the poor birth mom is stuck." R. 129; "It's hard to say if he's going to bark really loud and not bite and which ones are going to bite."  A lot of times they get their mothers behind them pushing and pushing; R. 131;

x.  Agency gets "a million calls a day...." R. 128;

y.  You can notify the UBF of your intentions to come to Utah any way you want, but just need to show that he knew, whether by certified mail, text, or email, or whatever; R. 126.[27]

## Questionable, Unethical, and/or Other Illegal Conduct by Agencies

---

[27]In the first round of interviews in 2011, one of the offices of LDS Family Services adoption agency interviews suggested that there were no major forum shopping, birth mother coaching, or Fraud Immunity issues.  In specific instances, however, LDS Family Services has engaged in questionable if not illegal conduct, and on information and belief, opposed to any meaningful mandatory notice to birth fathers, and is at a minimum tacitly complicit with unethical, wrongful, and even fraudulent conduct perpetrated upon unmarried biological fathers by biological mothers, which is being facilitated by Fraud Immunity.

507.     Many Utah licensed child-placing agencies engage in a number of marketing and advertising schemes designed to entice birth mothers to travel to Utah, and further designed to make the adoption process much faster and much easier from the standpoint of eliminating fathers from the legal equation, thereby rendering far too many adoptions more financially lucrative.  This is largely accomplished by coaching birth mothers on how to unilaterally place their children for adoption without the knowledge and/or consent of the biological father.

508.     As just one example, the Utah-based adoption agency A Act of Love,[28] has at times had a variety of internet "pop up" advertisements.  A true and correct copy of such pop-up advertising is attached hereto as Exhibit S.

509.     A pop up ad for A Act of Love invites potential birth mothers to consider adoptions with a variety of promises, incentives and services:

      a.   "Private & Confidential Information";

      b.   "Free Housing Assistance";

      c.   "Free Medical Assistance";

---

[28]As set forth above, A Act of Love is the agency admonished by the Virginia Supreme Court in the John Wyatt case:

> [i]t is both astonishing and profoundly disturbing that in this case, a biological mother and her parents, with the aid of two licensed attorneys and an adoption agency, could intentionally act to prevent a biological father -- who is in no way alleged to be an unfit parent -- from legally establishing his parental rights in gaining custody of a child whom the mother did not want to keep. . . .

*John M. Wyatt III, et al. v. McDermott, et al.*, *283 Va. 685*; *725 S.E.2d 555*; *2012 Va. LEXIS 92*. The Defendants in the *Wyatt* case included: Virginia attorney Mark McDermott, Utah attorney Larry Jenkins, Utah law firm Wood Jenkins, Utah adoption agency A Act of Love, agency representative and Utah resident Lorraine Moon, and others.

     d. "You Choose the Family";

     e. "24/7 Support";

     f. "Free Cell Phone";

     g. "Get Away from it all if you wish";

     h. "Enjoy Life, Hobbies, Movies, Prenatal Massages"; and

     i. "Trust Act of Love Over 1,000 Succesfull [sic] Adoptions."

See Exhibit S, at page 2.[29]

    510.    Under an airplane "icon" entitled "Get Away From It All If You Wish," a portion of A Act of Love's pop up ad states:

---

[29]Arguably, such advertisements amount to illegal incentives offered to a birth mother, in violation of Utah's **felony sale of a child statute** (U.C.A. 76-7-203), which states in relevant part:

  (2) Except as provided in Subsection (3), a person is guilty of a third degree felony if the person:
     (a) while having custody, care, control, or possession of a child, sells, or disposes of the child, or attempts or offers to sell or dispose of the child, for and in consideration of the payment of money or another thing of value; or
     (b) ***offers, gives, or attempts to give money or another thing of value to a person, with the intent to induce or encourage a person*** to violate Subsection (2)(a).
  (3) A person does not violate this section by paying or receiving payment for adoption related expenses, if:
     (a) the expenses are paid as an act of charity; and
     (b) ***the payment is not made for the purpose of inducing the mother***, parent, or legal guardian of a child to:
     (i) place the child for adoption;
     (ii) consent to an adoption; or
     (iii) cooperate in the completion of an adoption.

(Emphasis added).

If you desire to relocate during the latter part of your pregnancy, Act of Love has free housing available to you.  Depending on your situation, most states will allow the adoptive family to assist with pregnancy related expenses.  Pregnancy related expenses include such things as, housing, food, transportation, medical and legal services, and pregnancy related clothing.  Your Act of Love adoption support team will help you with an adoption plan to meet your needs.

Exhibit S, at page 9.

## I.  FIRST CAUSE OF ACTION: CIVIL RIGHTS VIOLATIONS

(42 U.S.C. § 1981, et seq. - All Defendants)

511.    Plaintiffs reassert all allegations set forth above in paragraphs 1 through 510 as though incorporated fully herein by this reference.

512.     Defendants engaged, acting under color of state law, in numerous acts, including but not necessarily limited to the factual allegations set forth above which individually and collectively resulted in numerous violations of the civil rights of the Biological Fathers and the Minor Children, including but not limited to those secured through the Fight and Fourteenth Amendments, as follows:

a.   A violation of the due process, equal protection, anti-self-incrimination, and other civil rights of the Biological Fathers and the Minor Children (42 U.S.C. § 1981);

b.   A violation of the rights of the Biological Fathers and the Minor Children, afforded to all citizens who are afforded the same right, to hold and maintain personal property (42 U.S.C. § 1982);

c.   A violation of the civil rights of the Biological Fathers and the Minor Children, afforded to all citizens (42 U.S.C. § 1983);

90

d.  Defendants neglectfully failing to prevent a conspiracy to violate the civil rights of the Biological Fathers and the Minor Children  (18 U.S.C. § 1986); and/or

e.  Defendants engaging in other conduct that violated the civil rights of Plaintiffs and the Minor Children which Plaintiffs expects to identify through discovery.

513.    As a proximate result of Defendants' actionable conduct, Biological Fathers and their Minor Children have suffered considerable special and general damages in an amount that will be determined at the time of trial, which shall in no way be less that $250 million, and have further sustained punitive damages which should be awarded to deter such type of conduct in the future also in an amount that shall be determined at the time of trial and which shall be no less than an additional $250 million.

514.    Under established law, Plaintiffs are entitled to reimbursement of their reasonable attorney's fees and costs incurred in pursing the civil rights violations, including as set forth in 42 U.S.C. § 1988.

## II. <u>SECOND CAUSE OF ACTION</u>

(Declaratory Relief)

515.    Plaintiffs reassert all allegations set forth above in paragraphs 1 through 514 as though incorporated fully herein by this reference.

516.    A declaratory judgment that Utah's Fraud Immunity Statute, and other portions of the Utah Adoption Act (discussed more fully above), are unconstitutional as applied to the Biological Fathers and/or their Minor Children.

517.    That Utah's Fraud Immunity Statute, and other portions of the Utah Adoption Act

91

(discussed more fully above), are prospectively unconstitutional in the manner in which, as written, they can be and most likely shall be applied to biological fathers in the future, if it they are permitted to remain in place, judicially unchecked.

518.    That UAG Reyes in his official capacity, be required to carry out his oath of office, his statutory and other duties and obligations, and that he take any all steps necessary to prevent state/federal constitutional and/or state/federal statutory violations, including but not limited to:

a.    Investigate the unethical, fraudulent, and illegal activities of any and all adoption practices in Utah, including but not limited to those of Utah-licensed child-placing agencies;

b.    Prosecute Utah-licensed child-placing agencies who are found to engage in unethical, fraudulent, and/or illegal adoptions;

c.    Investigate the need for a reorganization of Utah's regulatory/administrative offices and all rules, regulations, and policies relating to the operation of Utah's licensed child-placing agencies;

d.    Implement new regulatory/administrative rules, policies, and/or procedures to ensure that Utah's licensed child-placing agencies are following ethical, non-fraudulent, and legal adoption practices;

e.    Oversee, enforce, and prosecute in a meaningful manner all Utah licensed child-placing agencies found to be out of compliance with Utah's statutes, rules, polices, and/or procedures required to be engaging in ethical, non-fraudulent, and legal adoption practices; and

f.       Implement any and all other prospective forms of relief to prevent the State of Utah from being used as a "baby brokerage" where birth mothers can come from all of the country, and place their babies for adoption without the birth fathers' knowledge or consent, in direct violation of the birth fathers' state and federal constitutional rights, and contrary to a fair and reasonable enforcement of Utah's Adoption Act and other adoption-related laws.

### III. THIRD CAUSE OF ACTION

(Reservation To Amend)

519.    Plaintiffs reallege all matters contained in paragraphs 1 through 518 above as though fully set forth herein.

520.    Plaintiffs anticipate that discovery may reveal other potential causes of action against Defendants, their principals, agents, representatives, or other persons or entities, and therefore reserve the right to amend this pleading to bring such additional causes and include additional party defendants.  Plaintiffs further reserve the right to amend this First Amended Complaint to add additional party plaintiffs and/or to bring a motion to certify this matter as a class action.

### JURY DEMAND

521.    Plaintiffs hereby reiterate their demand for a trial by jury of all issues so triable.

### PRAYER FOR RELIEF

Plaintiffs pray for relief against Defendants as follows:

1.      Compensatory and incidental damages in an amount to be proven at trial, but shall which in no event be less than $300 million;

93

2.       Prospective, equitable and/or declaratory relief as may be appropriate under the circumstances, including a pronouncement that the portions of the Utah Adoption Act which permit fraud, and the deprivation of the civil rights of the Biological Fathers and the Minor Children are unconstitutional, including under the Fifth and Fourteenth Amendments;

3.       For treble and/or punitive or exemplary damages to deter this type of conduct in the future, and in any event no less than $500 million;

4.       For an award of reasonable attorneys' fees and costs of collection;

5.       Such other and further relief as the Court deems just and proper under the circumstances.

DATED this __2st_ day of October, 2014.

THE HUTCHINS LAW FIRM, P.C.

/S/ *Wesley D. Hutchins*

Wesley D. Hutchins
***Attorney for Plaintiffs "Biological Fathers"
and their Minor Children***