DAVID N. WOLF (6688)
MEB W. ANDERSON (10227)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@utah.gov
E-mail: mebanderson@utah.gov

*Attorneys for Defendants Mark L. Shurtleff and John E. Swallow*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENITO MANZANARES; CHRISTOPHER DAVID THOMAS CARLTON; JAKE M. STRICKLAND; JACOB D. BROOKS; FRANK L. MARTIN; SAMUEL G. DYE; BOBBY L. NEVARES; WILLIAM E. BOLDEN; JOHN M. WYATT, III; CODY M. O'DEA; SCOTTIE WALLACE; NIKOLAUS L. THURNWALD; TERRY J. ACHANE; JOHNATHON C. CRAWFORD-HARRIS; CODY FOWLER; AUSTIN B. KNUDSON; DALLIN CURRY; C. CLINT WORSLEY; TRAVIS J. ANDERSON; RANDY COLE; MASON MEEDERINK; GERALD LAWSON, JR.; and GARRETT CONDOS; et al., personally and individually, and for and on behalf of their Minor Children, <br><br> Plaintiffs, <br> v. <br><br> ATTORNEY GENERAL SEAN D. REYES, ATTORNEY GENERAL OF THE STATE OF UTAH; MARK L. SHURTLEFF; and JOHN E. SWALLOW, in both their personal/individual and official capacities; and JOHN DOES I to XX, <br><br> Defendants. | **DEFENDANTS SHURTLEFF AND SWALLOW'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM** <br><br><br><br><br><br><br><br><br><br><br><br> Case No. 2:14-cv-00040-DN-EJF <br> District Court Judge David Nuffer <br> Magistrate Judge Evelyn J. Furse |

Defendants Mark L. Shurtleff and John E. Swallow, by and through counsel, David N. Wolf and Meb W. Anderson, Assistant Utah Attorneys General, hereby submit this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs' claims fail to state claims upon which relief can be granted.

## I.        INTRODUCTION

Plaintiffs are a group of unmarried biological fathers who claim that portions of the Utah Adoption Act (Utah Code Ann. §§ 78B-6-101 to -145) are unconstitutional.  Plaintiffs specifically allege that, as applied to them, Utah Code Ann. § 78B-6-106, § 78B-6-121 and § 78B-6-122 are unconstitutional.  Utah Code Ann. § 78B-6-106 provides, in part, that "[e]ach parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties."  Utah Code Ann. § 78B-6-106 further provides that "[a] fraudulent representation is not a defense to strict compliance with the requirements of this chapter, and is not a basis for dismissal of a petition for adoption, vacation of an adoption decree, or an automatic grant of custody to the offended party."[1]  Utah Code Ann. § 78B-6-121 and -122 set forth the circumstances upon which consent of an unmarried biological father to an adoption is and is not required and "prescribe[] the requirements that an unwed father must meet in order to secure the right to assert his parental rights and object to an adoption." *In re Adoption of J.S.*, 2014 UT 51 at ¶ 2.

---

[1] The statute preserves the right of a "person injured by fraudulent representations or actions in connection with an adoption . . . to pursue civil or criminal penalties in accordance with existing law."  Utah Code Ann. § 78B-6-106(2).

To date, no court has ever found these statutes to be unconstitutional.  To the contrary, in *In re Adoption of J.S.* the Utah Supreme Court very recently upheld the constitutionality of the Utah Adoption Act.  *Id.* at ¶ 8.  Nevertheless, Plaintiffs allege that their due process rights of fair notice and their first amendment rights of association with their children have been and continue to be violated by these statutory provisions.  Accordingly, Plaintiffs seek prospective injunctive relief in the form of an order prohibiting the State of Utah from administering the terms of Utah Code Ann. § 78B-6-106.  Plaintiffs also seek substantial money damages.

When a party challenges the constitutionality of a statute and seeks prospective injunctive relief, the proper defendant is the current attorney general, acting in his official capacity.[2]  When Plaintiffs brought this suit, Sean D. Reyes was serving as the Attorney General for the State of Utah.[3]  At the time this lawsuit was filed, neither Mark Shurtleff nor John Swallow was the elected Attorney General for the State of Utah, and thus, Shurtleff and Swallow cannot act in an official capacity on behalf of the State of Utah.  Consequently, neither Shurtleff nor Swallow are proper parties to an official capacity lawsuit, seeking prospective injunctive relief, nor susceptible to Plaintiffs' official capacity claims for money damages against Defendants; Eleventh Amendment immunity barring the same.

Plaintiffs have also sued Shurtleff and Swallow in their individual capacity.  Plaintiffs contend that Shurtleff and Swallow reneged on promises to lobby for legislative changes to the laws Plaintiffs believe to be infirm.  These claims are barred by official and qualified immunity.

---

[2] Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), prospective injunctive relief against a state official acting in his official capacity to prevent future federal constitutional violations is not barred by the Eleventh Amendment.

[3] Attorney General Reyes has not been served with the original or Amended Complaint and, thus, is not presently a party to this action.

Moreover, even if immunity were not conferred upon Defendants, there is no affirmative link between Shurtleff and Swallow's conduct and the alleged constitutional violations. And, several of the Plaintiffs' claims are barred by the applicable statute of limitations. Accordingly, Plaintiffs' First Amended Complaint fails to state a claim upon which relief can be granted and, thus, should be dismissed.

## II.     MOTION TO DISMISS STANDARD

A motion to dismiss requires the court to decide whether the factual allegations made in the Complaint, if true, would entitle Plaintiffs to some sort of legal remedy. To state a viable claim "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, the complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The "requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).

When deciding a motion to dismiss, the court must accept all well-plead facts as true and draw reasonable inferences from those facts in favor of the non-moving party. *Ridge at Red Hawk, L.L.C.*, 493 F.3d 1174, 1177 (10th Cir. 2007). However, legal conclusions, deductions, and opinions couched as facts are not presumed to be true, and the court must disregard unsupported conclusory allegations. *See, e.g., Erikson v. Pawnee County Bd. of County Comm.*,

263 F.3d 1151, 1154-55 (10th Cir. 2001).  When a civil rights complaint contains only "bare

assertions" involving "nothing more than a 'formulaic recitation of the elements' of a

constitutional . . . claim," the court considers those assertions conclusory and does not afford

them the presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (quoting *Twombly*,

550 U.S. at 554-55).  Plaintiffs' Complaint makes conclusory allegations of implausible claims.[4]

In addition, a host of legal immunities and affirmative defenses apply to bar this lawsuit at the

threshold.  Accordingly, this case should be dismissed as a matter of law.

**III.    ARGUMENT**

   **A.  Plaintiffs' Official Capacity Claims Against Shurtleff and Swallow Are Barred
        By Sovereign Immunity.**

        The Eleventh Amendment to the United States Constitution, grants states immunity from

suit in federal courts:

> The judicial power of the United States shall not be construed to extend to any
> suit in law or equity, commenced or prosecuted against one of the United States
> by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  The Eleventh Amendment bars any suit against a state in federal court,

unless the state has expressly waived immunity.  *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).

The immunity applies to all suits brought in federal court, including Section 1983 suits, *Quern v.

Jordan*, 440 U.S. 332, 345 (1979), and actions for injunctive relief, *Alabama v. Pugh,* 438 U.S.

781, 782 (1978).  The State of Utah has not waived immunity for Section 1983 suits in federal

---

[4] For example, Plaintiffs allege in paragraph 493 of their Amended Complaint that "Defendants,
acting under color of state law, caused the deprivation of federal civil rights of the Biological
fathers and the Minor Children, and were therefore acting in their personal or individual
capacities."   These allegations are not facts. Instead, these allegations are erroneous conclusions
of law that should not be accepted as true or afforded any deference.

court, and accordingly any such case against it should be dismissed.  *See Wallace v. Grey*, 2009
WL 249461 at *3 (D. Utah, Feb. 2, 2009) (holding that "the Court therefore has no jurisdiction to
hear Plaintiff's claims against Defendant in his official capacity.").

And though Plaintiffs have stated claims against state actors, and not the State, claims
against the Defendants acting in their official capacities are barred under the same principle.  In
*Kentucky v. Graham,* 473 U.S. 159 (1985), the Supreme Court emphasized that official-capacity
suits "'generally represent only another way of pleading an action against an entity of which an
officer is an agent.'"  *Id.* at 165–166 (quoting *Monell v. New York City Dept. of Social Services,*
436 U.S. 658, 690, n. 55 (1978)).  Suits against state officials in their official capacities are
therefore treated as suits against the state, and are barred by the Eleventh Amendment.  *Hafer v.
Melo,* 502 U.S. 21, 25 (1991).  Accordingly, all official capacity claims against Shurtleff and
Swallow in this case must be dismissed.

### B.  Shurtleff and Swallow Are Immune From Plaintiffs' Individual Capacity Claims.

It is not entirely clear from the Amended Complaint in what "individual capacity"
Plaintiffs allege Shurtleff and Swallow acted during the time they served as Attorney General.
All of Defendants' conduct described in the Amended Complaint involves conduct performed
under the color of state law in Shurtleff and Swallow's capacity as officials within the Attorney
General's office.  Notwithstanding the lack of clarity in Plaintiffs' Amended Complaint,
Shurtleff and Swallow are immune from an individual capacity suit in this case.  Here, Plaintiffs
suggest that Shurtleff and Swallow acted as prosecutors, investigators, and apparently as a direct
extension of the Legislature. *See* Pls.' Amend. Compl., Docket No. 35, ¶¶ 472 to 496.   Shurtleff
and Swallow are immune from suit for actions taken in each of these capacities.

Initially, as will be discussed in the qualified immunity section below, the Attorney

General has neither the power nor the duty to amend a law that some citizens believe to be

constitutional.  The power to make or amend laws resides with the Legislature. *See* Utah Const.

Art. 6 §1(a).  The power to declare laws unconstitutional resides with the courts.  *See* Utah

Const. Art. 8 §1.  This alone should end the Court's inquiry into the validity of Plaintiffs'

Amended Complaint, as it fails as a matter of law regardless of the immunity applied by the

Court.  However, because quasi-legislative immunity, prosecutorial immunity, or investigative

immunity can at times be absolute, a discussion of absolute immunity is entertained below.

Whether due to absolute or qualified immunity, Plaintiffs' claims against Shurtleff and Swallow

fail as a matter of law.

### 1.   Absolute Immunity.

Plaintiffs claim that Shurtleff and Swallow, while serving as the Attorney General, chose

not to prosecute private adoption agencies administrating Utah's adoption laws and failed to

correct Utah's adoption laws when they either knew or should have known those laws were

unconstitutional.  (Pls.' Amend. Compl., ¶¶ 472 to 496.)  However, a prosecutor's decision to

investigate or pursue a complaint (prosecutorial immunity)[5] and the assistance of any other

attorney in that decision (investigative immunity) is often entitled to absolute immunity.  *See,*

---

[5] It is well settled that prosecutors are immune from suits alleging misconduct in handling a
prosecution.  *Imbler v. Pachtam,* 424 U.S. 409, 427 (1975).  Absolute immunity allows
prosecutors and those performing equivalent functions the latitude to perform their quasi-judicial
tasks absent the threat of retaliatory litigation.  *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484,
1489–90 (10th Cir. 1991). Such tasks include a prosecutor's role as advocate for the state both
before and after the initiation of a criminal prosecution.  *Burns v. Reed*, 500 U.S. 478, 491 (1994)
(quoting *Imbler*, 424 U.S. at 431, n. 33); *Pfeiffer*, 929 F.2d at 1489.

*Zimmer v. Bork*, 1996 WL 470323 at *1 (10th Cir., Aug 20, 1996) (holding that civil action

against assistant attorney general, a county attorney, a district court judge, and the county sheriff

for participation in the criminal investigation and proceedings against plaintiff was barred

because these state actors enjoyed absolute immunity).  Prosecutorial immunity protects a

prosecutor even if he acted "with an improper state of mind or improper motive."  *Shmueli v.*

*City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Bernard v. County of Suffolk*, 356

F.3d 495 (2d Cir. 2004).  In addition, "a prosecutor is absolutely immune from a civil conspiracy

charge when his alleged participation in the conspiracy consists of otherwise immune acts."[6]

*Reasonover v. St. Louis County*, 447 F.3d 569, 580 (8th Cir. 2006).  The United States Supreme

Court has also applied absolute immunity to "executive officers engaged in executive

functions[.]"  *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

Plaintiffs further allege that Shurtleff and Swallow promised and then subsequently

withdrew their support for legislative changes to the Utah Adoption Act.  However, the power to

enact or amend laws lies with the Legislature, not the Attorney General.  And, even if the

Attorney General had the power to compel the Legislature to enact laws or amend statutes, his

actions would be protected by legislative immunity.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 49

(1998) (State and local legislators enjoy absolute immunity for their legislative acts.); *Tenney v.*

*Bendhove*, 341 U.S. 367, 377 (1951).  Legislative immunity also extends to other governmental

officials engaged in a legislative function.  Thus, under the functional approach to immunities,

---

[6] It is unclear whether Plaintiffs have pled a conspiracy claim against Defendants.  In their First
Cause of Action, Plaintiffs claim "defendants neglectfully fail[ed] to prevent a conspiracy to
violate the civil rights of the [Plaintiffs]," but cite 18 U.S.C. § 1986, a statute that doesn't exist.
(Pls.' Amend. Compl., ¶512(d).)  To the extent Plaintiffs intended to invoke 42 U.S.C. § 1986,
Plaintiffs' claims are untenable for the reasons set forth in this memorandum.

the critical inquiry is whether the official was engaged in legislative activity.  *See*, *e.g, Bogan*, 523 U.S. at 55 (city council member who introduced budget eliminating plaintiff's employment position and mayor who signed the bill into law were protected by absolute immunity); *Sup. Ct. of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 734 (1980) (state judges' promulgation of attorney professional responsibility rules were protected by absolute immunity); *Tenney*, 341 U.S. 377 (legislators who carried out a legislative investigation were protected by absolute immunity because "investigations whether by standing or special committees, are an established part of representative government").  The determination of an act's legislative or executive character "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54.  *See also Torressa-Rivera v. Calderon-Serra*, 412 F.3d 205, 213-14 (1st Cir. 2005) (Governor's signing of bill into law was protected by absolute immunity, regardless of motive or intent).  Legislative action involves the formulation of policy, while executive action enforces the policy in particular circumstances.  *See* 1A Martin A. Swartz, Section 1983 Litigation: Claims and Defenses § 9.08 [B][5] (4th ed. 2005).

Here, Plaintiffs complain that Shurtleff and Swallow reneged on their promises to lobby the Legislator for a change in the law.  To the extent it is presumed that the Attorney General's support of a change in the law would have resulted in the changes to the law the Plaintiffs desire, such conduct is clearly legislative in nature as it is designed to formulate policy.  Accordingly, legislative immunity bars Plaintiffs' claims against Shurtleff and Swallow.[7]

---

[7] Unlike most common law immunities, legislative immunity is not limited to monetary relief; it also encompasses injunctive and declaratory relief. *See Consumers Union of the U.S.*, 446 U.S. at 732; *Scott v. Taylor*, 405 F.3d 1251, 1257 (11th Cir. 2005); *Star Distrib. Ltd. v. Marino*, 613 F.2d 4, 6 (2d Cir. 1980).

## 2.   Qualified Immunity.

"Qualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial."  *Oliver v. Woods,* 209 F.3d 1179, 1185 (10th Cir. 2000) (quotation marks and citation omitted).

The United States Supreme Court has held that:

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial. Indeed, we have made clear that the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery.  Accordingly, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

*Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (marks and citations omitted).

The Tenth Circuit has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).  The Supreme Court has further held that "[q]ualified immunity shields an [official] from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 599 (2004).  Qualified immunity may be denied "only if, on an

objective basis, it is obvious that no reasonably competent [official] would have concluded that the actions were constitutional." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006).  But "'if [officials] of reasonable competence could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized.'" *Id.* at 1136 (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Once a defendant raises qualified immunity, the plaintiff bears the heavy burden of proving (1) that the facts alleged make out a violation of a constitutional right, and/or (2) that a reasonable official would have known they were violating such a constitutional right. *Pearson*, 555 U.S. at 232.  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).

When applicable, the Tenth Circuit has also applied a third prong to the qualified immunity analysis.  Under this third prong, an official is entitled to qualified immunity if "in spite of the fact that the law was clearly established, extraordinary circumstances" including reliance on counsel, on a statute, or policy "so prevented the official from knowing that her actions were unconstitutional that she should not be imputed with knowledge of a clearly established right." *Gomes*, 451 F.3d at 1135 (internal quotation marks omitted).  If the plaintiff fails to satisfy any element of his heavy three-part burden, the court must grant the defendant qualified immunity.  *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

If the material facts are not disputed, the question of immunity is a legal one for the court to decide.  *Gomes*, 451 F.3d at 1136.  "[T]here is no such thing as a 'genuine issue of fact' as to whether the officer 'should have known' that his conduct violated constitutional rights.  The

conduct was either 'reasonabl[e] under settled law in the circumstances,' or it was not…" *Id.*
(second alteration in original) (quoting *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th
Cir. 2000)).

      As applied to this case, the Attorney General will be entitled to immunity so long as his
actions do not violate "clearly established statutory or constitutional rights of which a reasonable
person would have known." *Harlow*, 457 U.S. at 818.  The United States Supreme Court has
long recognized a qualified immunity for executive officers, like the attorney general, whom the
law encourages to exercise his or her best judgment without fear of liability so long as they act in
good faith.  *Id.* at 807.  *See also Mitchell v. Forsyth*, 472 U.S. 511, 524 (U.S. 1985); *Potter v.
Murray City*, 585 F. Supp. 1126, 1134 (D. Utah 1984).  This is because the United States
Supreme Court recognizes "the need to protect officials who are required to exercise their
discretion and the related public interest in encouraging the vigorous exercise of official
authority." *Harlow*, 457 U.S. at 807. (citation omitted).  Because of qualified immunity:
"Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of
artful pleading.  Unless the complaint states a compensable claim for relief …, it should not
survive a motion to dismiss." *Id.* at 808.  In *Harlow*, the Supreme Court permitted the dismissal
of claims barred by qualified immunity in order to avoid the "expenses of litigation, the diversion
of official energy from pressing public issues, and the deterrence of able citizens from
acceptance of public office." *Id.* at 814.

### a.  No Constitutional Violation.

      Here, there can be no constitutional violation on the facts alleged.  "[I]t is within the right
of the Attorney General, if not his duty, to bring suits to clarify the constitutionality of laws

enacted by the Legislature **if he deems it appropriate**." *Hansen v. Barlow*, 456 P.2d 177, 181 (Utah 1969)(emphasis added).  Consequently, while the Attorney General possesses the discretion to challenge the constitutionality of a state statute, there is no requirement that the Attorney General do so simply because an individual has made that request.

Here, Plaintiffs put the Attorneys General on notice that they believed portions of the Utah Adoption Act are unconstitutional.  The Attorneys General exercised their discretion not to be heard in those cases.  The Attorneys General were well within their discretion in deciding not to file an application with the court to be heard.  *See* Utah R. Civ. P. 24(d).  It was also within the Attorney General's discretion to choose not to bring independent actions challenging the Utah Adoption Act.  *See Morris v. Gressette*, 432 U.S. 491, 506-507 (1977)(holding "where the discriminatory character of an enactment is not detected upon review by the Attorney General, it can be challenged in traditional litigation.  But it cannot be questioned in suit seeking judicial review of the Attorney General's exercise of discretion . . . ").

To expose the Attorney General to civil liability for exercising his discretion not to challenge the constitutionality of a statute would invite unwarranted litigation, as every time a citizen formed the belief a law was unconstitutional the Attorney General would be required to challenge the law or risk being sued for money damages if he didn't.  Removing the discretion of the Attorney General to decide whether to defend the constitutionality of a state statute is also contrary to the express duties of the Attorney General, which provide, in part that "the attorney general shall . . . defend all causes to which the state . . .  is a party; and take charge, as attorney, of all civil legal matters in which the state is interested."  Utah Code Ann § 67-5-1(2).  Defending the laws of the state is a role often and properly filled by the Attorney General.

9

Subjecting the Attorney General to civil liability for merely fulfilling his duty to defend the state's laws would discourage "the vigorous exercise of [his] official authority." *Harlow*, 457 U.S. at 807.

Further, just this week, on November 4, 2014, the Utah Supreme Court held that with regard to the Utah Adoption Act:

> There is doubtless room for disagreement about whether our legislature has struck the best balance as a matter of policy.  But we see no basis for deriding our law as a product of "invidious gender stereotypes." *Infra* ¶ 88.  At some level all adoption laws discriminate against unwed fathers - by requiring of them some legal filing not required of unwed mothers.  Such requirements are not an indication of stereotype or discrimination.  They are simply an element of a legal scheme aimed at assuring that any parent who would block an adoption has manifested a commitment to the child's best interests.  And we uphold the Utah Adoption Act as constitutional on the basis of its advancement of those important interests.

*In re Adoption of J.S.*, 2014 UT 51 at ¶ 8.  "The overarching, important governmental objective is clearly prescribed by the [Utah Adoption Act] the preservation of the 'best interests' of children.  See Utah Code § 78B-6-102(1).  That objective is among the most important of any in our society." *Id.* at ¶ 74.  "Litigants in Utah are entitled to rely on our explication of the law as definitive." *Id.* at ¶ 49.  The recent decision of the Utah Supreme Court upholding the constitutionality of the Utah Adoption Act further demonstrates that Shurtleff and Swallow did not violate the law in deciding not to challenge the constitutionality of the statute.  Accordingly, Plaintiffs' Amended Complaint fails to state a constitutional violation and must therefore be dismissed.

### b.  No Clearly Established Constitutional Violation.

In the unlikely event that Plaintiffs have pled a constitutional violation sufficient to withstand the first prong of the qualified immunity analysis, the alleged constitutional violation

was not so clearly established that Shurtleff and Swallow would have known they were violating Plaintiffs' constitutional rights.  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir. 1995).  The inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004).  "Officials who are mistaken about the lawfulness of their conduct may still be entitled to qualified immunity if the mistake is reasonable in light of the applicable law and the facts known to them at the time." *Gomes*, 451 F.3d at 1136.

Plaintiffs point to the Attorney General's Oath of Office and the constitutional and statutory duties which attach to the Office of the Attorney General as the basis for the alleged duty of Shurtleff and Swallow to investigate and prosecute claims against adoption agencies and judicially challenge the constitutionality of the Utah Adoption Act.[8]  However, Plaintiffs have not articulated, and cannot articulate, how that oath of office or the Attorney General's defined legal duties would have given the Attorney General a "clearly established" understanding that he was constitutionally obligated to investigate and prosecute Plaintiffs' claims.  In paragraph 466 of their Amended Complaint, Plaintiffs assert that the Attorney General is statutorily obligated to "[p]rosecute corporations which act illegally."  Plaintiffs subsequently assert that, in administering the provisions of the Utah Adoption Act, certain adoption agencies acted illegally.

---

[8] Those occupying the Office of the Attorney General take an oath to "obey and defend the Constitution of the United States and the Constitution of [the State of Utah]" and to "discharge the duties of [the] office with fidelity."  Article 7, § 16 of the Utah Constitution states that "[t]he Attorney General shall be the legal advisor of the State officers, except as otherwise provided by this Constitution, and shall perform such other duties as provided by law."  The statutory duties of the Attorney General are enumerated in Utah Code Ann. § 67-5-1.

*See* Pls.' Amend. Compl. ¶¶ 497 to 510.  Plaintiffs conclude that the Attorney General is civilly

liable for failing "to prosecute the illegal conduct of Utah adoption agencies." *Id.* at 495.

Absent from Plaintiffs' Amended Complaint, however, is any reference to controlling case law

which would have put the Attorney General on notice that exercising his discretion as to whether

to investigate and prosecute the adoption agencies could subject him to liability.

Plaintiffs have also failed to explain how the Attorney General's Oath of Office or the

Attorney General's defined legal duties would have given the Attorney General a "clearly

established" understanding that he was legally required to challenge the constitutionality of the

Utah Adoption Act.  Although Plaintiffs contend the Utah Adoption Act was unconstitutional,

this contention is not clearly established.  In fact, no court has ruled that the Utah Adoption Act

is unconstitutional.  Instead, the Utah Supreme Court has "previously sanctioned the Act's

procedural requirements as not violative of due process."  *In re Baby Girl T.*, 298 P.3d 1251,

1258 (Utah 2012).  "Under the Act, a putative father is intended to be the master of his own

destiny; he may not argue constitutional unfairness where his parental rights are terminated due

to his *own* failure to comply with the Act." [9] *Id.* (emphasis in original); *see also In re Adoption*

*of T.B.,* 2010 UT 42, ¶¶ 26, 44, 232 P.3d 1026, 1258 (holding that a "putative father's

constitutional rights were not violated" where it was "undisputed that the putative father did not

---

[9] In *In re Baby Girl T.*, the court distinguished circumstances where "negligent actions by a *state agency* have prevented notice from being filed, resulting in the deprivation of a putative father's opportunity interest in establishing a relationship with his child."  298 P.3d at 1258 (emphasis in original) *(citing In re Adoption of Baby Boy Doe,* 717 P.2d 686, 689, 691 (Utah 1986) (holding that an unwed father had shown "that the termination of his parental rights was contrary to basic notions of due process," but also noting that "[i]n all but the most exceptional cases" the Act achieves the appropriate constitutional balance).

comply with a number of [the Act's] requirements"); *In re I.K.,* 2009 UT 70, ¶ 9, 220 P.3d 464 ("In this case, it is undisputed that the Natural Father did not comply with the first set of Utah's statutory requirements."); *O'Dea v. Olea,* 2009 UT 46, ¶ 45, 217 P.3d 704 (noting that a putative father did not complete the requirements to establish paternity until eighty days after a qualifying circumstance existed); *C.F. v. D.D. (In re Adoption of B.B.D.),* 1999 UT 70, ¶ 12, 984 P.2d 967 (noting that an unwed father "failed to make any attempt to establish legal paternity under the provisions of [the Act]"); *Sanchez v. L.D.S. Soc. Servs.,* 680 P.2d 753, 755 (Utah 1984)(describing an unwed father's attempt to register with Vital Records after the birth mother consented to the child's adoption); *Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 207–08 (Utah 1984) (describing an unwed father's "sufficient opportunity" and failure to assert paternity, "including ample advance notice of the expected time of birth and the fact that the mother intended to relinquish the child for adoption, advice of counsel on filing the required form, and a copy of the [necessary] form").  In fact, just this week the Utah Supreme Court indicated that "Utah law is roughly in line with the adoption laws of all states across the country." *In re Adoption of J.S.*, 2014 UT 51 at ¶ 3.  "And we uphold the Utah Adoption Act as constitutional on the basis of its advancement of [the child's best] interests." *Id*. at ¶8.

In the absence of a prior, controlling, judicial ruling finding the Utah Adoption Act unconstitutional, it cannot be said that Shurtleff and Swallow's conduct violated clearly established law.  To the contrary, the controlling case law indicates that the Utah Adoption Act is constitutional.  Thus, Shurtleff and Swallow were not on notice of any constitutional infirmity of the statute at issue and, thus, had no notice that in exercising their discretion not to challenge the constitutionality of a statute (that they are constitutionally obligated to defend) their alleged

conduct violated clearly established law.  Accordingly, a ruling of a constitutional violation would be contrary to the Tenth Circuit and Utah Supreme Court precedent cited above.

Similarly, Plaintiffs cannot identify any basis for claiming it was clearly established that an Attorney General's decision to withdraw his support for proposed legislation constitutes a constitutional violation.  Plaintiffs cannot meet this burden because no court has ever ruled that an Attorney General's decision to withdraw his support for proposed legislation constitutes any violation of the law, let alone a constitutional violation.  Plaintiffs, therefore, cannot overcome Shurtleff and Swallow's qualified immunity as a matter of law.  Accordingly, Plaintiffs have failed to state a claim entitling them to money damages and, those contentions must be dismissed.

### C.  There Is No Affirmative Link Between the Conduct of Shurtleff and Swallow and Plaintiffs' Claims.

Plaintiffs' Section 1983 claims against Shurtleff and Swallow fail to state a viable claim because no facts in the Amended Complaint link either to any alleged constitutional violation.  Under Section 1983, an "affirmative link" between each defendant's conduct and the alleged constitutional deprivation must be plead and proven.  *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1156 (10th Cir. 2001).  "Personal participation is an essential allegation in a § 1983 claim."  *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976).  A civil rights complaint must contain sufficient factual specificity to identify the particular conduct of the named defendant which has injured the plaintiff.  In other words, the plaintiff must establish that each defendant committed some action that intentionally or deliberately violated the plaintiff's rights.  *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993).

14

Here, Shurtleff and Swallow did not control the Legislature's decision to promulgate the Utah Adoption Act.  Similarly, Shurtleff and Swallow did not control the Legislature's decision not to amend the statute in the manner Plaintiffs desired.  The conduct attributed to Shurtleff consists of appearing on a televised news program on August 19, 2011 and agreeing to look at the Utah Adoption Act and talk to the State Legislature about whether the application of the statute was inadvertently hurting birth fathers.  (Pls.' Amend. Compl., ¶¶ 479-480.)  Shurtleff did not promise to advocate on Plaintiffs behalf, nor did he provide any assurance that the Legislature would amend the statute, or challenge its constitutionality.

The conduct attributed to Swallow consists of promising to support new legislation that Plaintiffs believed would cure notice deficiencies in the Utah Adoption Act and subsequently withdrawing his support for a change in the law. (Pls.' Amend. Compl., ¶¶ 486-490.)  However, it is not reasonable to conclude that Swallow's withdrawal of his support for the legislation prevented the bill from becoming law.

Similarly, Shurtleff and Swallow have no affirmative link to any of the named Plaintiffs. While Shurtleff was the Attorney General, one of the Plaintiffs, Jack Strickland ("Strickland"), wrote a letter to Shurtleff asking for a personal meeting to discuss his pending case filed against LDS Family Services in which he sought to regain custody of his son.  *See* Pls.' Amend. Compl., Exhibit L (doc. 35-13).  Shurtleff did not meet with Strickland nor did he personally respond to Strickland's correspondence.  Instead, the constituent affairs representative from the Attorney General's Office responded to Strickland's letter, reminded Strickland that the Attorney General did not write the current law and encouraged Strickland to work with his legislative representative if he believed a change in the law was warranted.  *Id.*  Because Shurtleff and

Swallow had no direct involvement in any of Plaintiffs' alleged constitutional violations an affirmative link between Plaintiffs' claims and these Defendants simply does not exist.

Nor can Plaintiffs assert that Shurtleff or Swallow are liable as supervisors.  It is settled in the Tenth Circuit that "[u]nder § 1983, government officials are not vicariously liable for the misconduct of their subordinates." *Serna v. Colorado Dep't of Corrs.*, 455 F.3d 1146, 1151 (10th Cir. 2006).  Supervisors are liable only "for their own culpable involvement in the violation of a person's constitutional rights." *Id.*  Section 1983 liability is not available under the doctrine of *respondeat superior. Monell*, 436 U.S. 658, 691–92 (1978).  In other words, a plaintiff may not rely on a defendant's job title to establish liability.

Failing to allege any facts sufficiently linking Shurtleff or Swallow to any actionable claim, Plaintiffs' Section 1983 causes must be dismissed as a matter of law.  This Court should so order.

### D.  Plaintiffs Lack Standing To Assert Criminal Claims.

It is not entirely clear whether Plaintiffs have asserted criminal claims against Shurtleff and Swallow.  Plaintiffs contend venue is proper pursuant to 18 U.S.C. § 1965(b).  *See* Pls.' Amend. Compl., ¶ 53.  Title 18 of the United States Code governs crimes and criminal procedure.  Plaintiffs also allege that Shurtleff and Swallow's actions or omissions resulted in children being kidnapped, which constitutes a criminal act.  *See* Pls.' Amend. Compl., ¶ 54.

To the extent Plaintiffs have asserted criminal claims against Shurtleff and Swallow, Plaintiffs lack standing to assert claims under the federal criminal code in this civil proceeding. "These federal statutes authorize criminal prosecution for various acts, they do not authorize a private right of action."  *Perkins v. Univ. of Kansas Med. Ctr.*, 2014 WL 1356042 at *4 (D. Kan.,

16

April 7, 2014).  "Courts universally endorse the principle that private citizens cannot prosecute criminal actions. . . . Therefore, to the extent [they are] attempting to do so, [Plaintiff] lacks standing to maintain a criminal action . . . ."  *Bluff v. Brass*, 2009 WL 3764079  at *3 (D. Utah, Nov. 10, 2009).

### E.  Plaintiffs' Claims Are Barred By The Applicable Statute Of Limitations.

Civil rights actions brought under Section 1983 must be brought within four years from the time the claim arose.  S*ee, e.g., Mismash v. Murray City,* 730 F.2d 1366, 1367 (10th Cir. 1984) (concluding that Utah's residual four-year statute of limitations applies to section 1983 claims); *Adamson v. City of Provo*, 819 F. Supp. 934, 942 (D. Utah 1993) (same); *Maddocks v. Salt Lake City Corp.,* 740 P.2d 1337, 1339 (Utah 1987) (same); *see also* Utah Code Ann. § 78B-2-307(3).  "Applying the proper statute of limitations, it is clear that Plaintiff's claims are barred … [T]he statute of limitations began to run when [Plaintiffs] knew or had reason to know 'of the existence and cause of injury which is the basis of his action,' not from the time the latest bit of evidence was received."  *Wallace v. Grey*, 2009 WL 249461 at *4 (D. Utah, Feb. 2, 2009).

In this case, Plaintiffs either knew or, through the exercise of due diligence, should have known that they suffered an injury upon which to base their claims at the time they discovered the mother intended to place the child for adoption.  Plaintiffs filed their Complaint in this action on January 22, 2014.  Accordingly, Plaintiffs who learned of the mother's intent to place the child for adoption on or before January 22, 2010 are statutorily prohibited from bringing a claim challenging the constitutionality of the Utah Adoption Act.  Plaintiffs Manzanares, Wyatt, O'Dea, Thurnwald, Curry, Worsley, and Anderson each learned his child was placed for adoption more than four years prior to filing the Complaint which forms the basis of this action.

(*See* Pls.' Amend. Compl., ¶¶ 68-73, 214-220, 230-232, 270-281, 375, 380, 394-395, 398, 419-420.)  Thus, the applicable four-year statute of limitations has clearly expired and Plaintiffs Manzanares, Wyatt, O'Dea, Thurnwald, Curry, Worsley, and Anderson's claims are time barred as a matter of law.  Those claims should be dismissed.

**F.  Plaintiffs' Claims Brought Under 42 U.S.C. § 1981 Should be Dismissed.**

Plaintiffs' First Cause of Action alleges that Defendants' conduct violated Plaintiffs' civil rights protected under 42 U.S.C. § 1981.  *See* Pls.' Amend. Compl., ¶ 512(a).  As originally enacted, 42 U.S.C. § 1981 directed that "[a]ll persons ... shall have the same right ... to make and enforce contracts." *Harris v. Allstate Ins. Co.,* 300 F.3d 1183, 1186 (10th Cir. 2002). That statute, codified in 1991 as 42 U.S.C. § 1981(a), protects the right to the make contracts, *i.e.* contract formation, and the right to enforce contracts, *i.e.* the right of access to legal process. *Id.* at 1189.  Sections 1981(b) and (c), which Congress added in 1991, "essentially created a new cause of action to challenge an employer's discriminatory post-formation conduct." *Id.* at 1187; *see also* Ware v. Union Pacific R. Co. Omaha, 278 F. Supp. 2d 1263, 1266 (D. Kan. 2003).[10]  Section 1981 pertains solely to contracts and has been used almost exclusively

---

[10] Section 1981, in its current form, provides:

(a)  Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)  "Make and enforce contracts" defined

to protect against discrimination in the workplace.  *Ware*, 278 F. Supp. 2d at 1266; *see also*

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 454, 128 S.Ct. 1951, 1959 (U.S. 2008) (applying

section 1981 to employment-related retaliation actions).

To establish a prima facie case of discrimination under § 1981, a plaintiff must show: (1)

the plaintiff is a member of a protected class; (2) the defendant had the intent to discriminate on

the basis of race; and (3) the discrimination interfered with a protected activity as defined in

§1981.  *Hampton v. Dillard Dept. Stores, Inc.,* 247 F.3d 1091, 1101–02 (10th Cir. 2001).

Plaintiffs have failed to allege facts in support of any of the necessary elements.  First, unmarried

biological fathers are not a member of the protected class identified in the statute.  Second, there

are no allegations that Defendants discriminate based on race or that it was their intent to do so.

And third, Plaintiffs have not alleged that Defendants interfered with their right to enter into and

enforce contracts.[11]

---

> For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> (c)  Protection against impairment

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

*Id.* § 1981 (a)-(c).

[11] "A claim seeking personal liability under section 1981 must also be predicated on the actor's personal involvement." *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir. 1991), overruled on other grounds by *Kendrick v. Penske Transp. Servs.,* 220 F.3d 1220, 1228 (10th Cir. 2000). Here, the Amended Complaint contains no allegations that Shurlteff or Swallow was

To the extent Plaintiffs have brought their claims under the equal benefit clause of section 1981, they remain untenable.  Few reported cases have arisen under the equal benefit clause of § 1981.  In *Chapman v. Higbee Co., 319 F.3d 825 (6th Cir. 2003)*, the Sixth Circuit permitted a § 1981 action to proceed upon a claimed violation of the equal benefit clause.  In *Higbee*, the plaintiff, a black woman, was stopped in a Dillard's Department Store, directed to a fitting room, and searched by having her remove her coat and jacket and lifting up her skirt due to erroneous suspicion of shoplifting.  In *Philip v. University of Rochester, 316 F.3d 291 (2nd Cir. 2003)*, private university security officers had summoned the police to help disperse a group of black students gathered on university property.  Four students were arrested and held overnight, and all charges were subsequently dismissed.  In *Pierre v. J.C. Penney Co., Inc., 340 F. Supp.2d 308 (E.D.N.Y. 2004)*, the plaintiff, a black woman, was accused of shoplifting, forced to return to the store, searched, and detained for nearly three hours though the search revealed no stolen merchandise.  In each of these cases, which permitted § 1981 actions to proceed upon a claimed violation of the equal benefit clause, the plaintiffs alleged racially motivated detentions or arrest or searches by police or security personnel.

The Plaintiffs in the instant action have not alleged they were discriminated against because of their race nor have they claimed to have been detained or arrested by police or security personnel.  Accordingly, Section 1981 is inapplicable to Plaintiffs' claims and all causes of action based on that statue should be dismissed.

---

personally involved with any raced based discrimination which prevented Plaintiffs from making or enforcing a contract.

**G.  Plaintiffs' Claims Brought Under 42 U.S.C. § 1982 Should be Dismissed.**

Plaintiffs' First Cause of Action alleges that Defendants' conduct violated Plaintiffs' civil rights protected under 42 U.S.C. § 1982.  *See* Pls.' Amend. Compl., ¶ 512(b).  Under 42 U.S.C. § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  Congress enacted Section 1982 to enforce the Thirteenth Amendment and to prohibit all racial discrimination, private and public, in the sale and rental of property. *See Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir .1996) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S. Ct. 2186, 20 L.Ed.2d 1189 (1968)).  To state a prima facie case plaintiff must allege that (1) she is a member of a racial minority; (2) defendants denied her rights or benefits connected with the ownership of property; and (3) defendants would not have denied these rights and benefits in the absence of racial discrimination.  *See* R*eeves v. Carrollsburg Condominium Unit Owners Ass'n,* No. 96–2495RMU, 1997 WL 1877201, at *8 (D.D.C. Dec. 18, 1997) (defendants violated Section 1982 by not enforcing rules violations regarding racial harassment in way other rules were enforced); *Asbury v. Brougham*, 866 F.2d 1276, 1279-80 (10th Cir. 1989); (concluding proof necessary to establish a prima facie case under the FHA also establishes a prima facie case of racial discrimination under §1982).

Again, Plaintiffs' Amended Complaint does not contain allegations that satisfy the required elements of a claim brought pursuant to Section 1982.  Plaintiffs have not alleged they are members of a racial minority.  Plaintiffs have not alleged the Defendants denied them any rights or benefits in connection with the ownership of property.  And, Plaintiffs have not alleged Defendants had any racial motivation for the denial of rights or benefits in connection with the

ownership of property.  Accordingly, Plaintiffs' claims brought pursuant to Section 1982 must be dismissed.

### H.  Plaintiffs' Claim of Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1986 Fails as a Matter of Law.

Plaintiffs claim that Defendants "neglectfully fail[ed] to prevent a conspiracy to violate the civil rights of [the Plaintiffs]" in violation of 18 U.S.C. § 1986.[12] *See* Pls.' Amend. Compl., ¶ 512(d).  Section 1986 provides as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented…

*Id.*  In other words, § 1986 provides a remedy against any person who has knowledge of, and the power to prevent, a § 1985 conspiracy, but neglects or refuses to act.  *Burnett v. Grattan,* 468 U.S. 42, 45 n. 5 (1984).  To be liable under § 1986, a defendant must have actual knowledge of a § 1985 conspiracy, and have the ability to prevent or aid in preventing that conspiracy.  *Wesley v. Don Stein Buick, Inc.,* 996 F. Supp. 1312, 1315 (D. Kan. 1998).

Because a § 1986 claim is considered derivative of § 1985 violations, the § 1986 claim must be dismissed where the plaintiff fails to state a cause of action under § 1985(3).  *See Park v. City of Atlanta,*120 F.3d 1157, 1159-60 (11th Cir. 1997).  Where no viable claim under § 1985 for a conspiracy is made, a claim under § 1986 based upon neglect or refusal of certain persons

---

[12] 18 U.S.C. § 1986 does not exist.  Defendants will analyze Plaintiffs' conspiracy claims under the assumption they intended to bring these claims pursuant to 42 U.S.C. § 1986.

to prevent the violation of § 1985 similarly fails.  *Santistevan v. Loveridge,* 732 F.2d 116 (10th Cir. 1984).

In this case, Plaintiffs have not expressly pled a claim under 42 U.S.C. §1985 and, thus, their section 1986 claim fails as a matter of law.  But, even had Plaintiffs alleged a claim under Section 1985, as discussed below, the facts as alleged in the Amended Complaint do not support a claim for a Section 1985 conspiracy.

**I.  Plaintiffs' Have Not Set Forth Sufficient Facts to Support a Claim of Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985.**

Section 1985(3) prohibits conspiracies in violation of civil rights.  *See* 42 U.S.C. § 1985. However, Section 1985 does not confer any substantive rights.  Rather, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere."  *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833 (1983).  Thus, if the underlying civil rights claims fail, there can be no Section 1985(3) claim.  As discussed above, Plaintiffs cannot state any civil rights claim against any of the Defendants.  Accordingly, their Section 1985(3) claim fails as well.

Moreover, Plaintiffs' Section 1985 claim also fails because they have not alleged sufficient facts to support such a claim.  To state a claim under 42 U.S.C. § 1985(3), a complaint must allege specific facts to support some racial, or other class-based, discriminatory animus behind the conspirator's action.  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  "The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.*  The complaint must also allege facts showing a conspiracy against plaintiff "because of" his or her membership in a class and that the criteria defining the class "were invidious."  *Lessman v. McCormick*, 591 F.2d 605, 608 (10th Cir. 1979).

23

Claims under § 1985 must be plead with specificity in order to withstand a motion to dismiss. *Ross v. Meagan*, 638 F.2d 646, 650 (3rd Cir. 1981). To survive a motion to dismiss, plaintiffs must allege specific facts showing that defendants reached an understanding or agreement to violate plaintiffs' federally created rights. *Martin v. Delaware Law School*, 625 F. Supp. 1288 (D. Del. 1985). The complaint must also assert facts to show that one or more of the conspirators committed, or caused an act to be committed, in furtherance of the conspiracy. *Griffin*, 403 U.S. at 103. Finally, the facts must show an actionable conspiracy that can be maintained under the statute. *Swoboda v. Dubach*, 992 F.2d 286 (10th Cir. 1993).

Plaintiffs Amended Complaint is bereft of factual allegations necessary to maintain a claim against Defendants Shurtleff or Swallow under Section 1985. The only mention of a conspiracy, as it pertains to these Defendants, is a conclusory statement to support their claim that a conspiracy existed: Plaintiffs state that Defendants failed to prevent a conspiracy to violate Plaintiffs' civil rights. *See* Pls.'Amend. Compl., ¶ 512(d). However, Plaintiffs have not provided specific facts to support this self-serving conclusion. While this Court must accept well-pleaded factual allegations as true for purposes of ruling on a motion to dismiss, Plaintiffs are not entitled to favorable inferences of allegations which are merely conclusions of law asserted in the guise of factual allegations. *Papsan v. Allain*, 478 U.S. 265, 286 (1986). Moreover the Tenth Circuit has held that conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Here, Plaintiffs fail to allege sufficient facts to show any conspiracy, much less a conspiracy to violate their constitutional rights based on racial or class-based animus. Thus, Plaintiffs' claims under § 1985 necessarily fail and should be dismissed,

24

with prejudice.

## IV.    CONCLUSION

For the reasons stated above, Defendants Shurtleff and Swallow respectfully requests that

Plaintiffs' Amended Complaint be dismissed, with prejudice.

DATED:  November 7, 2014.

OFFICE OF THE UTAH ATTORNEY GENERAL


/s/ David N. Wolf_____
DAVID N. WOLF
MEB W. ANDERSON
Assistant Utah Attorneys General
Attorneys for Defendants Mark L. Shurtleff and
John E. Swallow