Wesley D. Hutchins, #6576
**THE HUTCHINS LAW FIRM, P.C.**
6751 South Adventure Way
West Jordan, Utah 84081
Telephone: (801) 969-0104
Fax: (801) 618-4251
E-Mail: wes@thehutchinslawfirm.com
***Attorney for Plaintiffs "Biological Fathers" and "Minor Children"***

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENITO MANZANARES; CHRISTOPHER DAVID THOMAS CARLTON; JAKE M. STRICKLAND; JACOB D. BROOKS; MICHAEL D. HUNTER; FRANK L. MARTIN; SAMUEL G. DYE; BOBBY L. NEVARES; WILLIAM E. BOLDEN; JOHN M. WYATT, III; CODY M. O'DEA; SCOTTIE WALLACE; personally and individually, and for and on behalf of their Minor Children; <br><br>       Plaintiffs, <br><br> vs. <br><br> OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF UTAH; MARK L. SHURTLEFF; and JOHN E. SWALLOW, in both their personal/individual and official capacities;  and JOHN DOES I TO XX; <br><br>       Defendants. | **MEMORANDUM IN OPPOSITION TO DEFENDANT SHURTLEFF AND SWALLOW'S MOTION TO DISMISS** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> Civil No.: 2:14-cv-00040-EJF <br><br> Magistrate Evelyn J. Furse |

The above-captioned Plaintiffs, by and through their retained counsel of record, Wesley

D. Hutchins of THE HUTCHINS LAW FIRM, P.C., hereby file the following Memorandum in

Opposition to Defendant Shurtleff and Swallow's Motion to Dismiss.

<u>**INTRODUCTION**</u>

Plaintiffs understand Defendants' Motion to Dismiss  (hereinafter "Motion") seeks a

dismissal based on a variety of grounds, including a technical reading of some of the principles

embodied in the Eleventh Amendment and sovereign immunity.  These technicalities, assuming

they are well-taken, were easily cured with the filing of the First Amended Complaint.  With

their original filing, Plaintiffs intended to pursue prospective relief against the current Utah

Attorney General, Sean D. Reyes ("AG Reyes")(as set forth in the Second Cause of Action), in

his official capacity, in order to prevent future federal constitutional and/or federal statutory

violations.  Such claims against AG Reyes are not barred by the Eleventh Amendment, nor are

they a violation of sovereign immunity.  *Ex parte Young*, 209 U.S. 123, 159-60). These issues

were clarified through the First Amended Complaint, however, Defendants attempt to resurrect

them again through this second Motion, which should be denied.

     As additional support for Plaintiffs' position, the United States Supreme Court has more

recently held in the post-*Young* era, that the plaintiff must name the responsible state official in

his or her official capacity for prospective relief, and such claim shall not be barred by the

Eleventh Amendment.  *Alabama v. Pugh* 438 U.S. 781, 781-82 (1978)(injunctive relief against

specifically named state officials not violate Eleventh Amendment, however, claims against State

of Alabama and Alabama Board of Corrections properly dismissed).  More recently, the Supreme

Court also held that the *Young* doctrine also applies when the complaint alleges an ongoing

violation of federal law, and seeks prospective relief – precluding dismissal under the Eleventh

Amendment.  *Verizon of Maryland v. Public Service Commission*, 535 U.S. 635, 645

(2002)(quoting *Idaho* v. *Coeur d' Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'CONNOR,

J., joined by SCALIA and THOMAS, JJ., concurring in part and concurring in judgment);  *see*

*also id.,* 521 U.S. at 298-299 (SOUTER, J., dissenting, joined by STEVENS, GINSBURG, and

BREYER, JJ.); *see also Green v. Mansour*, 474 U.S. 64, 67 (1985)(declaratory relief is within

the *Young* doctrine, but only when there are ongoing or threatened violations of federal law); *Hutto v. Finney*, 437 U.S. 678, 700 (1978)(when federal court grants *Young* prospective relief, it has power to enforce that relief, including by monetary sanctions payable our of the state treasury).  Applying these binding case law precedents, in addition to the arguments set forth below, Defendants' Motion should be denied.

## RESPONSE TO DEFENDANTS' "INTRODUCTION"

In Defendants' "Introduction," they try to paint an "all-is-well" picture of Utah's Adoption Act.  That is simply not the case.  Utah's constitutionally infirm adoption laws and practices have earned Utah the reputation as one of the most anti-birth father jurisdictions in the nation.  As Adam Pertman points out in his book, *Adoption Nation*, "Today, some women travel to Utah to give birth and relinquish their babies for adoption, for instance, because the process of cutting out the birth father is relatively easy there."  Pertman, Adam, *Adoption Nation*, 2011, at p. 159-160.[1]  Mr. Pertman further points out in the Dateline interview, that "[p]eople who want an expedited adoption, something that isn't going to take too much time with the birth father's rights, if you want something like that, the word `Utah' does roll off the lips."[2]

Defendants further assert in their "Introduction" that Plaintiffs' constitutional challenges

---

[1]A true and correct copy of excerpts are relevant portions of the cited/quoted treatise are attached hereto as Exhibit A.  Moreover, as pointed out in the "About the Author" section, Adam Pertman is identified as the "executive director of the Evan B. Donaldson Adoption Institute, a national nonprofit that is the pre-eminent research, policy, and education organization in its field."  *See* Exhibit A.

[2]A portion of the transcript from the Dateline interview referred to the First Amended Complaint was attached as Exhibit K thereto.  A complete copy of the transcript, including numerous portions referring to Mr. Adam Pertman is attached hereto as Exhibit B.  The portion quoted above is set forth on page 8 of Exhibit B.

are have been silenced by recent Utah Supreme Court case law, including *In re Adoption of J.S.*, 2014 UT 51.  That case, however, dealt with equal protection and due process issues surrounding the birth father affidavit requirements set forth in Utah Code Ann. Section 78B-6-121.  *Id.* ¶ 6.  It does not, however, deal ***at all*** with the due process or other constitutionality infirmities surrounding Utah's fraud immunity statute, set forth at Utah Code Ann. Section 78B-6-106, nor its interplay with the other relevant portions of the Utah Adoption Act.[3]

Defendant's misconstrue the nature and scope of Plaintiffs' First Amended Complaint. The claim for prospective injunctive relief is brought against the current Utah Attorney General, Sean D. Reyes, in a manner set forth in the amended pleading, as well as the motion for leave to amend pleadings on file herein.  Defendants Shurtleff and Swallow are Defendants primarily in their personal and individual capacity roles, as further set forth in the First Amended Complaint. Such delineation of claims and roles pertaining to each of the Defendants is not a violation of either the Eleventh Amendment, nor of the well-established principles of sovereign immunity.

Finally, upon close examination of Plaintiffs' claims, it becomes clear that they are not based solely on Defendants' failures to bring about legislative changes, but upon several other grounds as set forth below, including their personal knowledge of fraudulent adoption activities in Utah, stripping citizens of their fundamental constitutional rights, and their failure to do

---

[3]It is important to also point out two additional factor pertaining to the *Adoption of J.S.* decision.  First, it was a 3-2 split decision, with a lengthy and persuasive dissenting opinion authored by Associate Child Justice Nehring, in which Justice Parrish joined.  Second, the *Adoption of J.S.* case is also in the process of being appealed to the United States Supreme Court via a petition for certiorari, with noted constitutional scholar and professor Eugene Volokh representing the biological father William E. Bolden in that matter.  *See* copy of United States Supreme Court docket with Justice Sotomayor granting an extension for the filing of Bolden's petition for certiorari in that matter, attached hereto as Exhibit C.

anything about it in violation of their oath of office, constitutional and statutory mandates, as well as even public promises issued in the national media.  Principles of absolute or qualified immunity, and any applicable statutes of limitation, also do not warrant a dismissal of Plaintiffs' claims.

## STATEMENT OF FACTS

Notably, Defendants do not dispute any of the factual allegations contained in the First Amended Complaint, nor could they procedurally, and successfully have Plaintiffs' claims dismissed under Rule 12(b)(6).  As noted in the "Rule 12(b)(6) Dismissal Standards" Section, each and every factual statement contained in the ' 94-page 521-paragraph First Amended Complaint must therefore be accepted as true, together with all reasonable inferences from those allegations.  Accordingly, Defendants' Motion to Dismiss, under the circumstances of this case must therefore be denied in whole, or at least in part, as set forth below.

## RULE 12(b)(6) DISMISSAL STANDARDS

*"*While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid., a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  An appellate court reviews "the denial of a Rule 12(b)(6) motion to dismiss de novo, applying the same standard as the district court, and accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff." *Miskovsky v. Jones*, 2014 U.S. App. LEXIS 5016, *15-16

(unpublished decision)(10th Cir. 2014)(quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118 (10th Cir. 2012)).  Plaintiffs' 94-page 521-paragraph, together with Exhibits A through S (19 exhibits), much of which Defendants had first-hand personal knowledge.  The First Amended Complaint contains considerable detail, much more than just labels or conclusions, and much more than a mere formulaic recitation of the elements for the various causes of action.  The Court must therefore take all of Plaintiffs' allegations as true, and construe them in the light most favorable to Plaintiffs.  Defendants' Motion to Dismiss must therefore be denied.

## <u>ARGUMENT</u>

**DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED.**

Defendants set forth nine (9) grounds upon which allegedly Plaintiffs' First Amended
Complaint should be dismissed, including: (A) Plaintiffs' official capacity claims against
Shurtleff and Swallow are barred by sovereign immunity (Defendants' Memo at pages 1-2); (B)
Shurtleff and Swallow are immune from Plaintiffs' individual capacity claims (Defendants'
Memo at pages 2-14); ( C ) there is no affirmative link between the conduct of Shurtleff and
Swallow and Plaintiffs' claims (Defendants' Memo at pages 14-16); (D) Plaintiffs lack standing
to assert criminal claims (Defendants' Memo at pages 16-17); (E) Plaintiffs' claims are barred by
the applicable statute of limitations (Defendants' Memo at pages 17-18); (F) Plaintiffs' claims
brought under 42 U.S.C. § 1981 should be dismissed (Defendants' Memo at pages 18-20); (G)
Plaintiffs' claims brought under 42 U.S.C. § 1982 should be dismissed (Defendants' Memo at
pages 21-22); (H) Plaintiffs' claim of conspiracy to violate civil rights under 42 U.S.C. § 1986
fail as a matter of law (Defendants' Memo at pages 22-23); and (I) Plaintiffs have not set forth
sufficient facts to support a claim of conspiracy to violate civil rights under 42 U.S.C. § 1985
(Defendants' Memo at pages 23-25).[4]   Each of these grounds for dismissal should be rejected by
the Court.  Plaintiffs will address each of these points in turn.

---

[4]Interestingly, Defendants have not argued that Plaintiffs' claims under  42 U.S.C. § 1983
should be dismissed, which Plaintiffs have expressly claimed.  *See* First Amended Complaint ¶
512 ( c ), at pages 90-91.  Perhaps this is because, as set forth in footnote 20 at page 73 of the
First Amended Complaint, "[T]o establish personal liability in a § 1983 action, it is enough to
show that the official acting under color of state law, caused the deprivation of a federal right."
*Haler v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)).
Defendants' Motion to Dismiss as to all such Section 1983 claims should therefore be easily
rejected.

A.   **Plaintiffs' Official Capacity Claims Against Shurtleff and Swallow Are Not Barred By Sovereign Immunity.**

As noted above, Defendants have not sought a dismissal of any of Plaintiffs' Section 1983 claims. Section 1983 governing a civil action for deprivation of rights expressly states as follows:

> ***Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State*** or Territory or the District of Columbia, ***subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,*** except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (emphasis added).   "[T]o establish personal liability in a § 1983 action, it is enough to show that the official acting under color of state law, caused the deprivation of a federal right." *Haler v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)).  Defendants' Motion to Dismiss as to all such Section 1983 claims should therefore be easily rejected. Shurtleff and Swallow were obviously officials acting (or failing to act) under color of state law, and therefore to exonerate them from "official capacity" liability runs counter to the letter and spirit of Section 1983 and the case law interpreting same.

The cases relied on by Defendants are readily distinguishable from this case.  For example, in *Wallace v. Grey*, 2008 U.S. Dist. LEXIS 116380, the Court granted Eleventh Amendment immunity to the Chief Medical Examiner Todd Grey, who plaintiff in that case attempted to hold responsible for a deprivation of his civil rights because he was responsible for

2

an employee of the office of the ME who allegedly committed perjury during his felony murder

trial – a charge for which Wallace was convicted.  This case neither involves a theory of liability

under respondeat superior (i.e. any employer responsibility for acts of an employee) nor does it

involve claims regarding a conviction of a crime.  The claims against Defendants are against

them personally for their actions and inactions, giving rise to a deprivation of constitutional

rights.  *See* First Amended Complaint ¶¶ 465-96 at pages 67-74, incorporated herein in full by

this reference.  Defendants had personal knowledge of the constitutional infirmities pertaining to

Utah's Adoption Act (hereinafter "the Act"), and is apparent legalization of fraud under Utah

Code Ann. § 78B-6-106, together with the clearly fraudulent conduct conceived and carried out

by some Utah adoption agencies, and other, and yet Defendants did nothing – contrary to their

oath of office, their statutory obligations, and contrary to their public pronouncements that they

would investigate and make changes as needed.  Defendants were personally aware (or should

have been aware) as early as July of 2010, of constitutional deprivations, and that individuals

fighting against the constitutional rights of biological fathers were relying on Utah's fraud

immunity statute.  *See* First Amended Complaint ¶ 475 (a) at page 69.  In spite of such

knowledge, Defendants did nothing, and in fact withdrew support for an amendment to the Act

that would have required mandatory notice to birth fathers.  *See* First Amended Complaint ¶ 486

at page 72.

      **B.**     **Shurtleff and Swallow Are Not Immune From Plaintiffs' Individual Capacity Claims.**

Defendants struggle with identifying the specific governmental functions at issue in this

case because they are wide, varied, and overlapping in their application.  In spite of Defendants'

position set forth in their Memo in Support, the United States Supreme Court has

> been quite sparing in its recognition of claims to absolute official immunity. One species of such legal protection is beyond challenge: the legislative immunity created by the Speech or Debate Clause, U.S. Const., Art. I, § 6, cl. 1. Even here, however, the Court has been careful not to extend the scope of the protection further than its purposes require. See, *e. g., Gravel* v. *United States*, 408 U.S. 606, 622-627 (1972); see also *Hutchinson* v. *Proxmire*, 443 U.S. 111, 123-133 (1979); *Doe* v. *McMillan*, 412 U.S. 306 (1973); *United States* v. *Brewster*, 408 U.S. 501 (1972); *United States* v. *Johnson*, 383 U.S. 169 [**543] (1966); *Kilbourn* v. *Thompson*, 103 U.S. 168 (1881). Furthermore, on facts analogous to those in the case before us, the Court indicated that a United States Congressman would not be entitled to absolute immunity, in a sex-discrimination suit filed by a personal aide whom he had fired, unless such immunity was afforded by the Speech or Debate Clause. *Davis* v. *Passman*, 442 U.S. 228, 246 (1979); see also *id.*, at 246, n. 25 (reserving question of qualified immunity).

*Forrester v. White*, 484 U.S. 219, 224 (1988).  This Court should continue to follow the same

narrow approach to any application of absolute immunity for the reasons set forth in these cases.

Moreover, in a variety of other cases, appellate courts have refused to apply absolute immunity

when the state action (or inaction) is of a particularly egregious nature.

For example, in *Buckley v. Fitzsimmons*, 509 U.S. 259, 274-76 (1993) the Supreme Court

held that prosecutors did not have absolute immunity with respect to claims that they had

fabricated evidence during the preliminary investigation of a crime and had made false

statements at a press conference announcing the arrest and indictment of the petitioner.  Even

more recently in *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997) the Supreme Court held in a

unanimous opinion that prosecutor who make false statements in an application for an arrest

warrant is not entitled to absolute immunity, but only at best qualified immunity.  And yet again,

even more recently in *Mink v. Suthers*, 482 F.3d 1244, 1261-62 (10th Cir. 2007)(holding

prosecutor not entitled to absolute immunity), the Tenth Circuit observed that absolute immunity

does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution.

In addition, the defense of qualified immunity does not insulate Defendants from liability either.  In *Harlow* v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982), the Court "completely reformulated qualified immunity," *Anderson*, 483 U.S. at 645, replacing the common-law subjective standard with an objective standard that allows liability only where the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra*, at 818. This change was "specifically designed to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,' and we believe it sufficiently serves this goal." *Malley* v. *Briggs*, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986); see also *Mitchell* v. *Forsyth*, 472 U.S. 511, 524, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). Accordingly, it satisfies one of the principal concerns underlying the Court's recognition of absolute immunity. *See, e. g., Imbler*, 424 U.S. at 419, n.13.  Accordingly, whether or not qualified immunity even exists in this case is an issue of reasonableness reserved for the jury in this case.  Moreover, applying an objective test, how could any individual believe that the law condoning fraudulent conduct could be reasonable?  By analogy, as a society, the government does not tolerate companies like Microsoft engaging in questionable business practices when the concern involves computer software.  The law, and the fair and equitable constitutional principles that govern the most basic and fundamental right of a father to raise his child are certainly entitled to a heightened degree of protection.

Contrary to Defendants' assertions, there are clear constitutional violations in this case. Due process under the Utah and United States Constitutions protects the biological fathers and

5

their children in this case, all of whom are Plaintiffs.  The U.S. Supreme Court has observed that

the Due Process Clause affords only those protections "so rooted in the traditions and conscience

of our people as to be ranked as fundamental."  *Michael H. v. Gerald D.*, 491 U.S. 110, 122

(1989)(quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)(Cardozo, J.)).  The Court went

on to state: "Our cases reflect `continual insistence upon respect for the teachings of history [and]

solid recognition of the basic values that underlie our society. . . .' " *Id.* at 122-23 (quoting

*Griswold v. Connecticut*, 381 U.S. 479, 501 (1965)(Harlan, J., concurring in judgment)).  The

Plaintiffs' fundamental rights to be able to know, raise, provide for, and love their children (and

the children to know and love their fathers) are values that could not possibly be any more basic

in our society.  *See also In re adoption of T.B. v. B.B.*, 2010 UT P33 (recognizing significance

even short period of interaction may hold for a putative father).

The *T.B.* Court discussed at length the U.S. Supreme Court decision in *Lehr v. Robertson*,

463 U.S. 248 (1983).  *Id.* P34-36.  In *Lehr*, the unmarried biological father filed a petition to

vacate an order of adoption under New York law, on the grounds that the order was obtained by

fraud and in violation of his constitutional rights.  The Court held that there was no violation of

the unmarried biological father's due process or equal protection rights as a result of him not

receiving notice of the adoption and an opportunity to be heard, since the father had never had

any significant custodial, personal, or financial relationship with the child.  *Lehr*, 463 U.S. at

256-65, and 265-68.  The most critical distinguishing factor in *Lehr,* which was clearly an

overriding concern in reaching the decision the Court did, is that the child was over two years

old, the father had failed to properly register with New York's putative father registry, and had

failed to establish the requisite custodial, personal, and financial relationship with the child.  As

6

the *Lehr* Court pointed out, requiring such a bond between parent and child does not apply when

the unmarried biological father is not given opportunity to establish that kind of relationship with

the child.  *Id.* at 262-63.

> *Lehr* began its analysis of the constitutional rights of biological fathers by observing:

>> The intangible fibers that connect parent and child have infinite variety.
>> They are woven throughout the fabric of our society, providing it with strength,
>> beauty, and flexibility.  It is self-evident that they are sufficiently vital to merit
>> constitutional protection in appropriate cases.

*Id.* at 256.  The Court went on to consider and discuss the three cases in which the Court had

previously examined the extent to which a natural father's biological relationship with his child

receives protection under the Due Process Clause, to wit: *Stanley v. Illinois*, 405 U.S. 645

(1972); *Quilloin v. Walcott*, 434 U.S. 246 (1978), and *Caban v. Mohammed*, 441 U.S. 380

(1979).  *Id.* at 258-62.  As *Lehr* observed, quoting from *Caban*: "Parental rights do not spring

full-blown from the biological connection between parent and child.  They require relationships

more enduring."  *Lehr*, 463 U.S. at 260 (quoting *Caban*, 441 U.S. at 397).  The linchpin in this

case, however, is that the conduct of Defendant and/or failure(s) to act, deprived Plaintiffs and

others of their constitutional rights.  Plaintiffs clearly wanted to raise their children, and made

every reasonable effort to do so.  Plaintiffs' conduct is consistent with their efforts to be an

involved, caring, and responsible fathers.   The Court recognized this distinction in *Lehr* when it

pointed out:

>> The significance of the biological connection is that it offers the natural
>> father an opportunity that no other male possesses to develop a relationship with
>> his offspring.  If he grasps that opportunity and accepts some measure of
>> responsibility for the child's future, he may enjoy the blessings of the parent-child
>> relationship and make uniquely valuable contributions to the child's development.
>> If he fails to do so, the Federal Constitution will not automatically compel a State

to listen to his opinion of where the child's best interests lie.

*Lehr*, 463 U.S. at 262.  In the fact scenario in *Lehr*, the Court observed that the unmarried

biological father in that case never had any significant custodial, personal, or financial

relationship with the child, "and he did not seek to establish a legal tie until after she was two

years old." *Lehr*, 463 U.S. at 262.  The Court's only concern was "whether New York has

adequately protected his opportunity to form such a relationship." *Id.*  Plaintiffs in this case

obviously grasped, or desired to grasp, the opportunity to accept responsibility for their children.

They desired to establish a legal tie to their children, as soon as he learned of the existence of

their children.  Plaintiffs' actions have been consistent with  fathers who desire a strong and

meaningful relationship with their children, which transcends all notions of biology alone.

### C.   Contrary to Defendants' Assertion, There Is An Affirmative Link Between the Conduct of Shurtleff and Swallow and Plaintiffs' Claims.

The allegations contained in Plaintiffs' First Amended Complaint are merely the

proverbial tip of the constitutional iceberg.  Once again, as set forth above, the claims against

Defendants are against them personally for their actions and inactions, giving rise to a

deprivation of Plaintiffs' constitutional rights.  *See* First Amended Complaint ¶¶ 465-96 at pages

67-74, incorporated herein in full by this reference.  Defendants had personal knowledge of the

constitutional infirmities pertaining to Utah's Adoption Act (hereinafter "the Act"), and is

apparent legalization of fraud under Utah Code Ann. § 78B-6-106, together with the clearly

fraudulent conduct conceived and carried out by some Utah adoption agencies, and other, and yet

Defendants did nothing – contrary to their oath of office, their statutory obligations, and contrary

to their public pronouncements that they would investigate and make changes as needed.

8

Defendants were personally aware (or should have been aware) as early as July of 2010, of

constitutional deprivations, and that individuals fighting against the constitutional rights of

biological fathers were relying on Utah's fraud immunity statute.  *See* First Amended Complaint

¶ 475 (a) at page 69.  In spite of such knowledge, Defendants did nothing, and in fact withdrew

support for an amendment to the Act that would have required mandatory notice to birth fathers.

*See* First Amended Complaint ¶ 486 at page 72.

> **D.      Plaintiffs Either Do Not Lack Standing To Assert Criminal Claims, Or
> Alternatively Defendants Have Misconstrued Plaintiffs' Claims of Criminal
> Wrongdoing.**

Leaving aside whether the conduct of Defendants' conduct rises to the level of criminal

activity, Defendants have misconstrued the nature of Plaintiffs' claims.  Moreover, to the extent

Plaintiffs' counsel may have inadvertently referenced an incorrect venue statute, venue

appropriately resides in this Court based on 18 U.S.C. § 1965(a), which states "[a]ny civil action

or proceeding under this chapter against any person may be instituted in the district court of the

United States for any district in which such person resides, is found, has an agent, or transacts his

affairs."  Clearly Defendants reside, are found in, and transacted affairs relevant to this case in

the current venue.  Any dismissal of Plaintiffs' claims based on an inadvertent citation to an

incorrect venue statute would elevate form over substance to the degree that it would work

substantial violence upon the most basic notions of Plaintiffs' fundamental rights and overall

justice.  Moreover, to the extent necessary, the Court should either consider the First Amended

Petition to be filed in the proper venue as a matter of law, no matter what the pleading may state,

or alternatively permit the pleading to be further amended to refer to  18 U.S.C. § 1965(a).

Finally, consistent with the rationale behind Rule 15(b) of the Federal Rules of Civil Procedure,

the Court should, particularly at this stage of the proceedings, consider the First Amended

Complaint to be amended to conform to the evidence presented in this case.

       **E.**       **Plaintiffs Claims Are Not Barred By The Applicable Statute Of Limitations.**

       Defendants argue that the triggering event that started the four-year statute of limitations

to run against Plaintiffs was when they intended a mother intended to place their respective child

for adoption.  (Memo in Support at 17).  That, however, is not the relevant triggering event.

Knowledge of their claim for civil rights violations, or when they should have known of their

civil rights violations, is the triggering event.  Plaintiffs did not know of such violations, and had

no reason to have knowledge of such violations, until such time as they became aware of the

unconstitutionality of Utah's fraud immunity statute as applied to them through Utah Code

Annotated Section 78B-6-106, and the other applicable portions of the Act.  That did not occur

until approached by undersigned counsel in this case, or at such time as those claims were

specifically brought by undersigned counsel in their individual cases (when represented therein

by undersigned counsel).

       The discovery rule also prevents the running to the statute of limitations against Plaintiffs.

In *Johnson v. Henry Vogt Machine Co.*, 544 F. Supp. 2d 1276, 1282 (Utah Dist. 2008), the court

observed:

>        Utah law also "determines when . . . [Plaintiffs'] action is commenced for
> statute of limitations purposes." *Burnham,* 403 F.3d at 712. Under Utah law, "[a]s
> a general rule, a statute of limitations begins to run 'upon the happening of the last
> event necessary to complete the cause of action.'" *Russell Packard Dev., Inc. v.
> Carson,* 2005 UT 14, P20, 108 P.3d 741 (quoting *Myers v. McDonald,* 635 P.2d
> 84, 86 (Utah 1981)). [**15] "Once a statute has begun to run, a plaintiff must file
> his or her claim before the limitations period expires or the claim will be barred."
> *Id.* "Mere ignorance of the existence of a cause of action will neither prevent the
> running of the statute of limitations nor excuse a plaintiff's failure to file a claim

within the relevant statutory period." *Id.*

       The discovery rule, however, is a recognized exception to this general rule, tolling the statute of limitations period "until the discovery of facts forming the basis for the cause of action." *Id.* at P21 (additional quotations and citations omitted). "There are two types of discovery rules: a 'statutory discovery rule' and an 'equitable discovery rule.'" *Moore v. Smith,* 2007 UT App 101, P26, 158 P.3d 562 (quoting *Russell,* 2005 UT 14 at PP21, 24, 108 P.3d 741). "A statutory discovery rule is one that is included within the governing statute, and an equitable discovery rule applies when a statute does not include a statutory discovery rule." *Id.*

*Id.* at 1282.  Plaintiffs did not discover they had causes of action until well within the four years

of the filing of this action on January 22, 2014.

       Finally, as to all of the Plaintiffs' minor children, who are also parties to this action, by

and through the claims filed by their biological fathers, any applicable statute of limitations is

tolled during the time of the age of their minority.  Utah Code Annotated Section 78B-2-108

states that "[d]uring the time the person is underage or incompetent, the statute of limitations for

a cause of action other than for the recovery of real property may not run."  The children

Plaintiffs in this case are all under the age of majority, and therefore no applicable statute of

limitations has run against them.  Defendants' Motion should therefore be denied on this basis as

well.

     **F.**    **Plaintiffs' Claims Brought Under 42 U.S.C. § 1981 Should Not Be Dismissed.**

       Consistent with grounds set forth above, Plaintiffs believe that under the unique

circumstances of this case, that their claims surrounding a violation of their Section 1981 rights

are well-taken.  For purposes of the present Motion, however, to the extent the Court denies

Defendants' Motion to Dismiss as to Plaintiffs' other claims, Plaintiffs believe Section 1981

remedies would provide them with appropriate redress of their grievances, and that such claims

would only be potential alternative remedies.  In the unlikely event all other claims of Plaintiffs

are dismissed, they request the opportunity to more fully brief their Section 1981 claims.

G.      **Plaintiffs' Claims Brought Under 42 U.S.C. § 1982 Should Not Be Dismissed.**

Consistent with grounds set forth above, Plaintiffs believe that under the unique

circumstances of this case, that their claims surrounding a violation of their Section 1982 rights

are well-taken.  For purposes of the present Motion, however, to the extent the Court denies

Defendants' Motion to Dismiss as to Plaintiffs' other claims, Plaintiffs believe Section 1982

remedies would provide them with appropriate redress of their grievances, and that such claims

would only be potential alternative remedies.  In the unlikely event all other claims of Plaintiffs

are dismissed, they request the opportunity to more fully brief their Section 1982 claims.

H.      **Plaintiffs' Claim of Conspiracy to Violate Civil Rights Under 42 U.S.C.**
        **§ 1986 Do Not Fail as a Matter of Law.**

Shurtleff was aware (or should have been aware) of constitutional infirmities as reflected

by the Dateline interview, and Swallow (first as Shurtleff's Chief Deputy and then as the AG

subsequent to Shurtleff) was also aware of the same issues.  Together, as co-conspirators they

acted and/or failed to act in a manner so as to prevent the deprivation of the constitutional rights

at issue in this case.  As set forth above, the First Amended Complaint, with all allegations

therein and inferences therefrom being accepted as true, Defendants' Motion based on alleged

Section 1986 deficiencies must be denied as well.  *See* First Amended Complaint ¶¶ 465-96 at

pages 67-74, incorporated herein in full by this reference.  Defendants had personal knowledge of

the constitutional infirmities pertaining to Utah's Adoption Act (hereinafter "the Act"), and is

apparent legalization of fraud under Utah Code Ann. § 78B-6-106, together with the clearly

fraudulent conduct conceived and carried out by some Utah adoption agencies, and other, and yet Defendants did nothing – contrary to their oath of office, their statutory obligations, and contrary to their public pronouncements that they would investigate and make changes as needed. Defendants were personally aware (or should have been aware) as early as July of 2010, of constitutional deprivations, and that individuals fighting against the constitutional rights of biological fathers were relying on Utah's fraud immunity statute.  *See* First Amended Complaint ¶ 475 (a) at page 69.  In spite of such knowledge, Defendants did nothing, and in fact withdrew support for an amendment to the Act that would have required mandatory notice to birth fathers. *See* First Amended Complaint ¶ 486 at page 72.

    **I.**    **Plaintiffs Have Set Forth Sufficient Facts to Support a Claim of Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985.**

    *See* Argument "Section H" immediately preceding this Section.  For the same reasons set forth therein, Defendants' Motion based on alleged Section 1985 deficiencies should be denied.

**ORAL ARGUMENT REQUESTED**

    Pursuant to DUCivR 7-1(f), Plaintiffs hereby request that there is good cause for the Court to conduct oral argument in this case.  This case deals with complex issues of constitutional interpretation, and therefore the Court should permit oral argument so that the parties may further present their positions to the Court, and to address any questions or concerns the Court may have.

**CONCLUSION**

    Based on the foregoing points and authorities, Defendants' Motion to Dismiss should be accordingly denied.   Paragraphs 54 to 64 of the First Amended Complaint summarize the nature

13

of this case, and thereby underscore further the grounds upon which Defendants' Motion should

be denied:

  54. In spite of promises by Shurtleff, later endorsed by Swallow, even
though they had received numerous written notifications of gross adoption
infirmities in Utah, they have done nothing for more than a decade to correct the
fraud and deception that has consequently led to the unlawful and unconstitutional
removal of children from their biological families, essentially resulting in their
kidnapping[5] and highly unethical and disruptive placement into adoptive homes
without the knowledge or consent of their biological fathers.  The putative father
requirements set forth in Utah's Adoption Act (including in Utah Code Ann. §
78B-6-121 and -122) though perhaps intended to assist with more final and stable
adoptive placements in Utah, have now been employed in practice, to create a
confusing labrynth of virtually incomprehensible legal mandates and nearly
impossible deadlines with which Biological Fathers and others are unable to
comply, in direct contravention of their due process, equal protection, self-
incrimination, Utah open courts provision, and other constitutional rights.[6]

---

 [5]"Kidnapping" is admittedly an emotionally charged word, describing perhaps one of the
most atrocious abuses that can be wrought upon a child.  Kidnapping, is nevertheless, by its most
basic definition, the stealing of a child by another person to whom that child does not belong.

 [6]The putative father requirements under the Utah Adoption Act include:
(3) Except as provided in Subsections (6) and 78B-6-122(1), and subject to Subsection (5), with
regard to a child who is six months of age or less at the time the child is placed with prospective
adoptive parents, consent of an unmarried biological father is not required unless, prior to the
time the mother executes her consent for adoption or relinquishes the child for adoption, the
unmarried biological father:

 (a) initiates proceedings in a district court of Utah to establish paternity under Title 78B,
Chapter 15, Utah Uniform Parentage Act;
 (b) files with the court that is presiding over the paternity proceeding a sworn affidavit:
  ( i ) stating that he is fully able and willing to have full custody of the child;
  (ii) setting forth his plans for care of the child; and
  (iii) agreeing to a court order of child support and the payment of expenses
  incurred in connection with the mother's pregnancy and the child's birth;
 (c) consistent with Subsection (4), files notice of the commencement of paternity
proceedings, described in Subsection (3)(a), with the state registrar of vital statistics within the
Department of Health, in a confidential registry established by the department for that purpose;
and
 (d) offered to pay and paid, during the pregnancy and after the child's birth, a fair and
reasonable amount of the expenses incurred in connection with the mother's pregnancy and the

Biological mothers, Utah adoption agencies, and Utah adoption attorneys have consistently exploited Utah laws in a manner they were never intended.

55.     The majority if not all of the illegal adoptions accomplished in Utah are ostensibly given a stamp of judicial approval through an adoption process that has effectively legalized fraud and kidnapping.  Under Utah Code Ann. § 78B-6-106, an adoption may be accomplished through fraud, misdirection, misrepresentations, and lies, however, fraud expressly may not be a basis to undo an otherwise fraudulent adoption.  This statute, and the incentive that it creates for some to engage in fraud in adoption scenarios is referred to hereinafter as "Fraud Immunity."  The "Fraud Immunity" statute, does provide for civil liability for money damages, but a father may never obtain custody of his biological offspring – the practical equivalent of a death sentence to the father-child relationship.

56.     The Utah Legislature, however, expressly entered findings in the Utah Adoption Act, specifically recognizing "that the rights and interests of ___**all parties**___ affected by an adoption proceeding must be considered and balanced in determining what constitutional protections and processes are necessary and appropriate."  Utah Code. Ann. §78B-6-102(3) (emphasis).  This statutory provision has been ignored and overlooked in applying a mutated interpretation of the Utah Adoption Act to a variety of adoption scenarios, including but not limited to those involving Biological Fathers in this case.

57.     Since its amending in approximately 2008 (and even earlier), the Fraud Immunity Statute and other portions of the Utah Adoption Act (Utah Code Ann. § 78B-6-101, et. seq.) have been used to unlawfully and unconstitutionally

---

child's birth, in accordance with his financial ability, unless:

       (i) he did not have actual knowledge of the pregnancy;

       (ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or

       (iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses described in this Subsection (3)(d).

Utah Code Ann. § 78B-6-121 (hereinafter referred to at times as "putative father requirements").

The unmarried biological father must "fully and strictly" comply with the putative father requirements "before he later of: (I) 20 days after the day that the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that a qualifying circumstance existed; or (II) the time that the mother executed a consent to adoption or relinquishment of the child for adoption."

Utah Code Ann. § 78B-6-122 (1)(c)(ii)(B).

strip unmarried Biological Fathers of their right to parent their Minor Children.

58.      As a result, the Minor Children have also been unlawfully and unconstitutionally denied of their right to know and maintain a child-parent relationship with their Biological Fathers.[7]

59.      As set forth above, Utah's Fraud Immunity Statute essentially legalizes and incentivizes biological mothers (and in many cases, lawyers and adoption agency representatives working with them) to commit fraud against Biological Fathers.

60.      The unmarried biological mothers, and others working with them, committed a variety of fraudulent acts against Biological Fathers in this case. Surprisingly to virtually everyone, the Utah Adoption Act callously and ostensibly proclaims fraudulent adoptions to be immune from judicial challenge.  See Utah Code Ann. Section 78B-6-106.

61.      Other portions of the Utah Adoption Act and Utah laws encourage non-Utah-resident biological mothers to forum shop the state of Utah, where laws are comparatively unfriendly to (if not utterly dismissive of) Biological Fathers. Biological mothers are therefore encouraged to secretly flee their home state and come to Utah for a very short period of time to give birth to their Minor Children, place them for adoption without any meaningful notice to or knowledge of the Biological Fathers, and then return to their home state, seemingly unaccountable for their immoral, unethical, and fraudulent conduct.

62.      Utah adoption laws, in far too many cases, countenance and support such reprehensible actions by biological mothers and all those who profit financially from deceptive practices.

63.      Utah laws which permit such unlawful conduct, and which have wrongfully been permitted to remain unchanged through the Utah Attorney General's affirmative actions and through gross inaction, have violated the fundamental civil rights of the Biological Fathers and their Minor Children.

64.      This lawsuit is principally intended to accomplish two things: (1) provide compensatory relief for the Biological Fathers and the Minor Children for the violation of their due process and other civil rights which were essentially snuffed out by Utah's unethical, illegal, and constitutionally bankrupt adoption laws, as well as compensatory relief for the Minor Children whose constitutional rights to be raised by their Biological Fathers have also been violated; and (2) provide prospective equitable relief to other Biological Fathers, and others, through declaratory relief that

---

[7]Much is spoken of the "best interest" of a child, but a true analysis of their fundamental constitutional rights and true best interests requires one to consider what the Minor Children have lost out on by _**not**_ being raised by their own flesh and blood, Biological Fathers and extended families who not only share genetics, but who share culture, traditions, and genealogy that bind them together beyond the mirage of a manufactured placement with a adoptive "family" members who are by definition legal strangers to the Minor Children.

to Biological Fathers in this case, and as it will most likely be prospectively applied to biological fathers in the future if the Utah Adoption Act is allowed to remain unchecked.

Plaintiffs, and the minor children through Plaintiffs, respectfully plead with this Court to bring an end to the violation of their most basic and fundamental constitutional rights.  They further plead for the Court to bring an end to Utah's reputation of being a "baby mill," churning out adoption after adoption that violates the most basic and fundamental human rights of fathers and children – to know, to love, to otherwise fully experience each other as parents and children.

DATED this   13th  day of January, 2015.

THE HUTCHINS LAW FIRM, P.C.

/S/ *Wesley D. Hutchins*

Wesley D. Hutchins
Attorney for Plaintiffs

17

## CERTIFICATE OF DELIVERY

I hereby certify that on the 13th day of January, 2015, I caused to be served on the following a true and correct copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANT SHURTLEFF AND SWALLOW'S MOTION TO DISMISS** via the court's electronic filing system (and via email as noted) to the following:


DAVID N. WOLF
MEB W. ANDERSON
Assistant Utah Attorneys General
SEAN D. REYES
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah   84114-0856

via email:      dnwolf@utah.gov
                      mebanderson@utah.gov


THE HUTCHINS LAW FIRM, P.C.


/S/ *Wesley D. Hutchins*

Wesley D. Hutchins
***Attorney for Plaintiffs "Biological Fathers" and "Minor Children"***


18